United States Court of Appeals
For The Seventh Circuit

No 21-2081

U.S.C.A. — 7th Circuit
RECEIVED
JUL 21 2021

United States of America,

Plaintiff - Appellee,

v

Andrew Johnston,

Defendant - Appellant

Originating Case Information: U.S.D.C - N.D.IL - Case
No. 1:17-cr-517

## APPELLANT'S OPENING BRIEF

Executed on: 07/14/21  Andrew Johnston

Mr. Andrew James Johnston

# Questions Presented

1. Did the district court commit reversible error by disregarding this Court's applicable precedent, United States v. Webster, 666 F.3d 1023, 1025, 1027 (7th Cir. 2012), when unilaterally deciding the United States' motion to reduce sentence based on a factor ("lack of remorse") that is outside of the parameters of the assistance provided?

2. Was the assistance provided worthy of a fifty percent reduction when compared side-by-side with the assistance provided in this Court's applicable precedent, United States v. Harrington, 834 F.3d 733, 734 (2016)?

3. Did the district court abuse its discretion by refusing to reassign the case to an unbiased judge that was not a party to a pending appeal involving material alteration of the trial transcript below?

4. Was the district court's conclusion of appellant's so-called "lack of remorse" a veiled penalization for appellant's reliance on his constitutional and statutory rights to bring civil actions?

## Jurisdiction

tion of the district court is founded upon
31 with respect to the disposition of a
ederal Rule of Criminal Procedure 35(b)
lant contends the district court had
ver that motion, but that Judge Pallmeyer
recused herself under 28 U.S.C. § 144
n of this Court is founded upon 5 USC
d 28 U.S.C. § 1291.

## Table of Authorities

### Cases

ted States, 295 U.S 78 (1935)
ynchcombe, 412 U.S. 17, 32 n. 20 (1973)
s v. Harrington, 834 F.3d 733, 734 (7th Cir. 2016
r. Washington, 283 F. Supp 2d 930, 932-933 (E.D. Wis 200
r. Webster, 1666 F.3d 1623, 1625, 1627 (7th Cir

### Other

## Statement of the Facts / Case

On April 21, 2019, appellant notified the United States of an immediate threat to Damaso Lopez-Serrano (Lopez) Lopez was moved to Chicago in order to testify as a cooperating witness for the United States at Jesus Raul Beltran Leon's (Beltran) sentencing hearing. Beltran, a high-level Sinaloa Cartel member, was a principal member of a close-knit Sinaloa Cartel cell headed by Ivan Guzman and Alfredo Guzman, sons of Sinaloa Cartel leader Joaquin Guzman Loera (El Chapo).

When Lopez first arrived in Chicago, he was housed in the Metropolitan Correctional Center (MCC). In late April 2019, appellant learned of a $5,000.00 hit on Lopez that was imminently going to be executed. A group of black gang members (Four Corner Hustlers) told Lopez's roommate to get out of the way as they were going to attack/kill him within 24 hours. That person came to appellant for advice because he did not want to be implicated. Appellant called a friend who reported the threat in person at the MCC lobby within the hour. In the middle of the night, Lopez was moved to protective custody, and the imminent violence to his person/life was averted. Just over 2 weeks later appellant was able to covertly record Beltran admitting to issuing the hit and that it was $25,000.00, not

$5,000.00 as solicited by the time it reached appellant's vicinity on April 21, 2019. Beltran also enlisted appellant as a courier on the recording to obtain information from Lopez's roommate about who and how and what Lopez was cooperating about besides Beltran. The recording took place on May 8, 2019, and the details of the operation had been leaked because Beltran's attorneys frantically tried to get him pulled out for a legal visit Beltran had no prior warning of while appellant was in the process of recording him. Appellant filed a complaint with the Office of the Inspector General explaining the details of the obstruction above stated.

Similarly, on May 14, 2019 appellant advised the United States of correspondence from Beltran that put appellant in a broker position for the $25,000.00 and the $100.00 for the cooperation information. The next day, over appellant's objection, he was placed in 24 hour lockdown protective custody. The same complaint to the OIG above stated also explained how the same individual(s) that leaked the time of the recording to Beltran's lawyers more than likely orchestrated the surprise 24 hour lockdown placement to obstruct appellant's ability to broker the $25,000.00 and directly link Beltran to the hit.

On August 5, 6, 2019, appellant testified at Beltran's sentencing hearing. See, Appendix A, Case No. 1:09-cr-383-1c, R. 778, Page 145-165; R. 780, Page 1-34 During cross, appellant testified against Judge Pallmeyer and an FBI agent on the due process and compulsory process violations in the case below. Curiously thereafter, Judge Castillo erroneously chose not to use the testimony to support the proposed obstruction of justice enhancement under USSG § 3C1.1 and stated it was a "very close call." R. 780, Pages 36-39.

Reading between the lines, it's clear Castillo, a long time colleague of Pallmeyer, did not want to credit testimony that would support Pallmeyer's misconduct below. However, the recording was used during Castillo's assessment of Beltran's § 3553(a) factors, R. 780, Page 111, as he concluded Beltran "was not the same person" his lawyers were portraying him as in comparison with the person Castillo heard on the recording. As a result, Beltran received 28 years imprisonment instead of the 10 years his lawyers asked for.

In February 2021, appellant sued the U.S. Attorney's Office over its proposed 20% reduction as insufficient, Johnston v. U.S. Attorney's Office ND IL, Case No. 1:21-cv-1057, and on March 8, 2021 was directed by Judge Seeger to file a motion to compel and to utilize the rule 35(b) briefing

On April 7, 2021, appellant filed the motion to compel, R. 399, an affidavit under 8 199, R. 400, and on April 12, 2021 the United States filed its motion to reduce, R. 401, requesting 25%. In retaliation for appellant seeking damaging transcripts for use as evidence of judicial bias in another case, on May 28, 2021 Pallmeyer unilaterally reduced the sentence by 10%. Compare: 20 CV 3729 on May 28, 2021 With: 17 CR 517 on May 28, 2021, R. 402, and this appeal follows.

## REASONS WHY THE DISTRICT COURT'S MAY 28, 2021 AMENDED JUDGMENT SHOULD BE VACATED AND/OR REVERSED AND REMANDED TO A NEW JUDGE

The district court's memorandum order relies on United States v. Johnson, 580 F.3d 666 (7th Cir. 2009) to justify its use of the 8 3553(a) factors, namely a purported "lack of remorse," to award a lesser sentence reduction than requested by appellant and the United States by 40% and 15%. In United States v. Webster, 666 F.3d 1023 (7th Cir. 2012), this Court clarified its prior decisions, i.e., Johnson, supra, and held that delving into the 8 3553(a) factors is inappropriate and inconsistent with the plain language of Rule 35(b).

Specifically, this Court held "Vays the rule's plain language indicates, in ruling on a rule 35(b) motion, the role of the Court is limited to assessing the extent of the defendant's assistance to the government and whether and to what degree, that assistance merits a reduction in his or her sentence. Rule 35 serves the limited purpose of facilitating law enforcement by enabling the government to elicit assistance from an offender by asking the court to reduce the offender's sentence in recognition of his assistance." Webster, Id. at 1025. Moreover, "the district court cannot consider factors other than the defendant's substantial assistance in deciding by how much to reduce the defendant's sentence if the reduction is less than the request." Webster, Id at 1027. Here the district court clearly committed wholesale disregard for the applicable precedent, Webster and relied on abrogated and obsolete cases to rationalize its 10% reduction being predicated on a supposed "lack of remorse" that had nothing to do with the substantial assistance provided.

In United States v. Harrington, 834 F. 3d 733, 73, (7th Cir. 2016), it was established that where Harrington testified before a grand jury, and repeated that testimony for a single day in trial, that even though his testimony was impeached and did not yield a a conviction or incorporation into a sentence, he was entitled to a 25% reduction according to the U.S. Attorney's Office in the northern district of Illinois.

Put differently, the fact that his testimony did not lead to anything was irrelevant to his entitlement of 25% off. Harrington did not avert an imminent threat to a very high profile witness and thereby preserve the integrity of that witness and the investigations/proceedings reliant upon that witness, did not risk his personal safety/life going in to make a covert recording of the source of that threat, and Harrington's testimony was not used in the assessment of § 3553 (a) factors that resulted in a 28 year prison sentence. Had appellant not reported the hit, and the Four Corner Hustlers were enabled to attack and/or kill Lopez in April 2019, where would the United States stand today in the investigations and/or proceedings Lopez was/is involved in? Had appellant not made the recording and confirmed the hit issued by Beltran against Lopez, would Beltran have received 28 years as a first time offender in the United States or the 10-15 years his lawyers were arguing for while getting away with putting $25,000.00 on a government witness's head? On a side-by-side comparison, appellant's assistance was at least twice as productive and twice as dangerous as Harrington's assistance was. Accordingly, the district court should be reversed in light of Harrington, and the matter remanded to a different judge with directions to reduce the sentence by 40% further.

In Berger v. United States 295 U.S. 78 (1935), the Supreme Court held that a judge should be recused under 28 U.S.C.S § 144 for making political statements in open court where a party to a case was associated with the adversely spoken upon political group. On January 8, 2019, during voir dire, Pallmeyer made adverse political statements towards supporters of President Trump's leveraging of a southern border wall for national security knowing full and well appellant supported such policies. Despite being requested for appellant's direct appeal, no. 19-1624, the transcript of voir dire has been withheld to date. Her statements there plus the fact that Pallmeyer is a party to a pending appeal where there is a prima facie showing of her involvement in the material alteration of the trial transcripts below, appeal no. 21-1221, shows a manifest appearance of impropriety causing the prejudice of 40% less reduction of sentence than was warranted.

Lastly, in Chaffin v. Stynchcombe, 412 U.S. 17, 32 n. 20 (1973), the Supreme Court reiterated that "chilling the assertion of constitutional [and statutory] rights by penalizing those who choose to exercise them [is] patently unconstitutional." Appellant respectfully contends that Pallmeyer's reference to appellant's civil actions, including a RICO lawsuit and Bivens Act lawsuit against Pallmeyer for the

obstruction of appellant's subpoenas/witnesses, and omissions from the trial transcripts, shows a veiled retaliation for appellant's exercise of those rights as the blatant disregard of Webster to only take 10% off for an unrelated reason cannot be reasonably unrelated to Pallmeyer's reference to those civil actions. See, 18 CV 5651; 20 CV 7247.

## Conclusion

Wherefore appellant prays that this Court reverses and/or vacates the May 28, 2021 amended judgment and directs that 40% more be taken off by a different judge at the earliest opportunity available.

Respectfully Submitted

Executed on: 07/14/21  Andrew Johnston

Mr. Andrew James Johnston

APPENDIX

A

August 5, 6, 2019
Sentencing Hearing
Transcript
(75) Pages



APPEARANCES: (Continued)

For the Defendant:  MR. STEPHEN G. RALLS
                    Ralls & Reidy, P.C.
                    314 South 6th Avenue
                    Tucson, AZ 85701
                    (520) 884-1234

                    MR. PAUL M. BRAYMAN
                    Law Offices of Paul M. Brayman
                    727 South Dearborn Street
                    Suite 712
                    Chicago, IL 60605
                    (312) 427-9766

                    MR. JONATHAN M. BRAYMAN
                    Breen & Pugh
                    53 West Jackson Boulevard
                    Suite 1215
                    Chicago, IL 60604
                    (312) 360-1001



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,          Case No. 09 CR 383-16

  -vs-                              Chicago, Illinois
                                    August 5, 2019
JESUS RAUL BELTRAN LEON,            10:32 a.m.

                Defendant.

                    VOLUME 1
      TRANSCRIPT OF PROCEEDINGS - SENTENCING
      BEFORE THE HONORABLE RUBEN CASTILLO

APPEARANCES:

For the Government:  MS. ERIKA L. CSICSILA
                     MR. ANDREW CONNOR ERSKINE
                     Assistant U.S. Attorneys
                     219 S. Dearborn Street
                     Suite 500
                     Chicago, IL 60604
                     (312) 353-5300

For the Defendant:   MR. PATRICK W. BLEGEN
                     Blegen & Garvey
                     53 West Jackson Boulevard
                     Suite 1437
                     Chicago, IL 60604
                     (312) 987-0100

                     MR. BEAU B. BRINDLEY
                     The Law Offices of Beau B. Brindley
                     53 West Jackson Boulevard
                     Suite 1410
                     Chicago, IL 60604

Court Reporter:
                     KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                     Official Court Reporter
                     United States District Court
                     219 South Dearborn Street, Suite 2504
                     Chicago, Illinois 60604
                     Telephone: (312) 435-5569
                     Kathleen_Fennell@ilnd.uscourts.gov





3

```
 1
 2              (Proceedings heard in open court:)
 3              THE CLERK:  09 CR 383, United States versus Jesus
 4   Raul Beltran Leon.
 5              THE COURT:  Okay.  Good morning.
 6              MS. CSICSILA:  Good morning.  Erika Csicsila and
 7   Andrew Erskine on behalf of the United States.
 8              MR. BLEGEN:  Good morning, Judge.  Pat Blegen, Steve
 9   Ralls, Beau Brindley, Jon Brayman and Paul Brayman on behalf
     of Mr. Beltran Leon.
10              THE COURT:  Okay.  Are both sides ready to proceed?
11              MS. CSICSILA:  Yes.
12              MR. BLEGEN:  Yes.
13              (The following section is under seal by Court Order.)
14
15
16
17
18
19
20
21
22
23
24
25
```







```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22   THE COURT:  Who's going to be your first witness?
23
24   MS. CSICSILA:  Damaso Lopez Serrano.
25
```

                                                                 7

```
 1   THE COURT:  Okay.
 2   THE CLERK:  We have two interpreters.
 3   THE COURT:  We'll swear in our interpreters.  Then
 4   you can call in your first witness unless you have some other
 5   matters you want to address.
 6   Everyone else can be seated.  That's not a problem.
 7   (Interpreters sworn.)
 8   THE COURT:  You can call your first witness.
 9   So, sir, if you would face me.  Can you hear me?
10   THE INTERPRETER:  Your Honor, can we put the head
11   phones on?
12   THE COURT:  Sure, you can put it.
13   If you would face me, raising your right hand.
14   (Witness sworn through interpreter.)
15   THE WITNESS:  Yes, I do.
16   THE COURT:  You may proceed.
17   MS. CSICSILA:  Thank you, Your Honor.
18   DAMASO LOPEZ SERRANO, GOVERNMENT'S WITNESS, DULY SWORN,
19                     DIRECT EXAMINATION
20   BY MS. CSICSILA:
21   Q.  Sir, could you state your full name and spell your last
22   name for the record.
23   A.  Damaso Lopez Serrano.
24   Q.  And is your last name spelled S-E-R-R-A-N-O?
25   A.  Yes.
```

                                                                 8

1  Q.  Are you known by any other name or nickname?
2  A.  They also call me Lic for Licenciado.
3  Q.  Where are you from?
4  A.  From Culiacán, Sinaloa.
5  Q.  How old are you?
6  A.  31 years old.
7  Q.  And how far did you go in school?
8  A.  I finished college.
9  Q.  You're currently living in the custody of the Bureau of
10 Prisons, correct?
11 A.  That's correct.
12 Q.  Before coming into U.S. custody, what did you do for a
13 living?
14 A.  Drug trafficking.
15 Q.  Approximately when did you first traffic in drugs?
16 A.  Approximately around 2009, 2010.
17 Q.  How did you come to be in the custody of the United States
18 government?
19 A.  I gave myself up to the government of the United States.
20 Q.  Why did you surrender to U.S. authorities?
21 A.  Because I was tired of living my life hiding from the
22 government and because I wanted to solve my problems with the
23 government and live a life with peace of mind.
24 Q.  Approximately when did you surrender to U.S. authorities?
25 A.  July 27, 2017.

1  Q.  Now, when you surrendered, you had drug conspiracy charges
2  pending in the United States, correct?
3  A.  That's correct.
4  Q.  And were those charges brought both in California and
5  Virginia?
6  A.  Yes.
7  Q.  What is the status of those cases?
8  A.  I pled guilty to both charges.
9  Q.  And you have not been sentenced yet; is that correct?
10 A.  No, not yet.
11 Q.  When you pled guilty, that was pursuant to a plea
12 agreement with the government; is that right?
13 A.  That's correct.
14 Q.  What were the terms of that agreement?
15 A.  That I had to cooperate with the government and tell the
16 truth.
17 Q.  And what is your expectation if you fulfill your part of
18 the agreement?
19 A.  To get a lower sentence.
20 Q.  Has the government provided any immigration benefits to
21 you or your family?
22 A.  Yes, to my family.
23 Q.  And other than what's contained in your plea agreement,
24 has the government made any promises to you?
25 A.  No.

1 Q. Now, I'd like to ask you a few questions about your
2 involvement in acts of violence.
3 Have you ever ordered acts of violence?
4 A. Yes.
5 Q. What kinds of acts?
6 THE INTERPRETER: May interpreter ask a question?
7 THE COURT: Yes.
8 BY THE WITNESS: (Through interpreter)
9 A. Yes, murders and kidnappings.
10 BY MS. CSICSILA:
11 Q. Who have you ordered kidnapped and murdered?
12 A. People involved in drug trafficking.
13 Q. Approximately how many murders have you ordered?
14 A. Between 13 and 15.
15 Q. And approximately how many kidnappings have you ordered?
16 A. Over 20.
17 Q. Now, you've been arrested prior to your surrender to the
18 United States, correct?
19 A. Yes.
20 Q. And when you were arrested, you were accompanied by
21 various bodyguards, correct?
22 A. That's correct.
23 Q. Okay. Those bodyguards had guns on them?
24 A. Yes.
25 Q. Now, when you were arrested, were you charged?

1 A. No.
2 Q. Why not?
3 A. Because they found the weapons on my bodyguards, not on
4 me.
5 Q. What, if any, contact did your family have with respect to
6 law enforcement on that case?
7 A. My dad had bought and paid for the government.
8 Q. And on that occasion and other occasions, did you use a
9 false identity?
10 A. Correct.
11 Q. And why was that?
12 A. Because it was a war, and my dad's enemies wanted to harm
13 me.
14 MS. CSICSILA: Judge, if I could have just a moment?
15 THE COURT: Yes.
16 (Counsel conferring.)
17 MS. CSICSILA: Your Honor, I'm handing up what's been
18 marked as Government Exhibit Group Photo, which the defense
19 doesn't have any objection to admitting and showing the
20 witness.
21 And if I can, I'll also put it on the ELMO.
22 THE COURT: Sure. It will be admitted for purposes
23 of this hearing. Group Photo.
24 (Government's Exhibit Group Photo received in evidence.)
25 BY MS. CSICSILA:

1　A. Chuy Raul or Trébol.
2　Q. Now, I'd like to turn to some of your own involvement in
3　trafficking.
4　Q. Who did you work with in drug trafficking before you
5　surrendered to U.S. authorities?
10:47:08
6　A. With my dad and with Chapo Guzman.
7　Q. Who is your father?
8　A. Danaso Lopez Nunez.
9　Q. What was your father's relationship, if any, with Chapo?
10　A. They are compadres. They thought of each other as
10:47:32
11　brothers, and my dad was Chapo's right-hand man.
12　Q. And when you say he was Chapo's right-hand man, can you
13　describe what you mean by that?
14　A. He was the closest person to Chapo.
15　Q. Did you have occasion to observe some of the work that
10:47:51
16　your father did for Chapo?
17　A. Yes.
18　Q. What kind of work did he do?
19　A. He could pay the cartel's payroll.
20　He could pay the government in exchange for
10:48:10
21　protection and information.
22　He would coordinate drug shipments from Central and
23　South America.
24　He could control flases for the cartel.
25　And he could purchase properties for Chapo to use.
10:48:30

---

1　Q. Taking a look at the group photo in front of you, starting
2　with the person on the left, do you recognize that individual?
3　A. Yes.
4　Q. And who is that person?
5　A. Jesus Raul Beltran Leon.
10:45:45
6　Q. How do you know him?
7　A. He was my friend.
8　Q. And did you hang out socially with him?
9　A. That's correct.
10　Q. In what other context did you know Jesus Raul Beltran
10:46:00
11　Leon?
12　A. In the drug trafficking business.
13　Q. Approximately how long have you known Mr. Beltran Leon?
14　A. Over ten years.
15　Q. And approximately how many times have you seen him in the
10:46:18
16　past?
17　A. Many times.
18　Q. I'd ask you to take a look around the courtroom and if you
19　see Mr. Beltran Leon, identify what he's wearing.
20　A. He's wearing an orange suit.
10:46:33
21　MS. CSICSILA: Judge, if the record would reflect
22　that he's identified the defendant.
23　THE COURT: It will.
24　BY MS. CSICSILA:
25　Q. Did you know the defendant by any other names?
10:46:46

15

1  Q. Did you have a close relationship with Chapo as a result

2  of your father's relationship with him?

3  A. Yes, that's right.

4  Q. What was your relationship with Chapo?

5  A. He is my godfather.

6  Q. When did you begin working with your father in the Sinaloa

7  cartel?

8  A. Around 2009, 2010.

9  Q. And what did you do for the Sinaloa cartel?

10 A. I could help my dad with the cartel's logistics.

11 I could buy and sell drugs.

12 I would coordinate drug shipments from South America

13 and Mexico to the United States.

14 Q. And what kinds of drugs are you referring to?

15 A. Cocaine, heroin and methamphetamines.

16 Q. What quantities of drugs are you talking about moving?

17 A. Hundreds of kilograms.

18 Q. Did you personally move the drugs and drug money?

19 A. No.

20 Q. Approximately how many people worked under you and your

21 father?

22 A. Over 500.

23 Q. Did you invest in drug loads on your own or with others?

24 A. Yes.

25 Q. Both?

10:48:48 (line 5)
10:49:04 (line 10)
10:49:28 (line 15)
10:49:55 (line 20)
10:50:12 (line 25)

16

1  A. Yes.

2  Q. Who would join in on drug loads with you?

3  A. Other cartel members.

4  Q. I'd like to turn now to ask you a few questions about

5  cartel operations.

6     Did cartel leaders meet from time to time?

7  A. Yes, that's correct.

8  Q. Approximately how often?

9  A. Each month.

10 Q. And were those meetings in person or by some other means?

11 A. In person.

12 Q. Did you attend those cartel meetings?

13 A. Yes.

14 Q. How often?

15 A. Very often.

16 Q. When you attended those meetings -- excuse me. When did

17 you attend those meetings?

18 A. When they were held within the territory that my dad

19 controlled.

20 Q. Is it fair to say that you attended those meetings between

21 the time you began trafficking in narcotics in 2010

22 approximately through the time that you turned yourself in?

23 A. That's correct.

24 Q. Now, who attended the cartel meetings?

25 A. Chapo Guzman, Mayo Zambada, my dad, Chapo's children,

10:50:33 (line 5)
10:50:47 (line 10)
10:51:01 (line 15)
10:51:16 (line 20)
10:51:38 (line 25)

18

1 A. Mayito Gordo.

2 Q. Did you ever see Mayito Gordo speak with the defendant?

3 A. Yes.

4 Q. And over what time period?

5 A. Between 2009, 2013.

6 Q. And did you see him speak with the defendant once or more

7 than once?

8 A. More than once.

9 Q. In what context did you have the occasion to observe the

10 defendant and Mayito Gordo?

11 A. At parties.

12 Q. I'd like to now turn to ask you some questions about

13 Chapo's sons.

14 Are you familiar with any of Chapo's sons?

15 A. Yes.

16 Q. Which ones?

17 A. Ivan Archivaldo, Jesus Alfredo, Ovidio and Joaquin.

18 Q. And is it the case that you're familiar with Chapo's sons

19 in part because of your father's relationship with Chapo?

20 A. That's correct.

21 Q. How long have you known Chapo's sons?

22 A. Approximately for 15 years or longer.

23 Q. Now, in addition to knowing them as Chapo's sons, did you

24 also socialize with Chapo's sons?

25 A. Yes.

17

1 Mayo's children, myself, hitmen, and some other associates,

2 members from the cartel.

3 Q. Between approximately 2010 and 2014, did you see the

4 defendant at any of those cartel meetings that you attended?

5 A. Yes.

6 Q. Approximately how many times?

7 A. That I remember? About twice.

8 Q. Generally, what was discussed at the cartel meetings?

9 A. Drug trafficking.

10 Q. You mentioned pistoleros?

11 A. Yes.

12 Q. So there were armed gunmen attending those meetings?

13 A. That's right.

14 Q. Why were there armed gunmen at the meetings?

15 A. To protect us.

16 Q. What, if any, understanding did you have -- actually, let

17 me ask a different question.

18 You mentioned the cartel leaders' children. Are you

19 familiar with an individual by the name of Ismael Zambada

20 Imperial?

21 A. Yes.

22 Q. And do you also know -- that's one of Mayo's sons,

23 correct?

24 A. That's right.

25 Q. Do you know him by another name?

1  Pepe?
2  A.  That was the nickname he used for the BlackBerry.
3  Q.  And is Alfredo approximately the same age as Ivan?
4  A.  He's a little younger.
5  Q.  Now, you testified that you started drug trafficking in
6  approximately 2010.  Do you know what Alfredo did for a living
7  around that time?
8  A.  Also drug trafficking.
9  Q.  And that was under his father?
10 A.  Yes.
11 Q.  How is it that you know that?
12 A.  Because I saw him at meetings with my father.
13 Q.  Did you have conversations with Alfredo in which he asked
14 you to join in on drug loads with him?
15 A.  Yes.
16 Q.  And that was between 2010 and 2017 approximately?
17 A.  That's right.
18 Q.  Now, as a result of spending time socially with Chapo's
19 sons, did you come to understand who was in Alfredo and Ivan's
20 close circle?
21 A.  Yes.
22 Q.  And how would you describe generally who was in Alfredo
23 and Ivan's close circle?
24 A.  Who were there?  Excuse me?
25 Q.  Just generally, who were the people that were in their

1  Q.  And before I turn back to the photo, just going back to
2  Mayito Gordo, did you also know Mayito Gordo by the nickname
3  Good Guy?
4  A.  Yes.
5  Q.  And how was it that you knew him by the nickname Good Guy?
6  A.  Because that was a nickname that he used for the
7  BlackBerry.
8  Q.  Turning back to Government Exhibit Group Photo, do you
9  recognize the person that's third from the right in that
10 photo?
11 A.  Yes.
12 Q.  Who is that individual?
13 A.  Ivan Archivaldo.
14 Q.  Do you know Ivan Archivaldo by any other name?
15 A.  Luis or Chapito.
16 Q.  Approximately how old is Ivan?
17 A.  Approximately 35 years old.
18 Q.  Turning next to the person that's on the far right-hand
19 side of the photograph.  Do you recognize that person?
20 A.  Yes.
21 Q.  Who is that?
22 A.  Jesus Alfredo.
23 Q.  And do you know Jesus Alfredo by any other names?
24 A.  As Pepe and as Menor, or Minor.
25 Q.  And in what context did you know Alfredo by the nickname

1 Q. And when you say work, what are you referring to?
2 A. Drug trafficking.
3 Q. And how is it that you know that?
4 A. Because they were my friends.
5 Q. Did you have occasion to talk with them about drug
6 trafficking?
7 A. Yes.
8 Q. And from those conversations, did you come to an
9 understanding about their drug trafficking relationship?
10 A. That's correct.
11 Q. Turning back to Government Exhibit Group Photo, do you
12 recognize the person that's in the center in the red apron?
13 A. Yes.
14 Q. Who is that?
15 A. Victor Felix.
16 Q. And is that the brother -- is that also a brother-in-law
17 of both the defendant and Alfredo?
18 A. That's right.
19 Q. What, if any, role in the cartel did Victor Felix have?
20 A. He would also do drug trafficking.
21 Q. Did Victor Felix use a BlackBerry to communicate?
22 A. Yes.
23 Q. And how do you know that?
24 A. Because he had communication with my people.
25 Q. Are you familiar with the BlackBerry screen name that

1 close circle?
2 A. Victor Felix, Jesus Raul, Sergio, Pano, Ezekiel and other
3 people.
4 Q. And just taking a step back from the people that you just
5 named, based on your interactions with those individuals, did
6 you have an understanding as to what they did for a living?
7 A. Yes, do drug trafficking.
8 Q. So you mentioned Jesus Raul. That's the defendant?
9 A. Yes.
10 Q. Why did you have an understanding that the defendant was
11 in Alfredo and Ivan's close circle?
12 A. Because they are relatives.
13 Q. And is it true that they're brother-in-laws?
14 A. Yes.
15 Q. What was your understanding of Alfredo's role in the
16 cartel in relation to his father Chapo between 2010 and 2014?
17 A. He was in charge of the relations with some of his
18 father's partners.
19 He would coordinate traffic shipments -- I mean drug
20 shipments, and he could find the customers in the U.S. and in
21 Mexico to sell the drugs to.
22 Q. You mentioned that the defendant and Alfredo are
23 brothers-in-law. Did they have any other kind of relationship
24 with each other?
25 A. Work and friendship.

```
           1   Victor Felix used?
           2   A.  Yes.
           3   Q.  And what were they?
           4   A.  Lic Bic.
11:01:57   5   Q.  Between approximately 2010 and 2014, did you join in on
           6   any loads with Alfredo?
           7   A.  Yes.
           8   Q.  Why -- how many times?
           9   A.  Quite a few.
11:02:18  10   Q.  And when you -- so I used the phrase join in on any loads.
          11       Did you know in advance that Alfredo was involved in
          12   a particular load before you decided to invest in it?
          13   A.  Yes.
          14   Q.  Now, you said you joined in on loads several times.  Was
11:02:42  15   that your preferred method of drug trafficking was to work
          16   with Alfredo and Ivan?
          17   A.  Not with them directly.
          18   Q.  And why -- why not?
          19   A.  Because I didn't like to do business with them.
11:03:02  20   Q.  Okay.  And why was that?
          21   A.  Because they don't know how to lose.  They like to steal,
          22   and they abuse their power.
          23   Q.  Did the defendant ever ask you to traffic in drugs with
          24   him?
11:03:22  25   A.  Yes.
```

```
           1   Q.  Did you traffic in drugs with the defendant?
           2   A.  Not directly, no.
           3   Q.  And why not?
           4   A.  Because he was in the Chapitos circle.
11:03:38   5   Q.  And by Chapitos, you're referring to Alfredo and Ivan?
           6   A.  That's right.
           7   Q.  So you said you didn't deal with him directly in loads.
           8   Were there occasions when you, in fact, had loads that were
           9   shared with the defendant?
11:04:01  10   A.  Yes.
          11   Q.  And can you explain to the judge how that came to be?
          12   A.  The Chapitos group would invest on their own with one
          13   person, and myself on my own, I could invest also with that
          14   person, and that's the person that would be in charge of
11:04:34  15   bringing the drugs.
          16   Q.  So was that person at times the defendant?
          17   A.  No.
          18   Q.  Okay.  So were there occasions where you invested in a
          19   load and after the fact learned that the defendant had also
11:04:58  20   been an investor in the load?
          21   A.  Yes.
          22   Q.  And approximately how many times did that happen?
          23   A.  More than twice.
          24   Q.  And how was it that you knew that the defendant was
11:05:14  25   involved in those loads?
```

```
              1   A.  One time because a friend told me, and another time
              2   because Chapitos' accountant told my secretary.
              3   Q.  Are you familiar with any relationship the Chapitos'
              4   accountant has with the defendant?
11:05:41      5   A.  Yes.
              6   Q.  And what is that relationship?
              7   A.  They are cousins.
              8   Q.  I'd like to turn now to some of the -- some statements
              9   that the defendant has made to you over the years.
11:05:58     10        And turning first to a conversation you had with him
             11   in 2001.  At some point, did you have a conversation -- excuse
             12   me.  I misspoke.  It was about a conversation, the topic of
             13   which took place in 2001.
             14        At some point, did you have a conversation with the
11:06:25     15   defendant about Chapo's escape from prison in 2001?
             16   A.  Yes.
             17   Q.  And approximately when did that conversation take place?
             18   A.  Approximately in 2010.
             19   Q.  Where were you when this conversation took place?
11:06:43     20   A.  I don't remember if it was Culiacán or Guadalajara.
             21   Q.  Were other people around when you had this conversation
             22   with the defendant?
             23   A.  Yes.
             24   Q.  And who else was around?
11:06:59     25   A.  My workers.
```

```
              1   Q.  During the conversation, what did the defendant say to you
              2   about Chapo's escape in 2001?
              3   A.  Chuy Raul told me that he was with his compadre, Ivan
              4   Archivaldo, when Chapo called Ivan and asked him to go pick
11:07:29      5   him up.
              6        So they went and picked him up, and Chapo told Ivan
              7   not to worry, that he was going to get lost for a while, but
              8   that everything would be all right.
              9        And after that, they just dropped him off somewhere.
11:07:57     10   Q.  Do you recall the context under which you were having this
             11   conversation with the defendant?
             12   A.  It was a social event.
             13   Q.  Now, at some point, did you have a conversation with the
             14   defendant about partnering with him in drug deals?
11:08:16     15   A.  Yes.
             16   Q.  Approximately when did that conversation take place?
             17   A.  Approximately in 2011.
             18   Q.  And approximately where did that conversation take place?
             19   A.  I think in Los Cabos.
11:08:38     20   Q.  Was anyone else present during the conversation?
             21   A.  Yes.
             22   Q.  And who was -- who was there?
             23   A.  My workers.
             24   Q.  During the conversation, what did the defendant say to
11:08:50     25   you, and what did you say to him?
```

1   permission to change.
2                   THE COURT:  Sure.  Go ahead.
3           (Pause.)
4   BY MS. CSICSILA:
5   Q.  Now you had -- sorry,
6                   MS. CSICSILA:  Are you all set?
7                   THE INTERPRETER:  Go ahead.
8   BY MS. CSICSILA:
9   Q.  You had this conversation with the defendant when he was
10  for lack of a better word, kind of complaining about his
11  relationship with the Chapitos.
12          Generally, what was your impression of the
13  defendant's relationship with the Chapitos?
14  A.  That they got along really well, that they were very
15  close.
16  Q.  And why did you have that impression?
17  A.  Because they would usually be together.
18  Q.  I'd like to turn now to information that you've learned
19  about regarding a shooting incident.
20          Approximately when did you first learn about an
21  incident involving the defendant shooting someone?
22  A.  Approximately in 2010.
23  Q.  How did you first learn about this?
24  A.  One of my workers told me so.
25  Q.  And what was that worker's name?

---

1   A.  He told me we had to work, that we should form a line to
2   bring drugs.  So I told him yes, that's fine, that we could
3   agree on it later on because we were drinking then.
4   Q.  When you told him yes, that was fine, did you have an
5   intention to traffic in drugs with the defendant after this
6   conversation?
7   A.  No.
8   Q.  Why not?
9   A.  Because he belongs to the Chapitos circle, and Chapitos
10  are very jealous, and I didn't want to end up in bad shape
11  with them.
12  Q.  At some point, did you have a conversation with the
13  defendant about his frustrations in working with the Chapitos?
14  A.  Yes.
15  Q.  Approximately when did that conversation take place?
16  A.  Approximately in 2012.
17  Q.  Do you recall where you were when that conversation took
18  place?
19  A.  At my house -- at a house of mine in Guadalajara.
20  Q.  What, if anything, did the defendant say to you about the
21  Chapitos during that conversation?
22  A.  The Chapitos didn't like that he drank or drugged himself
23  because he would spend several days partying, so they would
24  just freeze him over.
25          THE INTERPRETER:  Your Honor, interpreters request

1  A.  Eddie.
2  Q.  Was that something that you learned from Eddie in an
3  in-person conversation or by some other means?
4  A.  I learned about it through a personal conversation.
5  Q.  When you had that conversation, did you learn
6  approximately when the shooting incident took place?
7  A.  I don't recall.
8  Q.  What, if anything, do you know about when it took -- the
9  shooting incident took place in relation to the conversation
10 that you had with your worker?
11 A.  My worker told me that they had been at a party in
12 Culiacán and that Chuy Raúl had had an argument with a person
13 and that when the person had turned around, Raúl had shot him.
14 Q.  And your worker was telling you this, what was your
15 impression of when this shooting incident took place?
16 A.  I did not understand the question.
17 Q.  Did you understand that the shooting incident took place
18 recently?
19 A.  No.
20 Q.  Was it your impression that it took place years before?
21 A.  That's right.
22 Q.  What, if anything, did your worker tell you about the
23 person that was shot?
24 A.  Died.
25 Q.  Did he tell you anything about who the person was?

1  A.  He said that this was a familiar person or a friend of
2  somebody important in Culiacán.
3  Q.  And when you say somebody important in Culiacán, do you
4  know what that person did for a living?
5  THE INTERPRETER:  Sorry, could the interpreter ask
6  for a repetition?
7  BY MS. CSICSILA:
8  Q.  What do you mean by it was somebody important?
9  A.  That he had power.
10 Q.  What, if anything, did your worker tell you happened as a
11 result of the shooting?
12 A.  Chuy Raúl was fired from Culiacán.
13 Q.  So he was essentially told to leave the city?
14 A.  That's right.
15 Q.  Do you know if the defendant left Culiacán after the
16 shooting?
17 A.  Supposedly, yes.
18 Q.  And when you say supposedly, how is it that you came to
19 believe he had left Culiacán?
20 A.  Because Chuy Raúl was living in Guadalajara.
21 Q.  Did you have an occasion to meet with Chuy Raúl, the
22 defendant, in Guadalajara?
23 A.  Yes.
24 Q.  And it was during that time period that you understood him
25 to be banished from Culiacán?

1 A. Yes.
2 Q. At some point, did you learn that the defendant was
3 allowed to go back to Culiacán?
4 A. Yes.
5 Q. And how is it that you came to that understanding, that he
6 was allowed back in the city?
7 A. Because I would see him with the Chapitos.
8 Q. Now, in addition to your worker telling you about this
9 shooting incident, did you learn from anyone else about the
10 shooting incident?
11 A. Yes.
12 Q. From whom?
13 A. Abel told me.
14 Q. And who is Abel?
15 A. My brother-in-law.
16 Q. Approximately when did Abel tell you about the shooting
17 incident?
18 A. Approximately in 2010.
19 Q. And during this conversation, what did Abel tell you about
20 the shooting incident?
21 A. That -- the same thing, that Chuy Raul had had an argument
22 with a person at a party and that Chuy Raul had shot him.
23 Q. Did Abel explain to you how it was that he knew about this
24 incident?
25 A. He was also at the party.

1 Q. Now, in addition to your worker and your brother-in-law
2 Abel, did anyone else ever tell you about the shooting
3 incident?
4 A. Yes.
5 Q. Who?
6 A. Naum.
7 Q. Who is Naum?
8 A. My secretary.
9 Q. When did Naum tell you about the shooting incident?
10 A. Approximately 2010, 2011.
11 Q. And was that in Culiacán in an in-person conversation?
12 A. Yes.
13 Q. What did your secretary tell you about the shooting
14 incident?
15 A. The same thing, that Chuy Raul had shot a person at a
16 party.
17 Q. And what, if anything, did Naum tell you about what
18 happened to the defendant as a result of this shooting?
19 A. That he had been fired from Culiacán.
20 Q. In what context did you have this conversation with your
21 secretary?
22 A. A social event, a social conversation.
23 Q. Now, have you ever seen the defendant carrying a firearm?
24 A. Yes.
25 Q. Approximately how many times?

1  A. Quite a few times.
2  Q. And over what time period?
3  A. 2009, 2013.
4  Q. Could you describe for the Court on what types of
5  occasions you've seen the defendant carrying a firearm?
6  A. At social events, parties.
7  Q. And when you say parties, who was in attendance at these
8  parties?
9  A. Most of them would be people who worked with the cartel or
10  for the cartel.
11  Q. Did the cartel members at times have a Christmas party?
12  A. Yes.
13  Q. And did you have an occasion to see the defendant at one
14  of those Christmas parties?
15  A. Yes.
16  Q. What, if any, firearms did you see the defendant carry
17  during those Christmas parties?
18  A. A gold-plated K-47.
19  Q. And do you recall approximately when that Christmas party
20  took place?
21  A. It was either in December of 2009 or 2010.
22  Q. Now, since you've been here in Chicago, have you come to
23  learn that a threat has been made against you?
24  A. Yes.
25  Q. How did you learn about that threat?

1  A. Because my cellmate told me so.
2  Q. Approximately when did you learn about the threat?
3  A. April.
4  Q. What did your cellmate tell you about the threat that had
5  been made against you?
6  A. That Chuy Raul had offered money so that I would be
7  harmed.
8  Q. What, if anything, did your cellmate tell you about how
9  much money had been offered for you to be harmed?
10  A. I believe $25,000.
11  Q. And what, if anything, did your cellmate say about what
12  harm would come to you if someone accepted this offer?
13  A. I don't know exactly that. He didn't tell me what.
14  Q. What, if anything, did your cellmate tell you about who
15  was going to harm you?
16  A. Gang members.
17  Q. What, if anything, did you do about -- after you learned
18  about this threat?
19  A. Nothing.
20  Q. Approximately how long after you learned about the threat
21  were you placed in the SHU?
22  A. One day.
23  Q. And how long were you placed in the Special Housing Unit?
24  A. Between two to three weeks.
25  Q. After those two to three weeks, did you return to the

1   general population at the MCC?
2   A. Yes.
3   Q. For approximately how long?
4   A. Four days.
5   Q. And after those approximately four days, did you return to
6   the Special Housing Unit?
7   A. Yes.
8   Q. And for how long?
9   A. One day.
10  Q. After that day, where did you go?
11  A. To another prison.
12  Q. What was your understanding as to why you were moved to a
13  different prison?
14  A. For my own protection.
15  Q. And was it your understanding that all of these moves into
16  the Special Housing Unit were also for your protection?
17  A. That's right.
18  Q. Finally, over the time period that you've known the
19  defendant, have you known him to engage in any other kind of
20  work besides drug trafficking?
21  A. No.
22     MS. CSICSILA: I have no further questions.
23     THE COURT: Okay. Cross-examination.
24     CROSS-EXAMINATION
25  BY MR. RALLS:

1   Q. Mr. Lopez, when did you agree to cooperate with the
2   government?
3   A. From the time I turned myself in.
4   Q. Were you cooperating with the government before you turned
5   yourself in?
6   A. No.
7   Q. Okay. Now, you agreed to cooperate with the government.
8   You agreed to tell the truth; is that right?
9   A. Yes.
10  Q. And the truth means even if it helps a person that's on
11  trial or a co-defendant; is that right?
12  A. Yes.
13  Q. Now, if Mr. Beltran Leon wanted to say something bad about
14  you, he couldn't, could he?
15  A. I did not understand. I didn't hear that well.
16  Q. In other words, Mr. Beltran Leon knows nothing about your
17  narcotics trafficking, does he?
18     MS. CSICSILA: Objection. Outside the scope of this
19  witness's knowledge, what Mr. Beltran Leon knows.
20     THE COURT: Okay. I'll overrule that objection.
21  BY THE WITNESS:
22  A. Could you repeat the question?
23  BY MR. RALLS:
24  Q. Sure.
25     You've never done anything with Mr. Beltran Leon,

1 Q. Right.
2    Now, what you can say about Chuy Raul is that he's a
3 drunk, correct?
4 A. Yes.
5 Q. That he's an addict, correct?
6 A. Yes.
7 He drank a lot of alcohol, correct?
8 A. Yes.
9 Q. He was drunk most of the time, correct?
10 A. Not most of the times, but yes.
11 Q. And he was using an enormous amount of cocaine; isn't that
12 right?
13 A. Yes.
14 Q. Was he using any other drugs other than cocaine?
15 A. I don't know.
16 Q. All right. Now, in the drug trafficking business, nobody
17 wants to deal with a drunk, do they?
18 A. No.
19 Q. Nobody wants to deal with a drug addict, correct?
20 A. Uh-huh.
21 Q. You have to answer yes or no.
22 A. Yes.
23 Q. And Chuy Raul was both a drunk and a drug addict, correct?
24 A. That's right.
25 Q. Now, you're from Culiacán, correct?

---

1 have you?
2 A. No.
3 Q. In other words, you've known him 15 years or more, haven't
4 you?
5 A. Approximately.
6 Q. And during the time that you've known him, you've never
7 trafficked drugs with him, have you?
8 A. Not directly with him.
9 Q. And you told us a little while ago that -- that you had
10 heard on two occasions that Mr. Beltran Leon had trafficked
11 drugs; isn't that correct?
12 A. Yes.
13 Q. Okay. But that wasn't directly with you, was it?
14 A. Directly between myself and Chuy Raul? No.
15 Q. And this came, information from somebody else?
16 A. Yes.
17 Q. You weren't given details about that, were you?
18 A. No.
19 Q. In other words, you don't know whether it was five pounds
20 or 500 pounds, do you?
21 A. Chuy Raul somehow? No.
22 Q. Okay. So the reality is, you don't know of any criminal
23 activity, personally know, that Chuy Raul was involved in,
24 correct?
25 A. Correct.

1  A.  Yes.

2  Q.  Chuy Raul is from Culiacán, correct?

3  A.  I believe he was born in the U.S.

4  Q.  Right. He was born in the U.S., but he grew up in

5  Culiacán, correct?

6  A.  Yes.

7  Q.  Okay. Did you guys grow up in the same neighborhood?

8  A.  No.

9  Q.  But you knew each other?

10  A.  Yes.

11  Q.  Chapo's family grew up in the same neighborhood that Chuy

12  Raul grew up, correct?

13  A.  Yes.

14  Q.  And growing up, they became friends, Chuy Raul and Chapo's

15  sons?

16  A.  El Chapo or --

17  Q.  Oh, sí.

18  A.  Chapo or sons of El Chapo?

19  Q.  Sons.

20  A.  Yes.

21  Q.  And they became close friends?

22  A.  Yes,

23  Q.  That doesn't mean because you're friends with somebody

24  that you're involved with them, correct?

25  A.  That's right.

---

1  Q.  Now, they grew up in the same neighborhood, their parents

2  knew each other's parents, correct?

3  A.  Yes.

4  Q.  And in Culiacán is what one would describe as a mecca of

5  drug traffickers?

6  A.  Yes.

7  Q.  And so you're going to run into and have friends who are

8  drug traffickers or parents are drug traffickers, correct?

9  A.  Yes.

10  Q.  You knew that Chuy Raul was close to Ivan Guzman, correct?

11  A.  Yes.

12  Q.  You knew he was close to Alfredo Guzman, correct?

13  A.  Yes.

14  Q.  And you knew he was close to Mayito Gordo?

15  A.  Yes.

16  Q.  They would communicate all the time.

17  A.  Yes.

18  Q.  They would hang out all the time.

19  A.  Quite a lot of time.

20  Q.  And you would hang out with them also, correct?

21  A.  Yes.

22  Q.  You would be with the Chapo -- Chapo's sons, correct?

23  A.  Yes,

24  Q.  You would be with Chuy Raul?

25  A.  Yes.

1  Q. But that didn't mean that you were involved in any
2  narcotic trafficking with him, did it?
3  A. No.
4  Q. But you were friends with what you would term as Los
5  Chapitos?
6  A. Yes.
7  Q. Chuy Raul's drug addiction and alcohol addiction was a
8  concern for Alfredo Guzman, wasn't it?
9  A. Yes.
10 Q. As a matter of fact, Alfredo talked to you about it,
11 correct?
12 A. Yes.
13 Q. And Ivan Guzman also talked to you about the drug
14 addiction and alcohol addiction that Chuy Raul had,
15 correct?
16 A. Yes.
17 Q. And they would tell you that they wanted nothing to do
18 with Chuy Raul.
19 A. That's not correct.
20 Q. Well, what they would do -- is your terms -- they would
21 freeze him out?
22 A. Yes.
23 Q. And freeze him out means basically we're not talking to
24 you?
25 A. We don't help you work, we don't bring loans to you, and

1  we keep you at a distance.
2  Q. For how long did they keep him at a distance?
3  A. I don't know exactly how long.
4  Q. Was it months?
5  A. I don't know.
6  Q. Was it years?
7  A. No.
8  Q. But they kept him at a distance.
9  A. Yes.
10 Q. For the same reason that you and I talked about that you
11 can't trust in that business a person who's a drunk and an
12 addict?
13 A. That's right.
14 Q. And Chuy Raul himself was concerned about the way the
15 Chapitos treated him, wasn't he?
16 A. Yes.
17 Q. There was a day when he was at your house or you were at
18 Chuy Raul's house that Ivan called and said he was going to
19 come over, right?
20 A. Yes.
21 Q. And was it your house?
22 A. Yes.
23 Q. Okay. And Chuy Raul said tell Ivan not to come over,
24 correct?
25 A. No.

1  Q. What did he say?
2  A. Do not invite Ivan.
3  Q. Okay. So he said don't invite Ivan. Why?
4  A. Because we had been drinking for days, and Chuy Raul was
5  drunk and didn't want for Ivan to see him like that.
6  Q. How many days had you guys been drunk?
7  A. Two or three days.
8  Q. And were you guys using drugs, too?
9  A. Not me. Chuy Raul was.
10 Q. What was he using?
11 A. Cocaine.
12 Q. How much?
13 A. I don't know exactly how much.
14 Q. During the entire time that those two, three days that he
15 was at your house, was -- was he using cocaine?
16 A. Yes.
17 Q. Did he always have cocaine on his person?
18 A. Most of the times.
19 Q. Now, when Ivan started over to your house, Chuy Raul went
20 and hid in one of the rooms, didn't he?
21 A. Yes.
22 Q. And he hid in the room so Ivan would not see him drunk.
23 A. To freshen himself up, to clean himself up.
24 Q. But you can't really refresh or clean yourself off after a
25 two-, three-day drunk and coke use, can you?

1  A. Well, he would wash his face off. He would tuck his shirt
2  in.
3  Q. And it didn't work.
4  A. He would check for any cocaine residue in his nose or on
5  his clothing.
6  Q. And it didn't work, did it?
7  A. No.
8  Q. Ivan knew that he had been drinking and he had been using
9  drugs.
10 A. Yes.
11 Q. And Ivan was angry at Chuy?
12 A. Somewhat, yes.
13 Q. And he refused to talk to Chuy?
14 A. Uh-huh, yes.
15 Q. Now, Chuy's addictions was a strain on everybody who knew
16 him, isn't that right?
17 A. What was that?
18 Q. Chuy's addiction was a strain on the relationship of
19 everybody that he knew.
20 A. No.
21 Q. Just the people that were involved in drug trafficking?
22 A. Only to those who would get upset about it, who were the
23 Chapitos. I wouldn't care.
24 Q. But you didn't work with Chuy Raul, did you?
25 A. No.

1 Q. You had no drug trafficking activity with Chuy Raul?
2 A. Not directly with him, no.
3 Q. Yeah, and we've talked about the two other times that you
4 heard for which you have no details about, correct?
5 A. That's right.
6 Q. Chuy Raul was also a person that wanted to impress people;
7 isn't that right?
8 A. Yes.
9 Q. In other words, you were privileged to some of the
10 conversations where he talked about his father Jesus Raul
11 Beltran, correct?
12 A. Yes.
13 Q. And he would tell you and all his friends about how much
14 money his dad had made, correct?
15 A. Yes.
16 Q. And basically what Chuy Raul was doing, he was riding on
17 his dad's coattails to make himself look better.
18 A. Yes.
19 Q. That was his character. You know, he just wasn't good
20 enough, and so he had to build himself up.
21 A. No, he could also work.
22 Q. All right. But he used, you know, other people to make
23 himself look bigger.
24 A. Yes.
25 Q. In other words, for instance, you and Chuy were at a party

1 one time where he started to brag about how much money Alfredo
2 Guzman had made, correct?
3 A. Yes.
4 Q. Chuy asked you if you knew how much money Alfredo Guzman
5 had made, correct?
6 A. That's right.
7 Q. And you told him you didn't know how much money Alfredo
8 Guzman had made.
9 A. Yes.
10 Q. And he told you that Alfredo had made a lot of money times
11 three, correct?
12 A. That's right.
13 Q. And there was no need to tell you that, was there?
14 A. No.
15 Q. Other than to impress you that he had a friend that was
16 making a lot of money; isn't that right?
17 A. He did not need to impress me on that. Alfredo was also a
18 friend of mine.
19 This was just a social conversation, social -- normal
20 social chitchatting.
21 Q. So you don't think that him telling you about him making
22 three times as much money was trying to impress you, that he's
23 got a friend, a closer friend than you, that's making a lot of
24 money?
25 A. No. I mean I knew very well that they were friends.

1  Q. And there was no reason to tell you that he just happened
2  to be with Ivan when Ivan picked up Chapo after Chapo escaped
3  from Puente Grande.
4  A. No.
5  Q. He was trying to impress you.
6  A. I don't think so.
7  Q. He had no reason to tell you that, did he?
8  A. A conversation between friends.
9  Q. He's always been your friend, right?
10  A. Yes.
11  Q. He's never threatened you, correct?
12  A. Not until April.
13  Q. We're going to get to that. But, you know, that threat
14  there apparently someone in the prison told you Chuy had done
15  that or said something, right?
16  A. Yes.
17  Q. Chuy never had any contact with you in the -- here at the
18  MCC, did he?
19  A. Not directly with me, no.
20  Q. Now, Chuy also wanted to look good in front of Alfredo and
21  Ivan; isn't that correct?
22  A. Yes.
23  Q. As a matter of fact, were you present at the ranch of
24  Amelio Salazar?
25  A. Who, I'm sorry?

1  Q. All right. Now, Chuy also bragged to you about having
2  been present in 2001 when Ivan picked up his father; is that
3  right?
4  A. Yes.
5  Q. Chuy was living in Culiacán, right?
6  A. I don't know exactly.
7  Q. Back in 2001, Chuy was probably 16 or 17 years of age,
8  right?
9  A. Somewhere in there.
10  Q. Yeah, maybe a little bit younger?
11  A. I don't know exactly.
12  Q. He grew up in Culiacán, correct?
13  A. Yes.
14  Q. And apparently left Culiacán after this shooting, correct?
15  A. Yes.
16  Q. Okay. And Chapo Guzman escapes from Guadalajara, correct?
17  A. Yes.
18  Q. That's a big distance between Culiacán and Guadalajara,
19  correct?
20  A. Somewhat.
21  Q. Many hours away.
22  A. By plane, that would be 45 minutes.
23  Q. And he just happened to be with Ivan when Ivan picks up
24  his father; is that right?
25  A. Yes.

1  Q. Were you present at a ranch when Chuy -- Amelio Cácenes,
2  not Salazar. You know who he is, right?
3  A. Yes.
4  Q. Okay. Now, Chuy was asking Amelio Cácenes and Genaro
5  Payán whether or not they could give him some cocaine,
6  correct?
7  A. Yes.
8  Q. And he was telling them that they should help a guy like
9  him because he would look good in front or in the eyes of
10 Alfredo and Ivan; isn't that correct?
11 A. Could you repeat the question?
12 Q. Right.
13    He asked Amelio Cácenes and Genaro Payán, I believe
14 it's at Amelio's ranch whether they could give him some
15 cocaine because if they gave him kilos of cocaine, he would
16 look good in the eyes of Ivan and Alfredo.
17 A. Okay. We're talking about Genaro Payán and Amelio
18 Cácenes.
19 Q. Yes.
20 A. And the ranch was Genaro Payán's, and Chuy Raúl told both
21 Amelio and Genaro that just to give him the runaround --
22    THE INTERPRETER: May the interpreter ask for
23 clarification?
24    THE COURT: Yes.
25 BY THE WITNESS: (Through interpreter.)

1  A. -- just to bring up loads of drugs for him and that he
2  could bring them closer -- he could be the link between them
3  and Los Chapitos.
4     THE INTERPRETER: Your Honor, may the interpreters
5  switch?
6     THE COURT: Yes. We'll switch.
7     (Pause.)
8     THE INTERPRETER: We're ready, Your Honor.
9  BY MR. RALLS:
10 Q. And the reason he did that -- and you were there, weren't
11 you?
12 A. Yes.
13 Q. -- was because it would be good for people to get him
14 kilograms of cocaine because it would look good in the eyes of
15 Ivan and Alfredo, correct?
16 A. He wanted to make money.
17 Q. Did you ever tell the government that that's what
18 happened?
19 A. Yes.
20 Q. As a matter of fact, in June of this year, exact date,
21 June 3rd, you met with the prosecutor, didn't you?
22 A. I don't know the date exactly.
23 Q. All right. And at that time, did you tell the prosecutor,
24 and I'll quote: "It would be good for people to get him
25 kilograms of cocaine because it would look good in Ivan and

1  Alfredo's eyes."
2  Correct?
3  A. No, I never said that.
4  Q. So in other words, if the police officer here, being
5  Amelia Fernandez, wrote that in the report, who would be
6  lying, you or her?
7  MS. CSICSILA: Objection.
8  THE COURT: I'll sustain that objection.
9  BY MR. RALLS:
10 Q. Are you telling the truth?
11 A. Yes.
12 Q. Is she telling the truth?
13 A. Maybe she made a mistake.
14 Q. All right. Chuy Raul also asked your dad if he would
15 provide him some cocaine, correct?
16 A. He told me that we should form a line to bring cocaine.
17 Q. And your dad refused, correct?
18 A. Excuse me. I got -- I got confused. Are you asking if he
19 told me that or if he told my dad that?
20 Q. He told your dad, he asked your dad.
21 A. Once that I remember.
22 Q. Uh-huh. And your dad refused to do anything with Chuy
23 Raul?
24 A. Yes.
25 Q. And that was because your dad knew that Chuy Raul had both

1  an alcohol and a drug problem; isn't that correct?
2  A. More than anything, it's because he did not want to get
3  involved with people from Chapitos.
4  Q. And so your dad had nothing to do with Chuy Raul?
5  A. He just knew him as a friend.
6  Q. But he at no point in time had any involvement in drug
7  activity with him.
8  A. No.
9  Q. Now, same thing with Chapo. Chapo had nothing to do with
10 Chuy Raul other than him being -- Chuy Raul being the friend
11 of his sons, correct?
12 A. I don't know.
13 Q. You -- you met with Chapo in about 2009?
14 A. Yes.
15 Q. And Chapo asked about a lot of people?
16 A. Yes.
17 Q. And one of the people that he asked about was Chuy Raul?
18 A. Yes.
19 Q. Did he tell you that he had known Chuy since, you know, he
20 was a baby?
21 A. No.
22 Q. And when he asked you how Chuy was doing, you told him
23 that he was a good guy?
24 A. That's right.
25 Q. And you also told Chapo that -- that Chuy partied too

1  much?
2  A. Yes.
3  Q. And in that same conversation, did you tell Chuy -- or did
4  you tell Chapo that Chuy drank too much?
5  A. I don't remember.
6  Q. Did you tell him that Chuy used too much -- too many
7  drugs?
8  A. No.
9  Q. I want to talk a little bit about some of the things that
10 you said.
11    How many murders have you directed?
12 A. Between 13 and 15.
13 Q. And you said they were other people that were involved in
14 drug trafficking?
15 A. That's right.
16 Q. What about Javier Valdez. You know who he is, right?
17    THE INTERPRETER: I'm sorry, I couldn't understand
18 the name.
19 BY MR. RALLS:
20 Q. Javier Valdez.
21 A. Yes.
22 Q. Did you order the murder of Javier Valdez, the journalist?
23 A. No.
24 Q. The government says they have information that you did.
25 A. I know.

1  Q. And you're saying you were not involved with Javier
2  Valdez, in the murder of Javier Valdez?
3  A. That's right. I had nothing to do with it.
4  Q. This murder took place in 2017, correct?
5  A. Yes.
6  Q. Javier Valdez wrote extensively about drug traffickers in
7  Mexico; isn't that correct?
8  A. Yes.
9  Q. He wrote about your father.
10 A. Yes.
11 Q. And you did not like the fact that Javier Valdez painted a
12 very negative picture about your father?
13 A. The opposite.
14 Q. Oh, you did like what he wrote?
15 A. My dad wanted for that interview to be published.
16 Q. Your dad wanted that it be published that he was a major
17 drug trafficker involved in a lot of violence and murders and
18 kidnappings?
19 A. No. That was not published as part of the interview.
20 Q. So what you're saying, even the government -- even if the
21 government has information that you were involved in the
22 murder of Javier Valdez directly or indirectly, you disagree
23 with that.
24 A. Exactly.
25 Q. Now, your dad was Chapo's right-hand man, correct?

1   A. Yes.
2   Q. And he was the -- one of the directors of the prison in
3   Guadalajara back in 2001, correct?
4   A. Yes.
5   Q. And your dad helped Chapo escape from the prison in
6   Guadalajara the first time?
7   A. No.
8   Q. He just happened to be the subdirector of the prison
9   there?
10  A. No. He was not working at the prison any longer.
11  Q. In 2001, was he a subdirector of the prison?
12  A. No.
13  Q. When did he become the Chapo's right-hand man?
14  A. I don't know exactly the year.
15  Q. Now, your dad also helped Chapo escape from the prison
16  in -- the federal prison in Mexico City, didn't he?
17      MS. CSICSILA: Objection to relevance and outside the
18  scope of direct.
19      THE COURT: Okay. I'll overrule the objection.
20  BY THE WITNESS:
21  A. Yes.
22  BY MR. RALLS:
23  Q. And -- but you dispute that he was the subdirector of the
24  prison and -- Puente Grande, and you dispute that immediately
25  after that, your dad became Chapo's right-hand man?

1   A. No, I don't dispute that he was the subdirector. What I am
2   saying is that in 2001, he was not working at Puente Grande
3   any longer.
4   Q. And when did he leave being the subdirector?
5   A. Approximately in September of 2000.
6   Q. September 2000, and Chapo escaped in January of 2001,
7   correct?
8   A. Yes.
9   Q. Okay. So we're talking about a four-month time
10  difference?
11  A. Yes.
12  Q. And Chapo and your dad already had a relationship prior to
13  Chapo escaping.
14  A. Yes.
15  Q. Now, you began the involvement in drug trafficking when
16  you were approximately 15 years of age, correct?
17  A. No.
18  Q. How old were you?
19  A. Approximately 21.
20  Q. And your dad brought you in to the drug trafficking?
21  A. Yes.
22  Q. And you self-surrendered in July of 2017, correct?
23  A. Yes.
24  Q. And do you know you were described as a "violent
25  criminal"?

1    THE INTERPRETER: Excuse me, Your Honor, the
2  interpreter needs you to do that again. I didn't hear you.
3  You were described as what, counselor?
4  BY MR. RALLS:
5  Q. "Violent criminal"?
6  A. Yes.
7  Q. You knew that, right?
8  A. Yes.
9  Q. And it was DEA that described you as a violent criminal.
10 A. I don't know exactly who did.
11 Q. But it was the truth, wasn't it?
12 A. No.
13 Q. Do you know a person named Libre? Libre, L-I-B-R-E?
14 A. Libre? No.
15 Q. Do you know a person named Jimmy Fernandez?
16 A. Yes.
17 Q. Have you had communications with Jimmy Fernandez since --
18 since you've been at MCC here?
19 A. Me with him, no.
20 Q. Who have you had communications, directly or indirectly,
21 with Jimmy Fernandez?
22 A. Yes, yes.
23 Q. You had communications indirectly with Jimmy Fernandez?
24 A. Through another person.
25 Q. And Jimmy Fernandez has been communicating with you

1  concerning the drug activities that are taking place in
2  Mexico; isn't that correct?
3  A. Yes.
4  Q. As a matter of fact, Jimmy Fernandez was your drug
5  secretary?
6  A. No, not mine.
7  Q. Whose was it?
8  A. He worked for Ivan.
9  Q. And he's been communicating with you, hasn't he?
10 A. Yes.
11 Q. Through another person?
12 A. That's right.
13 Q. And have these been secret communications?
14 A. No.
15 Q. And Jimmy Fernandez has told you that as to the next
16 cooperating witness we're going to hear about, Manuel
17 Fernandez, that Ivan Guzman is waiting for him to get a
18 reduced sentence, correct?
19 A. Yes.
20 Q. Because Ivan has a place for him as a high-ranking member
21 of the Sinaloa Cartel, correct?
22 A. That's right.
23 Q. In other words, as soon as -- as soon as Manuel
24 Fernandez's sentence goes down and Manuel Fernandez goes back
25 into Mexico, he's got a position with Ivan and Alfredo Guzman,

1  doesn't he?
2  A. I don't know.
3  Q. That's what was communicated to you, wasn't it?
4  A. Yes.
5  Q. And Jimmy Fernandez is your cousin?
6  A. No.
7  Q. He's not your cousin?
8  A. No.
9  Q. But he's a trusted friend of yours?
10  A. No.
11  Q. We've already talked about Ivan and Alfredo and Mayito
12  Gordo knowing Chuy Raul, correct?
13  A. Yes.
14  Q. And we talked about that they grew up together as kids.
15  A. The Chapitos? Yes,
16  Q. That's --
17  A. And Chuy Raul.
18  Q. And Chuy Raul. Same neighborhood?
19  A. I don't know if it's the same neighborhood.
20  Q. But they grew up together.
21  A. Yes,
22  Q. And you made reference that Mayito Gordo also talked to
23  Chuy Raul?
24  A. Yes.
25  Q. Mayito Gordo and Chuy Raul used to party a lot; isn't that

1  right?
2  A. I know if they partied, but they were together at the many
3  parties.
4  Q. Okay. And what would happen at the party? Would there be
5  drinking?
6  A. Women, drinking, music.
7  Q. And the parties would last how long?
8  A. Days.
9  Q. These parties would last days of drinking, women and
10  drugs?
11  A. Yes.
12  Q. Would you stay there the entire days of drinking, women
13  and drugs?
14  A. Sometimes, yes.
15  Q. And Chuy Raul would always be there?
16  A. Not always.
17  Q. Now, I want to talk to you a little bit about this alleged
18  shooting that took place in Culiacán.
19      When did that take place?
20  A. I don't know exactly.
21  Q. Can you give us a year?
22  A. No.
23  Q. Can you give us a name?
24  A. No.
25  Q. Can you give us a location?

1  A. All I know is it was Culiacán.

2  Q. Well, you're from Culiacán, are you not?

3  A. Yes.

4  Q. And being from Culiacán, if something like that happens,

5  you know the location of where it took place, wouldn't you?

6  A. Yes.

7  Q. But you don't know the location?

8  A. I don't know exactly everything that goes on in Culiacán.

9  Q. No, but I'm talking about this particular event. You

10  can't give us a location, can you?

11  A. No.

12  Q. You said that it was a person who was significant in

13  Culiacán. You can't give us a name, can you?

14  A. No.

15  Q. You can't give us anything other than to say somebody told

16  me that that's what happened but there's no details to it.

17  A. That's right.

18  Q. And you said that Chuy carried a firearm?

19  A. Yes.

20  Q. You also carried a firearm, true?

21  A. Yes.

22  Q. A good percentage of the people carry firearms in

23  Culiacán, correct?

24  A. Quite a few.

25  Q. So it's not unusual in that community to see a person with

1  a firearm?

2  A. No.

3  Q. You never saw Chuy Raul point that firearm at anybody, did

4  you?

5  A. No.

6  Q. You never saw Chuy Raul discharge a firearm, did you?

7  A. No.

8  Q. And you mentioned at one time Chuy Raul had a gold-plated

9  AK-47 that he had on the dance floor, correct?

10  A. Yes.

11  Q. Do you know whose gun that was?

12  A. No.

13  Q. You can't tell us whether it was his or whether he

14  borrowed it from somebody, can you?

15  A. I just saw him with the weapon.

16  Q. He never used it in any threatening way, did he?

17  A. No.

18    (Counsel conferring.)

19  BY MR. RALLS:

20  Q. Now, you mentioned this roommate that told you about a

21  threat towards you.

22  A. Yes.

23  Q. Was this the same roommate that you told that you would

24  lie even as to innocent people to get your father out?

25  A. I don't know.

1 Q. But you did tell somebody that you would lie to help your
2 father out even if it meant jeopardizing the freedom of an
3 individual who had committed no crime?
4 A. No.
5 Q. Did you tell your roommate that you would even set up
6 people who were not involved in drug trafficking?
7 A. No.
8 Q. Did you tell him that you would do it to get your father
9 out of the situation that he's in?
10 A. No.
11 Q. To get his sentence reduced, which your dad's sentence is
12 a life sentence at this time.
13 A. No.
14 MR. RALLS: I don't have anything further.
15 THE COURT: Okay. Any redirect?
16 MS. CSICSILA: Just briefly one or two questions,
17 THE COURT: Okay.
18 REDIRECT EXAMINATION
19 BY MS. CSICSILA:
20 Q. Sir, you were asked some questions about occasions in
21 which the Chapitos froze the defendant out. Do you recall
22 those questions?
23 A. Yes.
24 Q. When the Chapitos froze the defendant out, was that a
25 permanent freeze?

1 A. No.
2 Q. Did they, following a period of time in which they didn't
3 work with him, then go ahead and continue to traffic with him
4 in drugs?
5 MR. RALLS: Excuse me, Judge, I'm going to object.
6 There's been no evidence that they trafficked drugs with
7 Mr. Beltran.
8 THE COURT: Okay. I'm going to overrule that
9 objection.
10 THE INTERPRETER: Could you repeat the question,
11 please?
12 BY MS. CSICSILA:
13 Q. Sure. After periods in which the Chapitos froze the
14 defendant out, did they then unfreeze him and continue to
15 traffic in drugs with him?
16 A. That's correct.
17 MS. CSICSILA: Nothing further.
18 THE COURT: Anything further?
19 MR. RALLS: Nothing further. Thank you, Judge.
20 THE COURT: Okay. We will recess for lunch and
21 resume at 1:45. You've got two more witnesses, right?
22 MS. CSICSILA: We have four more witnesses.
23 THE COURT: Four more witnesses. Okay. Let's resume
24 at 1:30 then.
25 (Court adjourned to reconvene at 1:30 p.m.)



65

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,    Case No. 09 CR 383-16

-vs-    Chicago, Illinois
    August 5, 2019
JESUS RAUL BELTRAN LEON,    1:32 p.m.

    Defendant.

VOLUME 1
TRANSCRIPT OF PROCEEDINGS - SENTENCING
BEFORE THE HONORABLE RUBEN CASTILLO

APPEARANCES:

For the Government:    MS. ERIKA L. CSICSILA
    MR. ANDREW CONNOR ERSKINE
    Assistant U.S. Attorneys
    219 S. Dearborn Street
    Suite 500
    Chicago, IL 60604
    (312) 353-5300

For the Defendant:    MR. PATRICK W. BLEGEN
    Blegen & Garvey
    53 West Jackson Boulevard
    Suite 1437
    Chicago, IL 60604
    (312) 957-0100

    MR. BEAU B. BRINDLEY
    The Law Offices of Beau B. Brindley
    53 West Jackson Boulevard
    Suite 1410
    Chicago, IL 60604

Court Reporter:

    KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
    Official Court Reporter
    United States District Court
    219 South Dearborn Street, Suite 2504
    Chicago, Illinois 60604
    Telephone: (312) 435-5569
    Kathleen_Fennell@ilnd.uscourts.gov



66

APPEARANCES: (Continued)

For the Defendant:    MR. STEPHEN G. RALLS
    Ralls & Reidy, P.C.
    314 South 6th Avenue
    Tucson, AZ 85701
    (520) 884-1234

    MR. PAUL M. BRAYMAN
    Law Offices of Paul M. Brayman
    727 South Dearborn Street
    Suite 712
    Chicago, IL 60605
    (312) 427-9766

    MR. JONATHAN M. BRAYMAN
    Breen & Pugh
    53 West Jackson Boulevard
    Suite 1215
    Chicago, IL 60604
    (312) 360-1001

1 Q. Okay. And how old are you?
2 A. 58 years old.
3 Q. Where are you from originally?
4 A. Michoacán, Mexico.
01:33:53
5 Q. What did you do to make money before you were arrested?
6 A. I would -- I would plant limes and avocados.
7 Q. And what else?
8 A. And drug trafficking.
9 Q. Were you charged for that conduct?
01:34:14
10 A. Yes, sir.
11 Q. And have you pled guilty in this case?
12 A. Yes, sir.
13 Q. Have you been sentenced yet?
14 A. No.
01:34:24
15 Q. I'd like to focus on the drug trafficking that resulted in
16 your current case.
17 Over what period of time did you traffic drugs?
18 A. From 2012 to 2014.
19 Q. Where were you based during that time?
01:34:46
20 A. In Culiacán, Sinaloa.
21 Q. Who did you work under when you trafficked drugs during
22 that period?
23 A. Alfredo Guzman.
24 Q. And who is he?
01:35:03
25 A. That's one of Mr. Guzman's, El Chapo's, children.

---

1 (Proceedings heard in open court:)
01:32:08
2 THE CLERK: 09 CR 383, United States versus Beltran
3 Leon. Please be seated and come to order.
4 THE COURT: Okay. The government can call their next
5 witness.
01:32:58
6 MR. ERSKINE: Your Honor, the government calls
7 Guadalupe Fernandez Valencia.
8 THE COURT: Okay. You're going to be seated right
9 there on the other side of me.
10 And then before you sit down, if you would raise your
11 right hand.
12 THE INTERPRETER: Just one second, Judge.
13 THE COURT: If you would raise your right hand.
14 (Witness sworn through interpreter.)
01:32:59
15 THE COURT: You can be seated.
16 THE WITNESS: Yes, Your Honor.
17 THE COURT: You may proceed.
18 MR. ERSKINE: Thank you, Your Honor.
19 GUADALUPE FERNANDEZ VALENCIA, GOVERNMENT'S WITNESS, SWORN,
20 DIRECT EXAMINATION
01:33:07
21 BY MR. ERSKINE:
22 Q. Good afternoon, ma'am. Would you please say and spell
23 your name.
24 A. Guadalupe Fernandez Valencia. G-U-A-D-A-L-U-P-E,
01:33:27
25 Fernandez, F-E-R-N-A-N-D-E-Z.

```
 1   Q.  And how did you meet Alfredo Guzman?
 2   A.  Through my brother, Manuel.
 3   Q.  Are you familiar with someone named Jesus Raul Beltran
 4   Leon?
 5   A.  Yes, sir.
 6   Q.  How so?
 7   A.  I met him through a baptism in the family.  He ended up
 8   giving a ride to some people, to some young people.
 9   Q.  And did you two live in the same town?
10   A.  Yes, sir.
11   Q.  During what period of time did you know him and live in
12   the same town as him?
13   A.  Give or take five years.
14   Q.  And can you say when till when that was approximately?
15   A.  Between 2018 to 2014.
16   Q.  Have you met him in person before?
17   A.  Before that date, no.
18   Q.  No, I'm sorry, before today.
19   A.  Yes.
20   Q.  About how many times would you estimate?
21   A.  About five times.
22   Q.  If you saw him again today, do you believe you'd recognize
23   him?
24   A.  Yes, sir.
25   Q.  I'll ask do you see him in the courtroom here today?
```

```
 1   A.  Yes.
 2   Q.  Can you please describe what he's wearing?
 3   A.  Orange clothing.
 4            MR. ERSKINE:  Your Honor, may the record reflect the
 5   witness has identified the defendant?
 6            THE COURT:  It will.
 7   BY MR. ERSKINE:
 8   Q.  About when, and you referred to this a moment ago, but
 9   about when was the first time you met or communicated with the
10   defendant?
11   A.  In 2018.
12   Q.  And where did that take place?
13   A.  At my house, Culiacán.
14   Q.  And was he dropping off his girlfriend at a party?
15   A.  We were going to a party, and he came to drop her off
16   there.
17   Q.  Did you speak with him at all?
18   A.  I just said hi.
19   Q.  And did he introduce himself by name?
20   A.  Yes.
21   Q.  What did he call himself?
22   A.  Jesus Beltran, Jesus Raúl Beltran.
23   Q.  Did you see him again after that?
24   A.  Yes.
25   Q.  One time or more than once?
```

G. Fernandez Valencia - direct

71

1   A.   More than once.

2   Q.   As a result of your interactions with the defendant, did

3   you come to know him by any other names or nicknames?

4   A.   Chuy Raul.

01:38:06

5   Q.   Any others?

6   A.   Or El Trebol.

7   Q.   And what's a trebol?

8   A.   It's a clover leaf.

9   Q.   So you mentioned the first time you spoke with him is when

10   you met him when he was dropping his girlfriend off. When was

01:38:28

11   the next time you saw the defendant?

12   A.   At a restaurant in Culiacán.

13   Q.   And which restaurant was that?

14   A.   El Flon back then.

01:38:42

15   Q.   And about when did you see him there?

16   A.   I saw him around 2009.

17   Q.   Did you speak with him?

18   A.   I said hi, and he was saying his good-byes.

19   Q.   Did you see him again after that?

01:39:01

20   A.   Yes.

21   Q.   When and where?

22   A.   At a piñata party.

23   Q.   Where was that located?

24   A.   In the private neighborhood where we both lived.

01:39:18

25   Q.   Did you speak with him at that time?

---

G. Fernandez Valencia - direct

72

1   A.   No.

2   Q.   Did you see him again after that?

3   A.   Yes.

4   Q.   Where and when?

01:39:28

5   A.   At a restaurant in Mazatlán.

6   Q.   And did you speak with him?

7   A.   I just said hi to him.

8   Q.   I'd like to direct your attention to an incident that took

9   place near your private residence where you testified you both

01:39:46

10   just lived.

11   Did you see the defendant again?

12   A.   Yes, sir.

13   Q.   And about when was that?

14   A.   It was in February of 2014.

01:40:00

15   Q.   And what happened such that you saw him?

16   A.   I was coming to my house, to my private residence area,

17   when I saw someone behind me signaling to me, and it was him.

18   It was Jesus Raul who was asking me for a ride.

19   Q.   You were in a car at the time?

01:40:28

20   A.   I was in a car.

21   Q.   And did you let him get into your car?

22   A.   Yes.

23   Q.   And what happened next?

24   A.   He simply told me that he was running from the restaurant

01:40:44

25   because the military had arrived to the restaurant, and he

1　ran.
2　Q. Did he tell you which restaurant that was?
3　A. El Mar and Sea.
4　Q. And what was Mar and Sea formerly called?
5　A. El Fion.
6　Q. So was that the same restaurant you had run into the
7　defendant a few years before?
8　A. Yes.
9　Q. Did the defendant tell you who else was at the restaurant
10　when the military arrived?
11　A. Yes.
12　Q. Who else was there?
13　A. Mr. Joaquin Guzman's children.
14　Q. And did he specify which children?
15　A. Yes.
16　Q. Who did he say?
17　A. Alfredo and Ivan.
18　Q. Did the defendant tell you how he was able to escape the
19　restaurant?
20　A. Yes. He told me that he switched shirts with a waiter,
21　and he ran through the back.
22　Q. Now, at that point, did the defendant ask you for any
23　advice?
24　A. He asked me whether I would consider reasonable to get
25　ahold of Mr. Joaquin, El Chapo.

1　Q. And just to be clear, he was asking you whether he should
2　do that or he wanted you to do that?
3　A. If he should do that.
4　Q. And what did you say to him?
5　A. I told him that that would be his decision.
6　Q. And what did you see him doing?
7　A. Well, he started using his BlackBerry, so I don't know
8　whether he ended up calling or not.
9　Q. And what happened next?
10　A. I took him home for a couple of hours.
11　Q. And then did he leave at some point?
12　A. Yes.
13　Q. Did there come a time when you were living in Culiacán and
14　you had some marijuana you needed help smuggling into the
15　United States?
16　　　　THE INTERPRETER: I'm sorry, interpreter asks for a
17　repetition.
18　BY MR. ERSKINE:
19　Q. Did there come a time when you were living in Culiacán and
20　you had some marijuana you wanted help smuggling into the
21　United States?
22　A. Yes.
23　Q. How many times did that situation arise?
24　A. Twice.
25　Q. So I'd like to direct your attention to the second time.

1      About when was that?

2    A.  In 2013.

3    Q.  And how much marijuana did you have?

4    A.  Two tons.

5    Q.  When you received that marijuana, did you mark it in any

6    fashion?

7    A.  Yes.

8    Q.  How so?

9    A.  With some stickers.

10   Q.  And what did the stickers look like?

11   A.  They were lucky charms, lucky charms.

12   Q.  With the little leprechaun?

13   A.  Yeah, the leprechaun.

14   Q.  And why did you mark the marijuana with stickers or mark

15   it at all?

16   A.  To distinguish it from other.

17   Q.  Who did you seek help from getting your marijuana across?

18   A.  Alfredo Guzman.

19   Q.  And did he agree?

20   A.  Yes.

21   Q.  And what happened next?

22   A.  I kept waiting for about a week, almost two weeks, and I

23   was told that I would need to pick it up because there was no

24   way of passing it. And I was asked to pick it up because they

25   were not going to pass it through.

1    Q.  And did you send a worker to go pick it up?

2    A.  Yes.

3    Q.  And what happened next?

4    A.  He picked it up, and then he said that it was useless.

5    Q.  The marijuana had gone bad?

6    A.  Yes.

7    Q.  And what happened next?

8    A.  I told the guy, well, what marks are on it? And he said

9    that it had a clover leaf on it.

10   Q.  A trebol?

11   A.  Yes. And I told him that that was not mine, to take it

12   back.

13   Q.  And did your worker take it back?

14   A.  Yes.

15   Q.  And did he speak with one of Alfredo Guzman's workers?

16   A.  Yes, the one in the warehouse.

17   Q.  And did your worker tell you what that worker said?

18   A.  Yes.

19   Q.  And what was that?

20   A.  He said that they had switched it; that by mistake, they

21   had switched it, and that was not mine. That was the

22   Trebol's. That was Chuy Raul's.

23   Q.  The defendant's marijuana?

24   A.  Yes.

25          MR. ERSKINE: No furthered questions, Your Honor.

1
2          THE COURT: Okay. Any cross?
3                    CROSS-EXAMINATION
4   BY MR. RALLS:
5   Q. Ms. Fernandez, how long have you been dealing drugs?
6   A. About --
7   Q. How many?
8   A. For about six to four years. I was doing it for about
9   four years.
10  Q. Isn't it true you've been dealing drugs since you were
11  20 years of age?
12  A. Yes, sir.
13  Q. So it's not three to four years then. The reason why
14  I'm arrested for now.
15  Q. But you've been trafficking almost 40 years of your life
16  now, haven't you?
17  A. Yes, sir.
18  Q. And you've been dealing with some pretty large quantities
19  of drugs, haven't you?
20  A. No, not large.
21  Q. We're going to get to that in a minute.
22         Now, you know, we talked about marijuana with a
23  clover on it, correct?
24  A. Yes.
25  Q. How much in weight was there?

1   A. 2,000 kilos.
2   Q. And it had a clover on it?
3   A. Yes.
4   Q. Now, did you get reimbursed for this marijuana?
5   A. No, sir.
6   Q. Did you ever call anybody to reimburse you for the bad
7   marijuana?
8   A. No.
9   Q. How much was it worth?
10  A. Two million pesos.
11  Q. And for two million pesos, you're not going to ask anybody
12  about it?
13  A. No, because it was useless.
14  Q. Well, but that wasn't your marijuana, was it?
15  A. It wasn't.
16  Q. And you think it belonged to Mr. Beltran Leon, right?
17  A. Yes, sir.
18  Q. And why didn't you call Mr. Beltran Leon?
19  A. Because I had no dealings with him.
20  Q. You've never had dealings with Mr. Beltran Leon, have you?
21  A. Never.
22  Q. In the five conversations that you had with him, there
23  never was discussion of marijuana, was there?
24  A. No.
25  Q. There was never discussions of any drug trafficking, was

1    there?

2    A.  No.

3    Q.  As a matter of fact, it was greeting discussions. "How

4    are you" and that's it, correct?

5    A.  That's right.

6    Q.  Now, getting back to this bad marijuana, why didn't you

7    call Alfredo Guzman and say, hey, look, man, you gave me

8    somebody else's marijuana and it's bad?

9    A.  Because they were doing me a favor.

10   Q.  What kind of favor would they be doing for you if you're

11   losing two million pesos or $2 million?

12   A.  I chose to lose.

13   Q.  You chose to lose two million pesos, correct?

14   A.  Yes.

15   Q.  You chose not to ask about it, correct?

16   A.  Yes.

17   Q.  And you had this deal with Alfredo Guzman, correct?

18   A.  Well, not -- not deal with him because it wasn't also him

19   to be blamed.

20   Q.  Well, your deal was with him, wasn't it?

21   A.  Yes.

22   Q.  Your arrangements to have the marijuana was with him,

23   correct?

24   A.  Yes.

25   Q.  And you're saying that you just didn't want to bother him

1    with it?

2    A.  Yes.

3    Q.  And so you're here today saying that Chuy Raul must have

4    had something to do with this, correct?

5    A.  I'm not saying that he had something to do with it, but

6    the one in the warehouse or the warehouse man did something

7    wrong.

8    Q.  Well, but you can't say that it's Chuy Raul's marijuana,

9    can you?

10   A.  Well, it had the trebol on it, and the warehouse man told

11   me that it was Chuy Raul's.

12   Q.  So someone told you because it had a clover on it, it had

13   to be Chuy Raul's?

14   A.  That's what the person from the warehouse told the person

15   that went there on my behalf.

16   Q.  All right.  So the person in the warehouse told your guy,

17   and he told you?

18   A.  Yes.

19   Q.  And you don't know whether or not that was a lie, do you?

20   A.  I received a photograph.

21   Q.  Of what?

22   A.  About the marijuana that was useless.

23   Q.  All right.  So you got the photograph, but my question is

24   you don't know whether the guy at the warehouse lied to your

25   worker, do you?

1   A. Well, if I'm looking at the -- I'm looking at one that is
2   not the one that I sent over there and it's useless, I
3   believed him.
4   Q. Well, let me ask you another way. Do you know if the guy
5   at the warehouse lied to your worker?
6   A. My worker didn't lie to me because he does not know Chuy
7   Raul, so how could he tell me so?
8   Q. Listen to my question. Do you know if the person at the
9   warehouse lied to your guy?
10  A. I don't think so.
11  Q. Do you know that for a fact?
12  A. Of course.
13  Q. Do you know the person at the warehouse?
14  A. No.
15  Q. Do you know whether or not that person's an honest person?
16  A. I don't know.
17  Q. You don't know if he's an honest person?
18  A. If he has that position, it's because he's honest.
19  Q. So you think -- without knowing him, you think that he may
20  be an honest person.
21  A. Yes.
22  Q. When's the first time that you mentioned that Chuy Raul
23  was involved with the marijuana that was -- that never made it
24  into the United States?
25  A. I never learned about it, not until the time that I was

1   told that that marijuana was not mine but was Chuy Raul's.
2   Q. Now, you, independent of what someone told your worker,
3   you don't have any information that it was Chuy Raul's, do
4   your?
5   A. No.
6   Q. And so all you have is some conversation, some hearsay
7   conversation that says there was a clover on it, and,
8   therefore, Chuy Raul is known as Trebol; therefore, it must be
9   his.
10  A. That's right.
11  Q. Did you know where Chuy Raul lived?
12  A. In Culiacán.
13  Q. Did you know where in Culiacán that he lived?
14  A. In a private residence where I lived.
15  Q. Did you ever make any effort to go talk to him and say,
16  hey, Chuy, man, you gave me some bad stuff or I got your bad
17  stuff?
18  A. I did not have to give him any claims because I did not
19  have any dealings with him.
20  Q. So you took a major hit, financial hit, just because you
21  didn't want to ask anybody about that marijuana; is that
22  right?
23  A. That's right.
24  Q. Ms. Fernandez, this is not your first time in a
25  courthouse, is it?

1   A. No, it's not the first time.
2   Q. As a matter of fact, you were sentenced to 153 months out
3   of the Central District of California, weren't you?
4   A. No, sir.
5   Q. You weren't sentenced to 153 months out of Los Angeles
6   federal court?
7   A. No, sir.
8   Q. How many years were you sentenced to?
9   A. 135 months, ten years.
10  Q. Okay. My apologies. It was 135 months that you were
11  sentenced.
12      And when you were sentenced to 135 months, you were
13  also given five years supervised release, weren't you?
14  A. Yes, sir.
15  Q. And when you went before the judge there in the Central
16  District of California, you told him you were never going to
17  engage in any criminal activity again; isn't that right?
18  A. Yes, sir.
19  Q. And were you lying to him?
20  A. Not at that time.
21  Q. And the conditions of release told you that you could not
22  commit another crime; is that right?
23  A. That's right.
24  Q. And you got released from prison in 2007; is that right?
25  A. That's right.

1   Q. And you began trafficking in drugs again 2009; isn't that
2   right?
3   A. That's right.
4   Q. And you were coordinating with at least a couple
5   customers; is that right?
6   A. That's right.
7   Q. And the two customers you were working with were the
8   Flores brothers?
9   A. No, sir.
10  Q. They weren't the Flores brothers?
11  A. No, sir.
12  Q. And back then, you were trafficking in 2009, 30 kilos per
13  week of cocaine?
14  A. Yes, sir.
15  Q. And 30 kilos is 120 kilos of cocaine a month?
16  A. Not exactly. Some of the times.
17  Q. Why don't you give me a number.
18  A. Because it was not exactly every week.
19  Q. On an average, that's what you trafficked?
20  A. Yes.
21  Q. And so that means that you were trafficking 1500 kilos of
22  cocaine a month -- or year? Excuse me.
23  A. Yes, sir.
24  Q. And the drug trafficking continued all the way up until
25  the time of your arrest; is that correct?

85

1  A. Yes, sir.

2  Q. Now, let's talk about 2012 to 2014. At that point, you

3  were trafficking 30 to 80 kilos of cocaine; is that correct?

4  A. Yes, sir.

02:00:00
5  Q. And you did that at least eight times?

6  THE INTERPRETER: Could I have --

7  BY MR. RALLS:

8  Q. You did that at least eight times?

9  A. Yes, sir.

02:00:11
10  Q. And so at least during that time during those years, it

11  was anywhere from 240 to 640 kilos of cocaine per year that

12  you were trafficking?

13  A. Yes, sir.

14  Q. And you were also moving marijuana?

02:00:32
15  A. That's right.

16  Q. And you were moving marijuana to Phoenix and Los Angeles?

17  A. That's right.

18  Q. And the marijuana that you were moving to Phoenix and Los

19  Angeles was approximately almost 10,000 pounds of marijuana;

02:00:56
20  is that right?

21  A. No.

22  Q. Well, how much marijuana were you moving?

23  A. I only tried that twice.

24  Q. Did you not move marijuana to Phoenix?

02:01:08
25  A. 500 kilos.

---

86

1  Q. That's what you moved to Phoenix?

2  A. Yes, only once.

3  Q. And how much marijuana did you move to Los Angeles?

4  A. None.

02:01:24
5  Q. We'll get to that in a minute.

6  You also were sending methamphetamine, weren't you?

7  A. That's right.

8  Q. How much methamphetamine were you sending into the United

9  States?

02:01:44
10  A. Only 50 pounds.

11  Q. Only 50?

12  And you were also sending into the United States

13  heroin?

14  A. That's right.

15  Q. How much heroin were you sending into the United States?

02:02:02
16  A. Anywhere from 5 to 10 kilos, 15 sometimes.

17  Q. Okay. So during that time period, you sent approximately

18  150 kilos of heroin into the United States?

19  A. Yes, sir.

02:02:24
20  Q. Any other drugs that you were bringing into the United

21  States?

22  A. No, sir.

23  Q. How much money were you making at that point in time?

24  A. I did not make anything.

02:02:41
25  Q. You didn't make any money?

1  A. Everything was being detained by police.
2  Q. And so in other words, you were sending drugs, and
3  everything was being seized?
4  A. Some of it, but I never made gains.
5  Q. Now, during -- your brother was arrested, Manuel was
6  arrested in Mexico and brought or extradited to the United
7  States, correct?
8  A. That's right.
9  Q. Now, when he was arrested and brought into the United
10 States, did he send you money so you could continue drug
11 trafficking?
12 A. I asked him for a loan.
13 Q. And you told him that the loan was so that you could
14 traffic in drugs, correct?
15 A. Yes, sir.
16 Q. And was this a point in time -- and Manuel sent you the
17 money, didn't he?
18    THE INTERPRETER: Could I have that --
19 BY MR. RALLS:
20 Q. Manuel sent you the money?
21 A. That's right.
22 Q. And there were several millions of dollars that he sent
23 you?
24 A. Yes.
25 Q. How many millions of dollars did Manuel send you when he

1  was here in the United States?
2  A. $500,000.
3  Q. He sent you a couple million, didn't he?
4  A. Not to me.
5  Q. There was you and your brother Evarado that were involved
6  in the drug trafficking business.
7  A. Yes.
8  Q. And he sent you and Evarado at least $2 million, didn't
9  he?
10 A. He didn't -- he did not know. Evarado did not know in the
11 beginning that that's what it was for. He sent me 500
12 million -- 500,000, but that was only to me, and I actually
13 lost a load in order to pay him back.
14    THE INTERPRETER: Your Honor, can the interpreters
15 change?
16    THE COURT: Yes.
17    (Pause.)
18    THE COURT: You can proceed.
19    MR. RALLS: Thank you, Judge.
20 BY MR. RALLS:
21 Q. Now, when Manuel sent you this money, did you -- he knew
22 you were going to buy drugs, correct?
23 A. That's right.
24 Q. And Manuel was cooperating with the U.S. authorities at
25 that point in time; isn't that correct?

1   A. That's right.

2   Q. And he didn't tell the U.S. Government law enforcement

3   that he was sending you money, a half million dollars --

4       THE INTERPRETER: She says the volume is very low, so

5   I'm going to raise the volume.

6       MR. ERSKINE: I object to the question, the witness's

7   ability to know what her brother would know at that point in

8   time.

9       THE COURT: I'll sustain that objection. So rephrase

10  the question.

11  BY MR. RALLS:

12  Q. You communicated with Manuel, your brother --

13  A. Yes, sir.

14  Q. -- during the time that he was in -- at the MCC here; is

15  that correct?

16  A. That's right.

17  Q. And you communicated with him by text?

18  A. No.

19  Q. Sorry, by email?

20  A. Possibly. I don't remember how it was, but I did ask for

21  the loan.

22  Q. And when you communicated with him, you also communicated

23  with him by telephone?

24  A. That's right.

25  Q. And when you communicated with him, you guys talked about

---

1   the fact that you wanted to get back into drug trafficking?

2   A. No.

3   Q. You talked to him, communicated with him about the loan or

4   the money that he was going to give you, correct?

5   A. I ask him for the money as a loan.

6   Q. And the communications a lot of times were with family

7   members that gave him the message that you wanted the money so

8   you could --

9   A. That's right.

10  Q. -- so you could engage in drug trafficking?

11  A. That's right.

12  Q. And this was all during the time when -- well, let me ask

13  you this: You knew Manuel was cooperating with the federal

14  government?

15  A. No, no.

16  Q. When did you learn Manuel was cooperating with the federal

17  government?

18  A. When I arrived here.

19  Q. And when did you arrive here?

20  A. November 20, I think, but I'm not sure.

21  Q. Of which year?

22  A. Of '18.

23  Q. Okay. So you came --

24  A. No, excuse me. '17.

25  Q. And when did you decide that you would start cooperating?

91

1    A.   Me?

2    Q.   Yes.

3    A.   When I arrived here.

4    Q.   Now, you entered into a plea agreement here that basically

5    limits your exposure from 10 to 15 years; isn't that right?

6    A.   That's right.

7    Q.   And you entered into this agreement with a prior drug

8    conviction where you got more than 10 years, correct?

9    A.   That's right.

10   Q.   And where you went to Mexico and you violated conditions

11   of supervised release, correct?

12   A.   That's right.

13   Q.   And with the understanding that you might get less time

14   out of this court than you got out of the Central District of

15   California; is that right?

16   A.   That's right.

17   Q.   And all you've got to do is come in and say Chuy Raul was

18   involved in some marijuana that never made it into the United

19   States.

20        MR. ERSKINE:   Objection, Your Honor.   That's not what

21   the plea agreement says.

22        THE COURT:   Sustained.

23   BY MR. RALLS:

24   Q.   Well, you don't dispute with me that the marijuana never

25   made it to the United States, correct?

92

1    A.   Correct.

2    Q.   And you don't disagree with me that you never talked to

3    Chuy Raul about the marijuana, correct?

4    A.   Never.

5    Q.   And you don't dispute with me that you never had Chuy

6    Raul's telephone number; is that right?

7    A.   Never.

8    Q.   You never texted with Chuy Raul?

9    A.   Never.

10   Q.   And nobody other than the worker, your worker who talked

11   to some warehouse guy, nobody's ever told you that that was

12   Chuy Raul's marijuana; isn't that right?

13   A.   No.

14   Q.   That's not right?

15   A.   No.

16   Q.   Someone else told you that was --

17   A.   No, nobody told me that.

18   Q.   Okay.   So it's clear, nobody told you that that was Chuy

19   Raul's marijuana other than your worker?

20   A.   That's right.

21        MR. RALLS:   That's all I have.   Thank you, Judge.

22        THE COURT:   Okay.

23        MR. ERSKINE:   No more questions, Your Honor.

24        THE COURT:   Okay.

25        THE WITNESS:   Can I say something?

93

1　　　MR. RALLS: No.
2　　　THE COURT: Do you object to this?
3　　　MR. RALLS: Yeah.
4　　　THE COURT: Okay. No. The witness is excused.
5　　　THE COURT: Okay.
6　　　THE COURT: Thank you.
7　　　THE WITNESS: Thank you.
8　　　THE COURT: The government can call their next
9　　witness.
10　　　MS. CSICSILA: The United States called Manuel
11　　Fernandez Valencia.
12　　　THE COURT: Okay, sir, we'll let you get situated.
13　　　THE INTERPRETER: Just one second, Judge.
14　　　(Pause.)
15　　　THE INTERPRETER: We're ready.
16　　　THE COURT: If you would raise your right hand, sir,
17　　and face me.
18　　　(Witness sworn.)
19　　　THE WITNESS: Yes, sir.
20　　　THE COURT: Okay. Thank you, you may proceed.
21　　MANUEL FERNANDEZ VALENCIA, GOVERNMENT'S WITNESS, SWORN,
22　　　　　　　　DIRECT EXAMINATION
23　　BY MS. CSICSILA:
24　　Q. Could you please state your full name and spell your last
25　　name for the record.

94

1　　A. Manuel Fernandez Valencia.
2　　Q. That's V-A-L-E-N-C-I-A?
3　　A. Yes.
4　　Q. Are you known by any other name or nickname?
5　　A. La Puerca.
6　　Q. Where are you from?
7　　A. El Aguacate, Michoacán, Mexico.
8　　Q. How far did you go in school?
9　　A. Sixth year of elementary school.
10　　Q. Before coming into U.S. custody, what did you do for a
11　　living?
12　　A. Farming and drug trafficking.
13　　Q. You were arrested in Mexico in 2010; is that correct?
14　　A. Yes.
15　　Q. And then you were extradited to the United States to face
16　　drug trafficking charges in this district, correct?
17　　A. Yes.
18　　Q. In 2015, did you plead guilty before Judge Guzman to
19　　conspiring to distribute cocaine and heroin?
20　　A. Yes.
21　　Q. At that time, did you have a written plea agreement with
22　　the government?
23　　A. Excuse me?
24　　Q. At that time, did you have a written plea agreement with
25　　the government?

95

1    A.   No.

2    Q.   What sentence did you receive?

3    A.   27 years.

4    Q.   And did that 27 years include credit for 16 months that

5    you spent in a Mexican prison awaiting extradition?

6    A.   Yes.

7    Q.   Have you since agreed to cooperate with the government?

8    A.   Yes.

9    Q.   What are you required to do as part of your agreement with

10   the government?

11   A.   To tell the truth.

12   Q.   What do you expect to receive in return for your

13   cooperation with the government?

14   A.   A reduction to my sentence.

15   Q.   And has the government represented that it will recommend

16   a sentence of no less than 25 percent off of your current

17   sentence so long as you fulfill your obligations under the

18   agreement?

19   A.   Yes.

20   Q.   Now, have you ever performed any acts of violence?

21   A.   No.

22   Q.   Have you ordered any acts of violence?

23   A.   No.

24   Q.   Why not?

25   A.   Because I am not a violent person, I don't like violence.

---

96

1    Q.   In 2012, you were incarcerated in this district; is that

2    correct?

3    A.   Yes.

4    Q.   And you were -- your case was pending before Judge Guzman

5    at that time.

6    A.   Yes.

7    Q.   Now, were you also attempting to cooperate with the

8    government at that time?

9    A.   Yes.

10   Q.   And in 2012, while you were incarcerated and while

11   attempting to cooperate with the government, did you loan a

12   million dollars to two of your siblings so that they could

13   invest in drug trafficking operations?

14   A.   Yes.

15   Q.   And did you arrange for those loans in part through the

16   use of telephone numbers associated with other inmates in the

17   jail?

18   A.   Yes.

19   Q.   Later did you arrange for a second loan to your siblings

20   for $2 million?

21   A.   Yes.

22   Q.   And then in 2014, did you arrange for a third loan of

23   $1.4 million to your siblings?

24   A.   Yes.

25   Q.   And that was all with the understanding, your

97

1    understanding, that the money would be used for drug

2    trafficking?

3    A.   Yes.

4    Q.   And at the time, you did not tell the government about

5    those loans, correct?

6    A.   Right.

7    Q.   Now, in addition, when you were asked while your case was

8    pending by the government about Ivan Guzman, did you tell the

9    government everything you knew about him?

10   A.   No.

11   Q.   Have you since answered the government's questions

12   truthfully regarding Ivan Guzman?

13   A.   Yes.

14   Q.   And, in fact, you admitted to both these loans and

15   withholding information about Ivan Guzman in approximately

16   2016 only after you were confronted by the government?

17   A.   Yes.

18   Q.   Now, I'd like to ask you about Jesus Raul Beltran Leon.

19   Do you know a person by that name?

20   A.   Yes.

21   Q.   Do you know that individual by any other names?

22   A.   El Chuy or Trebol.

23   Q.   When did you learn that the defendant goes by the nickname

24   Trebol?

25   A.   Here at the MCC from other inmates.

---

98

1    Q.   How is it that you know Mr. Beltran Leon?

2    A.   I met him in Culiacán, Sinaloa.

3    Q.   And in what context?

4    A.   At a baptism of one of his children.

5    Q.   When did you first meet him?

6    A.   Around 2002.

7    Q.   Are you familiar with what Mr. Beltran Leon does or did

8    for a living?

9    A.   No.

10   Q.   When you met Mr. Beltran Leon, did you have an

11   understanding as to how he made money?

12   A.   No.

13   Q.   Let me ask you this: The baptism that you said you met

14   Mr. Beltran Leon at, were there other individuals present?

15   A.   Could you repeat the question, please?

16   Q.   Were there other individuals who were present at the

17   baptism where you met the defendant?

18   A.   Yes.

19   Q.   And how was it that you were at the same event together?

20   A.   Because -- because the defendant invited a nephew of mine

21   to that event, and that's how I met him and the family.

22   Q.   At the time, did you understand the defendant to be

23   involved in drug trafficking?

24   A.   No.

25   Q.   Did you later learn that he was involved in drug

1    trafficking?

2    A.   Yes.

3    Q.   And how was that?

4    A.   Because I -- because I sold some drugs to Alfredo Guzman,

5    and those drugs were for him.

6    Q.   Okay.   And we'll talk about that incident in a little bit.

7         Let me show you -- you have a photo in front of you

8    marked Government Exhibit Group Photo?

9    A.   Yes.

10   Q.   Do you recognize some of the individuals in that photo?

11   A.   Some of them.

12   Q.   Starting with the person on the left, do you recognize

13   that person?

14   A.   Yes.   That is Chuy Raul.

15   Q.   And I'd ask you to look around -- would you recognize him

16   today if you saw him?

17   A.   Yes.

18   Q.   Could you look around the courtroom and see if you see the

19   person you know as Chuy Raul?

20   A.   Yes, the one wearing the orange uniform.

21   Q.   Turning back to Group Exhibit or Government Exhibit Group

22   Photo, the person to the right of the defendant --

23        MS. CSIKSZLA:   And, Judge, I would ask that the

24   record reflect that he identified the defendant.

25        THE COURT:   It will.

99

1    BY MS. CSIKSZLA:

2    Q.   Turning next to the defendant to the right of the

3    defendant, do you recognize that person?

4    A.   No.

5    Q.   And how about the person in the center with the red apron?

6    A.   Yes.

7    Q.   Who is that?

8    A.   Victor.

9    Q.   Do you know Victor's last name?

10   A.   Felix.

11   Q.   And the next three individuals moving from left to right,

12   can you describe if you know them and if you do what their

13   name is?

14   A.   Ivan Archivaldo.   I don't know the other one.   And the

15   last one is Alfredo Guzman.

16   Q.   I'd like to ask you now a few questions about your

17   involvement with the Sinaloa Cartel.   Prior to 2004, were you

18   involved in drug trafficking?

19   A.   Yes.

20   Q.   And as of approximately 2004, what kind of drugs were you

21   moving?

22   A.   Cocaine and marijuana.

23   Q.   Approximately how much and how often were you moving those

24   drugs?

25   A.   About 500 to 1,000 kilos a month.

100

1 Q. And where were you moving those drugs from?
2 A. From Guadalajara to Tijuana, Baja, California; from
3 Tijuana to Los Angeles.
4 Q. You were shot and injured in approximately 2004, correct?
5 A. Yes.

02:24:28

6 Q. After you recovered from those injuries, did you return to
7 drug trafficking?
8 A. Yes.
9 Q. Approximately when?
10 A. I came back in 2006 to Culiacán, Sinaloa to align myself

02:24:36

11 with Chapo.
12 Q. Why did you decide to align yourself with Chapo at that
13 time?
14 A. Because I had been attacked in Guadalajara, and I wanted
15 to request his protection for whatever happened in the future.

02:25:05

16 Q. Did you eventually start moving cocaine with Chapo?
17 A. Yes.
18 Q. When did that start?
19 A. I started in January of 2007.
20 Q. And what, if any, individual did you work with within the

02:25:27

21 cartel to move cocaine starting in January of 2007?
22 A. With Mochomo.
23 Q. Do you know Mochomo's real name?
24 A. Alfredo Beltrán-Leyva.
25 Q. And is it fair to say that you began moving larger amounts

02:25:48

1 of cocaine after you started moving drugs with the Sinaloa
2 Cartel?
3 A. Yes.
4 Q. While working with the Sinaloa Cartel, did you have
5 personal protection?

02:26:02

6 A. Yes.
7 Q. And, in fact, did you have two armed individuals assigned
8 to you as bodyguards?
9 A. Yes.
10 Q. What, if any, understanding did you have as to whether the

02:26:14

11 other cartel members had armed bodyguards?
12 A. Yeah, some other members.
13 Q. In terms of what members? Can you describe for the Court
14 what level those members were within the cartel?
15 A. Mochomo and Chapo's children.

09:26:36

16 Q. And Chapo himself, correct?
17 A. And Chapo himself.
18 Q. In 2008, did Mochomo stop his affiliation with the Sinaloa
19 Cartel?
20 THE INTERPRETER: Excuse me. Could you repeat?

02:26:57

21 BY MS. CSICSILA:
22 Q. In 2008, did Mochomo stop his affiliation with the Sinaloa
23 Cartel?
24 A. Yes.
25 Q. And around that time, did you begin receiving cocaine

02:27:05

1  loads from Chapo?
2  A. Yes.
3  Q. Now, these cocaine loads, with whom did you arrange to
4  receive those?
5  A. With his son Alfredo.
6  Q. Approximately how much cocaine did you receive in a load?
7  A. About 300 kilos five times.
8  Q. And did you begin -- did you receive some of those loads
9  in 2009?
10  A. Yes.
11  Q. I'd like to turn now to a June 2009 load of cocaine that
12  you received. Do you recall receiving a load of cocaine from
13  Chapo and Alfredo in approximately June of 2009?
14  A. Yes.
15  Q. Where were those drugs delivered to?
16  A. In Culiacán.
17  Q. And once you obtained the kilograms of cocaine in
18  Culiacán, what did you intend to do with them?
19  A. Take it to Los Angeles for sale.
20  Q. And did the drugs in fact move into the United States?
21  A. Yes.
22  Q. Was it all of your cocaine, all 300 kilograms?
23  A. Mine and El Chapo's.
24  Q. Who received the drugs on your behalf in Los Angeles?
25  A. El Zarco, my worker.

1  Q. Were all of the drugs sold in Los Angeles?
2  A. No.
3  Q. Why not?
4  A. Because they seized 90 kilograms.
5  Q. And when you say they, you're referring to law
6  enforcement?
7  A. In the month of June.
8  Q. Yes, when you said they seized --
9  A. The government.
10  Q. Now, before the drugs -- the drugs were seized, did you
11  receive a message from Alfredo Guzman about the load of drugs?
12  A. Yes.
13  Q. And approximately when did you receive that message in
14  relation to when the drugs arrived in Los Angeles?
15  A. About a week after the drug arrived.
16  Q. How did Alfredo communicate with you?
17  A. He sent me a BlackBerry message.
18  Q. And in the message that you received from Alfredo a week
19  after the drugs arrived in L.A., what did he say to you about
20  the load?
21  A. He asked me if I had any of the 300 kilos left over.
22  Q. And how did you respond?
23  A. I told him, yes, that it looked like I still had about a
24  hundred kilos.
25  Q. And what, if anything, did Alfredo say about why he was

105

1    asking if you still had some of the drugs available for sale?

2    A.  Yes, because he needed a hundred kilos for Chuy.

3    Q.  When Alfredo said he needed the kilograms for Chuy, who

4    did you understand him to be referring to?

5    A.  To the defendant.

6    Q.  And how did you know that he was referring to the

7    defendant?

8    A.  Because I don't know any other friend or relative of

9    Alfredo's by the name of Chuy other than him.

10   Q.  So what did you tell Alfredo in response to his questions

11   about whether there were drugs left?

12   A.  That I was going to check and see how much was left over,

13   and then they answer my message telling me that there were

14   only 90 kilos left, that if he could use that.

15   So he said let me ask Chuy.  And he asked me right

16   away, yes, I'm interested in the 90.  I can use them.

17   I am going to give you the phone number of Chuy's

18   worker so you can reach an agreement with his worker in Los

19   Angeles.

20   Q.  And this is Alfredo telling you this?

21   A.  That's right.

22   Q.  Were the 90 kilos -- well, did you pass along the phone

23   number to your worker?

24   A.  Yes.

25   Q.  Were the 90 kilos delivered to the defendant's worker?

02:30:48 (line 5)
02:31:07 (line 10)
02:31:39 (line 15)
02:32:12 (line 20)
02:32:25 (line 25)

106

1    A.  No.

2    Q.  They were seized beforehand?

3    A.  Before they got to him.

4    Q.  How did you learn about the seizure?

5    A.  By the same BlackBerry, Alfredo let me know that it looked

6    like there were some problems.

7    Q.  Did you contact your workers in Los Angeles to investigate

8    what problems were occurring?

9    A.  That's right.

10   Q.  And after you contacted your workers, did you then contact

11   Alfredo?

12   A.  That's right.

13   Q.  And what, if anything, did you tell Alfredo about what

14   your workers told you in that conversation?

15   A.  That, yes, that it looked like the police had stopped him

16   and that there were a lot of policemen at his house.

17   Q.  And when you say they stopped him, who are you referring

18   to?

19   A.  El Zarco, my worker.

20   Q.  What, if anything, did Alfredo tell you about the

21   defendant's worker?

22   A.  That he was fine, that he was sending him messages because

23   he was looking at everything that was going on.

24   Q.  In other words, the defendant's worker was watching the

25   seizure take place?

02:32:42 (line 5)
02:33:05 (line 10)
02:33:19 (line 15)
02:33:38 (line 20)
02:34:01 (line 25)

Case: 1:09-cr-00383 Document #: 778 Filed: 10/03/19 Page 107 of 165 PageID #:7158
M. Fernandez Valencia - direct
107

1 A. That's right.
2 Q. Were you able to get some kind of police reports following
3 the seizure?
4 A. Yes.
02:34:15 5 Q. When did you get those?
6 A. About a week later.
7 Q. And were you in Mexico at the time you received them?
8 A. Yes.
9 Q. When you received the reports, did you read them?
02:34:30 10 A. No.
11 Q. Why not?
12 A. Because I don't speak English. I don't know how to read
13 in English.
14 Q. So what did you do with the reports once you received
02:34:42 15 them?
16 A. I sent Alfredo a BlackBerry message. I told him that I
17 had the police report so we could get together to determine
18 where the problem was coming from, if it was on the side of my
19 worker or on the side of Chuy's worker.
02:35:11 20 Q. And was a meeting arranged with Alfredo?
21 A. Yes.
22 Q. Who, if anyone else, was arranged to be at the meeting?
23 A. Alfredo, Chuy and I.
24 Q. Okay. Now, before the meeting, did you have an
02:35:32 25 opportunity to learn what was contained in the police reports?

Case: 1:09-cr-00383 Document #: 778 Filed: 10/03/19 Page 108 of 165 PageID #:7159
M. Fernandez Valencia - direct

1 A. Yes.
2 Q. And is that because a family member read the reports to
3 you?
4 A. Yes.
02:35:44 5 Q. And that family member spoke English?
6 A. Yes.
7 Q. Now, did you, in fact, go to meet with Alfredo and the
8 defendant to discuss what was in the reports?
9 A. Yes.
02:36:00 10 THE INTERPRETER: Your Honor, may the interpreters
11 switch?
12 THE COURT: Yes.
13 (Pause.)
14 THE INTERPRETER: We're ready.
02:36:16 15 BY MS. CSICSILA:
16 Q. Okay. When your family member read the reports to you,
17 did you recognize any of the names contained in the report?
18 A. Yes.
19 Q. Whose names did you recognize?
02:38:28 20 A. Baldo's and my name.
21 Q. Now, this meeting that was arranged between you, the
22 defendant and Alfredo, where was that meeting to take place?
23 A. Yes.
24 Q. Where was it to take place?
02:38:48 25 A. At an apartment complex that is located in Zapopan,

1 fact, El Gordo in his apartment had a fucking load of ice.
2 Q. When you said Gordo, you're referring to the defendant's
3 worker?
4 A. That's right.
5 Q. And what did you understand that apartment to be, the one
6 that the defendant was referring to?
7 A. Well, that El Gordo had drugs in that apartment.
8 Q. That it was used as a stash location?
9 A. Yes. Yeah, like a warehouse.
10 Q. Approximately how long did the meeting last?
11 A. About 20 minutes.
12 Q. And after you talked with Alfredo and the defendant, what
13 happened?
14 A. I went back home.
15 Q. When you said -- just stepping back just a moment, when
16 you mentioned that the defendant said that his worker had a
17 large amount of ice, what are you referring to by "ice"?
18 A. Methamphetamine.
19 Q. Now, following this meeting in the apartment complex
20 lobby, did you have any other meetings regarding the seizure?
21 A. Yes.
22 Q. And, in fact, did you meet briefly with the defendant's
23 worker in Mexico to discuss the seizure?
24 A. Yes.
25 Q. That meeting took place at your house in Mexico?

1 Jalisco.
2 Q. And did you, in fact, go to that apartment complex to meet
3 with the defendant and Alfredo?
4 A. Yes.
5 Q. Who, if anyone, went with you to that meeting?
6 A. My family -- my relative.
7 Q. The same one that read the report?
8 A. Yes.
9 Q. When you arrived at the building, can you describe what
10 happened?
11 A. When I got to the building, Chuy Raul was there, Alfredo,
12 my niece, my relative, and me.
13 Q. What happened once you met in the apartment building? Did
14 you stay -- did you go into an apartment?
15 A. There are couches in the lobby, and we sat down to talk
16 there.
17 Q. Your family member, did your family member read the
18 report?
19 A. Yes.
20 Q. Out loud?
21 A. Yes.
22 Q. After the report was read, what, if anything, did the
23 defendant say about what happened with the seizure?
24 A. He told me that he could not find a sign in it related to
25 this issue coming from his people or his worker, that, in

1 A. Yes.
2 Q. And did you also have a second meeting that took place in
3 the mountains?
4 A. Yes.
5 Q. Who was that meeting with?
6 A. With Alfredo, El Chapo, and myself.
7 Q. What, if anything, was said about the kilos that were lost
8 during this seizure during that meeting?
9 A. That from those last 300 kilos that he had sold me, 90 had
10 been seized from us in Los Angeles. And after having done our
11 research, we would have to take a loss, 50 percent them and
12 50 percent me.
13 Q. Now, what -- did Alfredo tell Chapo anything about the
14 seizure during this meeting?
15 A. Yes.
16 Q. What did he say to Chapo?
17 A. That my worker had been arrested at the time that he was
18 going to give those 90 kilos to Chuy's worker.
19 Q. Now, you've met with prosecutors in this district on
20 several occasions over the course of several years, correct?
21 A. Yes.
22 Q. And when you first told the government about this seizure
23 in Los Angeles, did you tell the government about the
24 defendant's involvement?
25 A. No.

1 Q. Why not?
2 A. Because at that time, I could not recall, and I was also
3 being asked about El Chapo and Alfredo.
4 Q. Who did you consider this deal to be with?
5 A. Alfredo.
6 Q. And when discussing how to cover the loss from the
7 seizure -- I guess with respect to the loss from the seizure,
8 who ended up absorbing that loss?
9 A. Between El Chapo and me.
10 Q. Now, at some point, were you told about the defendant's
11 involvement in a shooting?
12 A. I overheard.
13 Q. Approximately when did you first learn about it?
14 A. In October of 2006.
15 Q. How was it that you learned about allegations of the
16 defendant being involved in a shooting?
17 A. I got together with a nephew of El Chapo, Chapito Lomas,
18 and another individual by the name of Tino. We got together
19 so that Tino could be introduced as a potential customer to
20 sell drugs to him.
21 Q. To sell drugs to Chapito Lomas?
22 A. Tino.
23 Q. I'm sorry, yes, the other way around, correct?
24 During the meeting, what was said about the shooting?
25 A. Tino was stating to me that he was a person who was

1   serious and to be trusted and that he had worked -- he had

2   been working with the defendant's father; that, in fact, at

3   the time that the defendant had killed a person at a party,

4   Tino hid him away in his ranch.

02:45:13   5   Q. When you say hid him away, you're referring to the

6   defendant?

7   A. Yes.

8   Q. And did Tino report that he hid him away at the ranch

9   after the shooting?

02:45:24   10   A. That's right.

11   Q. What, if anything, did Tino say about whether he was

12   present for the shooting?

13   A. No.

14   Q. He didn't say anything?

15   A. No.

02:45:38   16   Q. At the time, did you have an understanding as to who had

17   been shot?

18   A. I overheard or I heard between El Chapito Lomas and him

19   that, oh, yeah, the guy that got shot was a relative of Los

20   Idus or something like that.

02:46:06   21   Q. And who is Los Idus?

22   A. It's a Culiacán family.

23   Q. At some point did you have another conversation about the

24   shooting?

02:46:20   25   A. Yes.

---

1   Q. And when was that?

2   A. In December of 2006.

3   Q. How is it that you recall that you had this second

4   conversation in approximately December 2006?

02:46:38   5   A. Because that was the time when the father of the

6   defendant, Chuy Raúl, was arrested.

7   Q. Who was present during this conversation?

8   A. Alfredo, Felipe, El Mochomo's secretary, the defendant,

9   and myself.

02:47:56   10   Q. Where did this conversation take place?

11   A. At a house that I was using as an office in Culiacán.

12   Q. What was the purpose of the meeting?

13   A. Chuy wanted to meet with El Mochomo and asking for help to

14   see if he could get his father released or ask him for help to

15   help his father who had just been arrested in Guadalajara.

02:47:38   16   Q. Did Felipe, Mochomo's secretary, say anything in response

17   to the request?

18   A. Yes. He asked the defendant what are you doing in

19   Culiacán, because he knew that he was not to be in Culiacán

20   based on what he had done.

02:48:12   21   And the defendant said, yes, I know, but I am

22   desperate. I need to talk to Alfredo or Mochomo to find out

23   if you can help me or ask for advice.

24   Q. What, if anything, did the defendant say about where he

02:48:43   25   was going after this meeting?

1 A. That he would be going back to Guadalajara.

2 Q. And do you know if he, in fact, went back to Guadalajara?

3 A. I'm not aware.

4        MS. CSICSILA: I have no further questions.

5        THE COURT: Okay. Cross-examination.

6              CROSS-EXAMINATION

7 BY MR. RALLS:

8 Q. Mr. Fernandez --

9 A. Yes.

02:49:38

10 Q. -- have you ever talked to Mr. Beltran Leon over the

11 telephone?

12 A. No.

13 Q. Have you ever texted him?

14 A. No.

02:49:53

15 Q. Now, other than this one 90-kilo deal you talked about,

16 you'd never done any drug trafficking with Mr. Beltran Leon,

17 have you?

18 A. No.

19 Q. I want to clear up a couple of things here.

02:50:20

20    How many loans did you make to your sister and your

21 brother Evarado?

22 A. Three.

23 Q. The first one was how much?

24 A. For $1 million.

02:50:38

25 Q. And the second was?

---

1 A. It was both for my brother and my sister, one million

2 each.

3 Q. The second loan?

4 A. The first one and the second one.

02:51:01

5 Q. Okay. I'm losing you here.

6    The loans were for your brother Evarado and your

7 sister Guadalupe, correct?

8 A. Correct, sir.

9 Q. The first one was for $1 million?

02:51:22

10 A. Each.

11 Q. Okay. So it was a loan of $2 million the first time?

12 A. That's right.

13 Q. And the second loan was for another $2 million, correct?

14 A. That's right.

02:51:38

15 Q. And the third loan was for $1,000,400, correct?

16 A. That's right.

17 Q. Okay. So you loaned your brother and sister almost

18 five-and-a-half million dollars, correct?

19 A. Yes.

02:52:02

20 Q. And you did this through -- while you were here at the

21 MCC; is that right?

22 A. Yes.

23 Q. And you did this without the government knowing about it;

24 is that correct?

02:52:16

25 A. Yes.

1    Q.  All right. I just want to clear that up.

2        I'm going to show you -- I've shown it to the

3  government.

4        THE COURT:  Okay. Have you marked it?

5        MR. RALLS:  I --

6        THE COURT:  Mark it as Defendant's 1.

7        MR. RALLS:  All right. I will mark it, if it's okay

8  with the Court, I will mark it immediately after.

9        THE COURT:  Okay. That's fine.

10  BY MR. RALLS:

11    Q.  Who is this person right here?

12    A.  Me.

13    Q.  And when was that photo taken of you?

14    A.  They took that of me when I was arrested in Mexico.

15    Q.  Is that the way you normally look?

16    A.  Yes.

17    Q.  With black eyes?

18    A.  No.

19    Q.  Who are the two gentlemen that are standing next to you

20  there?

21    A.  Federal agents that arrested me.

22    Q.  And was that in Mexico City?

23    A.  I was arrested in Culiacán, and they took that picture of

24  me in Mexico, yes, Mexico City.

25    Q.  I'm showing you the next exhibit, which will be Defense

1  Exhibit No. 2.  Is that a closer picture of you?

2    A.  Yes.

3    Q.  And why do you look that way?

4    A.  Because the federal agents that arrested me tortured me.

5    Q.  And that was in Culiacán?

6    A.  That's right.

7    Q.  I want to talk to you a little bit about that. How did

8  they torture you?

9    A.  They kicked me, they would hit me with their rifles on my

10  back, and they would kick my entire body. They would have me

11  blindfolded. They would threaten me about killing me, and

12  this took place over two days, give or take.

13        THE COURT:  Which federal agents are we talking

14  about?

15        THE WITNESS:  The federal police.

16        THE COURT:  The Mexican federal police?

17  BY MR. RALLS:

18    Q.  Mexican federal police?

19    A.  That's right.

20    Q.  Do you know whether or not this group of federal Mexican

21  police were under the command of Eduardo Pequeño?

22    A.  I don't know under who they would be.

23    Q.  Do you know if Eduardo Pequeño was the head of the Mexican

24  group, Mexican law enforcement that is known as the Special

25  Investigative Unit of the DEA?

1   A. No, I don't know.
2   Q. Do you know if the SIU Mexican police is trained in
3   Quantico, Virginia?
4   A. I don't know.
5   Q. Do you know whether or not this SIU unit is subsidized by
6   the DEA?
7   MS. CSICSILA: Objection. I'm not sure that there's
8   a basis for this witness to have an understanding.
9   THE COURT: Okay. We're just going a little off
10  track.
11  Let me just ask you this, Mr. Ralls. Are these the
12  same federal police officers who arrested the defendant?
13  Because in your pleadings, you're saying it was the Mexican
14  Marines.
15  MR. RALLS: Yes.
16  THE COURT: I'm not hearing Mexican Marines.
17  MR. RALLS: We're not hearing Mexican Marines, but
18  what we're hearing is in our pleadings we make reference to
19  the Detroit torture case in which the SIU federal agents were
20  under the command of Eduardo Pequeño.
21  THE COURT: Okay. So how does this relate to the
22  defendant's arrest?
23  MR. RALLS: Well, it relates in the sense that we
24  have that witness testimony -- well, the affidavit of Leonardo
25  Silva who talks about the DEA Special Investigative Unit

1   Eduardo Pequeño and the fact that they were utilizing the SIU
2   unit and then they began immediately to utilize the Mexican
3   Marines.
4   THE COURT: Okay. I'm going to sustain the
5   objection.
6   MR. RALLS: All right.
7   BY MR. RALLS:
8   Q. I want to talk a little bit about the shooting of this
9   individual in Culiacán.
10  A. Yes.
11  Q. And you said you heard someone say that Mr. Beltran Leon
12  had shot someone in Culiacán?
13  A. Yes.
14  Q. Do you have the name of that person?
15  A. Nickname, Chapito Lomas and Tino.
16  Q. The person that died, the supposedly the person that got
17  shot.
18  A. No.
19  Q. Do you know what year that happened in?
20  A. No.
21  Q. Do you know the location it happened in?
22  A. No.
23  Q. Can you give us any details that would tell us, you know,
24  anything about the shooting?
25  A. No.

122

1    Leon.

2    A.  Can you repeat the question?

3    Q.  Sure.

4    A.  Slowly.

03:01:07  5    Q.  Did you and Mr. Beltran Leon ever have a conflict?

6    A.  No.

7    Q.  And you've been at the MCC for several months, correct?

8    A.  Yes.

9    Q.  And you're on a different floor than Mr. Beltran Leon,

03:01:26  10   correct?

11   A.  Repeat the question, please?

12   Q.  You're on a different floor than Mr. Beltran Leon?

13   A.  Yes.

14   Q.  And there's been no communication between you and

03:01:42  15   Mr. Beltran Leon, correct?

16   A.  No.

17   Q.  And you've never received any message from Mr. Beltran

18   Leon, correct?

19   A.  Greetings.

03:01:57  20   Q.  It's -- when you say greetings, he just said someone will

21   tell you Mr. Beltran Leon says hello?

22   A.  That's right.

23   Q.  And you would respond say tell Mr. Beltran Leon hello,

24   correct?

03:02:13  25   A.  That's right.

---

121

1    Q.  So in other words, this is something you just heard,

2    correct?

3    A.  That's right.

4    Q.  And you don't have any personal knowledge of it?

02:59:25  5    A.  No.

6    Q.  I want to talk to you about your communications or lack

7    thereof with Mr. Beltran Leon at the MCC here in Chicago.

8    You've known Mr. Beltran Leon for how long?

9    A.  Since 2002.

02:59:56  10   Q.  And when you met him in 2002, you met him at -- at a party

11   or something?

12   A.  Yes.

13   Q.  Mr. Beltran Leon was drinking?

14   A.  I don't recall.

03:00:18  15   Q.  Do you recall how many times that you would see

16   Mr. Beltran Leon drunk?

17   A.  No.

18   Q.  But you've seen him drunk?

19   A.  No.

03:00:33  20   Q.  No?

21   A.  No.

22   Q.  All right.  And you and him had a friendly relationship.  I

23   take it?

24   A.  Can you repeat the question, please?

03:00:50  25   Q.  There was never any issues between you and Mr. Beltran

1  Q. And that's the only communications that existed between
2  you and Mr. Beltran Leon?
3  A. That's right.
4  Q. All right. Let's talk a little bit about your drug
5  trafficking.
6      Back in 1989, you began to work with Luis Rodriguez,
7  correct?
8      THE INTERPRETER: Can I have the name repeated?
9  BY MR. RALLS:
10 Q. Luis Rodriguez.
11 A. Yes.
12 Q. And at that time you were selling a thousand kilos of
13 cocaine a month; is that correct?
14 A. Yes.
15 Q. And your customers were the Flores brothers?
16 A. No.
17 Q. You had other customers?
18 A. I had other customers.
19 Q. Not just the Flores brothers?
20 A. I had the Flores brothers later.
21 Q. Okay. So the other customers that you were selling to
22 were a thousand kilos of cocaine a month; is that right?
23 A. About a thousand kilos.
24 Q. Okay. And you did that from 1989, 1999 until 2004,
25 correct?

---

1  A. Yes.
2  Q. Okay. Then about 2006 you began working with Mochomo or
3  Alfredo Beltrán-Leyva, correct?
4  A. Not until 2007.
5  Q. Well, until the beginning of 2008; isn't that right?
6  A. 2008 -- to 2008.
7  Q. Okay. And with Mochomo, you moved approximately 10 tons
8  of cocaine; is that right?
9  A. About 15 tons.
10 Q. Oh, 15 tons, okay.
11     And then after Mochomo separated himself from Chapo,
12 you moved in 2009 approximately 8,000 kilos of cocaine; is
13 that right?
14 A. Can I have the question repeated?
15 Q. Sure. In 2009, you --
16 A. Yes.
17 Q. -- distributed 8,000 kilos of cocaine?
18 A. I don't have the exact number.
19 Q. Would that be fairly close?
20 A. I worked for -- I worked for him for a year, and I was
21 buying from him anywhere between 3,000 to 3,500 a month.
22 Q. Okay. So then my calculation is wrong here, that you
23 probably bought from him 35,000 kilos of cocaine during that
24 one year?
25 A. No.



125

1 Q. How many -- let's look at that one year. How many kilos
2 did you distribute?
3 A. I worked for -- with Mr. Mochomo for one year, and I would
4 buy from him anywhere between 1,000 to 1,500 kilos a month.
5 Q. Okay.
6 A. Depending on the market demand, perhaps a little bit over
7 that, perhaps a little bit under that. I don't recall
8 exactly.
9 THE INTERPRETER: Your Honor, can interpreter's switch
10 again?
11 THE COURT: Yes.
12 (Pause.)
13 THE INTERPRETER: We're ready, Your Honor.
14 THE COURT: Okay.
15 BY MR. RALLS:
16 Q. So we're talking about 15,000 kilos in that one year that
17 you bought?
18 A. Possibly.
19 Q. Okay. Then after Mochomo was arrested, you worked with
20 Chapo, correct?
21 A. Right.
22 Q. And in 2009, you bought 8,000 kilos of cocaine?
23 A. In 2009?
24 Q. Yes.
25 A. No.

126

1 Q. How much?
2 A. I could buy about 300 kilos.
3 Q. How often?
4 A. A month.
5 Q. Okay. And in 2010, you also moved about 6 to 7,000 kilos
6 of cocaine?
7 A. No.
8 Q. How much did you move?
9 A. I don't remember with precision.
10 Q. You were interviewed back on October 15th, 2013 by agents
11 of the DEA, correct?
12 A. I don't remember the dates.
13 Q. All right. And I can understand that because you've given
14 a lot of interviews. But during that time, did you tell the
15 agents of the DEA that the first load took place in
16 approximately 2009, which consisted of approximately
17 8,000 kilos of cocaine?
18 Did you tell the agents that?
19 A. It was marijuana.
20 Q. Let me read it again to you, okay?
21 A. Okay.
22 Q. The first load took place in approximately 2009 and
23 consisted of approximately 8,000 kilos of cocaine.
24 A. No.
25 Q. That's not correct?

1 distributed, you only lost 90 kilos in Los Angeles?
2      MS. CSICSILA: Objection. That misstates his
3 testimony. He testified --
4      THE COURT: I'll let him answer this question, so
5 I'll overrule the objection.
03:12:54 6 BY THE WITNESS:
7 A. I also lost a thousand kilos that I had sent to the Flores
8 brothers.
9 BY MR. RALLS:
03:13:08 10 Q. Okay. But that still leaves you 20-some-odd-thousand
11 kilos that got through, doesn't it?
12 A. I don't have the data.
13 Q. You made millions of dollars, didn't you?
14 A. Possibly.
03:13:27 15 Q. And the reality is is that you made so much money that you
16 were loaning money to El Chapo?
17 A. No.
18 Q. Did you ever loan money to El Chapo?
19 A. Yes.
03:13:40 20 Q. How many times did you loan money to El Chapo?
21 A. One time, three million.
22 Q. $3 million to El Chapo?
23 A. Yes.
24 Q. Did you have more money than El Chapo?
03:13:53 25 A. No.

1 A. No.
2 Q. All right. And then the -- let me finish -- I want to
3 quote it to you, okay?
4 "The second load took place approximately 2010 and
03:10:07 5 consisted of approximately 6,500 to 7,000 kilos of cocaine."
6 A. No.
7 Q. That's also a mistake in the report?
8 A. Yes.
9 Q. Conservatively speaking during this time period that you
03:10:51 10 were involved in cocaine trafficking, you moved approximately
11 25,000 kilos of cocaine, didn't you?
12 A. I don't have the exact data.
13 Q. And if it was 25,000 kilos of cocaine, how much profit
14 were you making off each kilo?
03:11:11 15 A. I don't have any idea at this time.
16 Q. And in 2009, you were also moving marijuana?
17 A. Yes.
18 Q. And how many thousands of kilos of marijuana did you move
19 in 2009?
03:11:30 20 A. I don't remember how many kilos.
21 Q. Did you ever lose any loads of marijuana or cocaine?
22 A. Of cocaine.
23 Q. Okay.
24 A. The 90 kilograms in Los Angeles.
03:12:28 25 Q. So out of the estimated 25,000 kilos of cocaine that you



129

1    Q.  He had more money than you?

2    A.  I don't know.

3    Q.  But he came to you for a $3 million loan?

4    A.  Yes.

03:14:04

5    Q.  You employed many people to transport the drugs for you,

6    didn't you?

7    A.  Yes.

8    Q.  How many people did you employ?

9    A.  The trailer driver, the one that would take it to Tijuana,

03:14:39

10   the one that would bring it across to Los Angeles.

11   Q.  People that would bring the money to you?

12   A.  Yes.

13   Q.  And you did this all the way up until you were arrested in

14   2011, was it?

15   A.  2010.

03:14:55

16   Q.  And during the entire time that you were involved, you

17   were involved with Luis Rodríguez --

18   A.  Yes.

19   Q.  -- Mochomo --

20   A.  Yes.

03:15:16

21   Q.  -- and El Chapo, correct?

22   A.  Yes.

23   Q.  Three of the major drug traffickers, you know, in Mexico

24   during that time period.

25   A.  I don't know if they were of the bigger ones or the

03:15:28

---

130

1    smaller ones.

2    Q.  But you were up there, too, weren't you?

3    A.  I don't know how to assess the levels.

4    Q.  You were one of the biggest, if not the biggest?

03:15:56

5    A.  Not even in height.

6    Q.  But what's clear on this is that at no time was

7    Mr. Beltran Leon involved with you?

8    A.  With the 90 kilograms.

9    Q.  We're going to get to that, but aside from that?

10   A.  No.

03:16:25

11   Q.  All right.  Let's talk about the 90 kilos.

12        Back on October 2013, you sat with the agents and

13   talked about those 90 kilos, didn't you?

14   A.  I don't remember the date.

15   Q.  Back in 2013 when you talked to the agents, you never

03:18:54

16   mentioned Mr. Beltran Leon being involved with any 90 kilos,

17   did you?

18   A.  No.

19   Q.  As a matter of fact, you mentioned that you were involved

20   with Chapo and Alfredo; isn't that right?

03:17:19

21   A.  Yes.

22   Q.  But there's no mention of Mr. Beltran Leon?

23   A.  No.

24   Q.  And you told them that the 90 kilos were seized from a

25   person you didn't know?

03:17:39

1   A. To El Zarco, my worker.

2   Q. I understand it, but back then, you never mentioned Zarco,

3   did you?

4   A. Yes.

5   Q. You mentioned a person whose name you didn't know. You

6   mentioned a memo, and you've mentioned a person by the last

7   name of Gomez?

8   A. Gomez is a different person.

9   Q. But you never mentioned Jesus Raul Beltran Leon, did you?

10  A. No.

11  Q. Then in 2014, you appeared before the federal grand jury;

12  is that correct?

13  A. Yes.

14  Q. And you also wrote a statement concerning your involvement

15  and people that were involved in the 90-kilo loss; is that

16  right?

17  A. Yes, yes.

18  Q. All right. When you talked about the 90 kilos, you never

19  mentioned Mr. Beltran Leon, did you?

20  A. At that time, I did not.

21  Q. And that's all we're talking about, at that time when you

22  appeared before the federal grand jury.

23      The federal grand jury was here in Chicago, correct?

24  A. Yes.

25  Q. And when you appeared before the federal grand jury, you

1   swore you were going to tell the truth; is that right?

2   A. Yes.

3   Q. And when you swore you were going to tell the truth, you

4   also swore that you were going to answer the questions as

5   completely as possible, correct?

6   A. Yes.

7   Q. And you were told that if you gave false testimony, you

8   could be charged with perjury?

9   A. Yes.

10  Q. And you were testifying before the federal grand jury at

11  that time because you were hoping to get a reduced sentence?

12  A. Yes.

13  Q. And when you testified before the grand jury, did you tell

14  them all the truth?

15  A. No.

16  Q. You didn't tell the grand jury the truth?

17  A. No.

18  Q. Why did you lie to the federal grand jury?

19  A. Because I had given the loan to my brother.

20  Q. All right. So you lied to the grand jury about the loan

21  to your brother and sister, correct?

22  A. Yes.

23  Q. And when you lied to the grand jury, you did it knowingly?

24  A. No.

25  Q. You did it -- you didn't know you were lying to the grand

133

Case: 1:09-cr-00383 Document #: 778 Filed: 10/03/19 Page 133 of 165 PageID #:7184
M. Fernandez Valencia - cross

1  jury?
2  A. Yes.
3  Q. And did you tell Ms. Csicsila that you were lying to the
4  federal grand jury?
5  A. At that moment, I did not.
6  Q. It was only after they came to you and pointed the finger
7  at you and called you a liar that you 'fessed up; isn't that
8  right?
9  A. That's right.
10 Q. In other words, you were willing to lie for your benefit;
11 isn't that right?
12 A. No.
13 Q. For whose benefit were you lying to the grand jury?
14 A. I only lied that time because it was about my sister. I
15 made a mistake. I know it was my fault. I already explained
16 that to the government.
17    My sister herself came and explained that to the
18 government; but other than that, I have never lied to the
19 government, neither before nor after, other than my sister's.
20 Q. I understand that. But that point in time, you did lie to
21 the federal grand jury.
22 A. Yes.
23 Q. And it wasn't you that went to the prosecutors and said,
24 hey, look, guys, I lied. Isn't that right?
25 A. I went to talk to the prosecutors to tell them the truth.

134

Case: 1:09-cr-00383 Document #: 778 Filed: 10/03/19 Page 134 of 165 PageID #:7185
M. Fernandez Valencia - cross

1  Q. When you testified before the grand jury concerning these
2  90 kilos, let me read to you what you told the grand jury.
3     MS. CSICSILA: Objection. This isn't impeachment.
4  It's just him reading.
5     THE COURT: This is this same 90 kilos?
6     MR. RALLS: Okay.
7     THE COURT: Okay. I'll overrule the objection.
8  BY MR. RALLS:
9  Q. "I am aware of at least two occasions in which cocaine I
10 received from Chapo and Alfredo was seized in the United
11 States. On the first occasion, approximately 90 kilos were
12 seized in Los Angeles from a person I knew only as Memo and
13 Zarco who worked for me in the United States."
14    Did I read that correctly?
15 A. El Zarco and Memo is the same person, and his name is
16 Baldo.
17 Q. You had the opportunity to review that statement before it
18 was read to the grand jury, didn't you?
19 A. Yes.
20 Q. And you had the opportunity to make corrections to that
21 statement, didn't you?
22 A. Yes.
23 Q. And as a matter of fact, you had an attorney with you
24 reviewing that statement to make sure it was accurate?
25 A. Yes.

1  Q. Now you're telling us that that portion is not accurate?
2  A. The name is Baldo, and we call him El Zarco.
3  Q. Why didn't you correct that false statement --
4     MS. CSICSILA: Objection --
5  BY THE WITNESS:
6  A. At that time, I didn't recall the name.
7     THE COURT: Okay. What's your objection?
8     MS. CSICSILA: It misstates his -- first of all, it
9  wasn't a false statement, so it's misstating what the witness
03:24:54  10  has testified to.
11     I also think there's a lot of confusion here.
12     THE COURT: I think at the very least, it's
13  impeachment by omission, and I'll overrule the objection.
14     The answer can stand.
03:25:14  15  BY MR. RALLS:
16  Q. Nowhere in your testimony before the grand jury do you
17  mention that Chuy Raul is involved with those 90 kilos, isn't
18  that correct?
19  A. Right.
03:25:27  20  Q. On July 29th, 2014, you were interviewed by the U.S.
21  Attorneys and the DEA here in Chicago, weren't you?
22  A. Yes.
23  Q. And when you were interviewed by the Assistant U.S.
24  Attorneys here, you never told them on that date that
03:26:38  25  Mr. Beltran Leon was involved with these 90 kilos, did you?

1  A. Yes.
2  Q. And you told the prosecutors on that date that you had
3  never worked with Chuy Raul; isn't that correct?
4  A. Right.
03:27:03  5  Q. So we've got your prior statements where you don't
6  implicate Mr. Beltran Leon, we've got your grand jury
7  testimony where you don't implicate Mr. Beltran Leon, you
8  don't even mention him on the 90 kilos, and then we've got the
9  July 29th statement in which, again, you state that you've
03:27:33  10  never worked with Chuy Raul, and you don't even mention him
11  involved in the 90 kilos; is that correct?
12  A. Yes.
13  Q. And at that time, the Assistant U.S. Attorney, Michael
14  Ferrara, summarized all your reports, all your statements, and
03:27:53  15  he asked you whether you have given all the names of all the
16  persons that were involved in your drug trafficking, and you
17  told him you had. Is that correct?
18  A. Of the ones I remembered.
19  Q. Well, you hadn't remembered any -- Chuy Raul involved in
03:28:16  20  anything up to that point in time, correct?
21  A. Because the questions were about Alfredo and about El
22  Chapo. They were not asking me about the defendant. At that
23  time, I was focused on them. I was not focused on anybody
24  else.
03:28:38  25  Q. You were asked by Mr. Ferrara, "If Fernandez Valencia told

1 the government about everyone in Mexico he may have worked
2 with or had information to further the investigation,
3 Fernandez Valencia stated he could not think of anyone else
4 besides those individuals already discussed."
5 Did I read that correctly to you?
6 A. Yes.
7 Q. So you reassured the agents and the U.S. Attorney's Office
8 that you had been completely honest with them; isn't that.
9 right?
10 A. Yes.
11 (Counsel conferring.)
12 BY MR. RALLS:
13 Q. Mr. Fernandez, you also were interviewed on March 27th,
14 2019, correct?
15 A. I don't remember the dates.
16 Q. When you were interviewed, did you tell the agents on that
17 particular date, even though you don't remember that date,
18 that -- that there was a rumor about Mr. Beltran having killed
19 a person in a party?
20 A. No.
21 Q. Let me read you something. Felipe we understand is the
22 secretary to Mochomo, correct?
23 A. Yes.
24 Q. Okay. Let me quote it to you and see if this sounds
25 right: "Felipe was a secretary of Mochomo, and Felipe said

1 the people did not like Beltran Leon in Culiacán because the
2 rumor was that Mr. Beltran Leon had killed a man at a party."
3 A. What's the question?
4 Q. It was a rumor, right?
5 A. Excuse me?
6 Q. It was a rumor.
7 A. I heard that from Felipe, from Tino, and from Chapito
8 Lomas.
9 Q. All right. Were you present when Special Agents Jennifer
10 Vaughn, Amelia Fernandez, Mr. Erskine were there with you back
11 on March 2019, do you remember, sir, telling them that this
12 was just a rumor about Mr. Beltran Leon being involved in a
13 killing?
14 A. I told the agents that I heard, that I heard as hearsay,
15 that I didn't see, but that I heard that Chuy Raul had killed
16 a person at a party.
17 Q. Did you tell the agents and the Assistant U.S. Attorney
18 that it was a rumor?
19 A. Not that it was a rumor, that I heard that.
20 Q. In other words, what they wrote in this report is wrong
21 then?
22 A. No. I didn't write it.
23 Q. If they write that you said it was a rumor, are they
24 correct?
25 A. Yes.

140

```
 1    your siblings; is that correct?
 2    A.  That's correct.
 3    Q.  You had not told the government about those loans at the
 4    time.
 5    A.  No.
 6    Q.  And when you went before the grand jury -- well, prior to
 7    going before the grand jury, you assisted in the preparation
 8    of a grand jury statement; is that correct?
 9    A.  Could you repeat that?
10    Q.  Prior to testifying before the grand jury in 2014, did you
11    meet with the government on multiple occasions?
12    A.  Yes.
13    Q.  And during those meetings, did you assist in the
14    preparation of a statement?
15    A.  I don't understand the question.
16    Q.  Sure.  When you testified before the grand jury, was your
17    testimony prepared in advance?
18    A.  Yes, yes.
19    Q.  And, in fact, in meetings with the government, you helped
20    prepare a written statement to be read to the grand jury,
21    correct?
22    A.  Yes.
23    Q.  That statement was approximately five pages, correct?
24    A.  Yes.
25    Q.  And you just testified a few moments ago that you've been
```

---

139

```
 1              MR. RALLS:  All right.  That's all I need.
 2         I don't have anything further.  Thank you, Judge.
 3              THE COURT:  Any redirect?
 4              MS. CSICSILA:  Judge, just a few questions.
 5              THE COURT:  Okay.
 6              THE INTERPRETER:  Your Honor, may the interpreters
 7    switch?
 8              THE COURT:  Sure.
 9              THE INTERPRETER:  The witness would like some water.
10              THE COURT:  Okay.  We'll get the witness some water.
11              THE INTERPRETER:  I'm ready.
12                        REDIRECT EXAMINATION
13    BY MS. CSICSILA:
14    Q.  You were asked some questions about your grand jury
15    statement; is that right?  Do you recall those questions?
16    A.  Yes.
17    Q.  You testified in the grand jury in approximately June of
18    2014; is that correct?
19    A.  Yes.
20    Q.  And that was prior to when the government confronted you
21    about the loans that you had made to your siblings; is that
22    correct?
23    A.  Yes.
24    Q.  And so during your preparation for your grand jury
25    testimony, you weren't asked any questions about the loans to
```



141

1  trafficking in drugs for decades, correct?
2  A. Yes.
3  Q. So those five pages did not cover the universe of your
4  knowledge about drug trafficking; is that fair to say?
03:37:28
5  A. Yes.
6  Q. And, in fact, your grand jury statement was focused on
7  your knowledge about Chapo and Alfredo; is that right?
8      THE INTERPRETER: I'm sorry, about --
9  BY MS. CSICSILA:
03:37:49
10  Q. Chapo Guzman and Alfredo Guzman.
11  A. Correct.
12  Q. Now, it's true, you did not -- you mentioned this 90-kilo
13  seizure, correct?
14  A. Yes.
03:38:00
15  Q. And is it fair to say that you considered that deal with
16  Chapo -- to be with Chapo and Alfredo?
17  A. That's right.
18  Q. So you did not mention at the time the defendant's
19  involvement, correct?
20  A. Correct.
03:38:14
21  Q. At the time the statement was prepared, did you recall the
22  defendant's involvement in the deal?
23  A. No.
24  Q. So you didn't lie to the grand jury, correct?
03:36:33
25  A. Correct.

142

1  Q. You told them what that you knew at the time?
2  A. Yes.
3  Q. And do you also recall testifying before the grand jury
4  and telling them that you were only testifying as to a small
5  portion of the information that you had about the topics you
6  were testifying about?
7  A. Correct.
8  Q. So you told the grand jury you weren't telling them
9  everything you knew?
03:38:48
10  A. Yes.
11  Q. And, in fact, it was only more recently, earlier this
12  year, that you recalled the defendant's involvement in this
13  90-kilo seizure?
14  A. That's correct.
03:39:07
15      MS. CSICSILA: Judge, I have nothing further.
16      THE COURT: Okay. Anything further?
17      MR. RALLS: Nothing further. Thank you, Judge.
18      THE COURT: Okay. We'll excuse the witness.
19      How long would the next two witnesses take?
03:39:25
20      MR. ERSKINE: Your Honor, may we have a sidebar on
21  this?
22      THE COURT: Sure.
23      (Sealed proceedings heard at sidebar.)
24
03:39:40
25
03:41:28



Case: 1:09-cr-00383 Document #: 778 Filed: 10/03/19 Page 144 of 165 PageID #:7195
M. Fernandez Valencia - redirect



Case: 1:09-cr-00383 Document #: 778 Filed: 10/03/19 Page 143 of 165 PageID #:7194
M. Fernandez Valencia - redirect

1  (Proceedings heard in open court.)
2      THE COURT: We'll stand in recess for at least
3  10 minutes.
4      (Recess from to 3:42 to 4:00 p.m.)
04:00:27
5      THE COURT: Okay. You can call your next witness.
6      MR. ERSKINE: Your Honor, the government calls Andrew
7  Johnston.
8      THE COURT: Okay. Mr. Johnston, if you'd raise your
9  right hand.
04:01:09
10     (Witness sworn.)
11     MR. ERSKINE: Can you move that microphone in front
12  of your face, please.
13     THE WITNESS: I do.
14  ANDREW JOHNSTON, GOVERNMENT'S WITNESS, DULY SWORN,
15          DIRECT EXAMINATION
16  BY MR. ERSKINE:
17  Q. Good afternoon, sir. What's your full name?
18  A. Andrew Johnston.
19  Q. And the common spelling?
04:01:16
20  A. A-N-D-R-E-W, J-O-H-N-S-T-O-N.
21  Q. How old are you?
22  A. 29 years old.
23  Q. And where do you currently reside?
24  A. Kankakee County Jail.
04:01:28
25  Q. And where did you live before that?

1  A. The Metropolitan Correctional Center in downtown Chicago.
2  Q. And can you just keep your voice up, please?
3  A. The Metropolitan Correctional Center in downtown Chicago.
4  Q. Are you currently serving a prison sentence on a federal
04:01:42
5  felony conviction?
6  A. I am.
7  Q. What were you convicted of?
8  A. Attempted bank robbery.
9  Q. At trial?
04:01:48
10  A. Yes.
11  Q. Did you represent yourself?
12  A. I did.
13  Q. When was the trial?
14  A. January 8th through January 10th of 2019.
04:01:54
15  Q. And what sentence did you receive?
16  A. 168 months imprisonment.
17  Q. Do you have any other convictions?
18  A. I have two prior convictions for bank robbery.
19  Q. From what years?
04:02:04
20  A. 2009 and 2014.
21  Q. Regarding your 2019 conviction, is it your position that
22  you are actually innocent of that crime?
23  A. It is.
24  Q. And have you previously claimed that evidence from that
04:02:20
25  case was planted on you by the FBI?

1   A. Yes.
2   Q. For the past few months, have you been cooperating with
3   the government in an investigation of a fellow inmate of the
4   MCC?
5   A. Yes.
6   Q. Have you been cooperating in the hopes of getting a
7   reduced prison time?
8   A. Yes.
9   Q. Have any promises been made to you about whether you will
10  receive a sentencing benefit?
11  A. No.
12  Q. You previously said that you resided at the MCC. When did
13  you arrive there, and when did you leave there?
14  A. I arrived in the MCC on July 25th, 2017, and I stayed
15  there until May 28th of 2019.
16  Q. During that time, did you ever meet someone named Jesus
17  Raul Beltran Leon?
18  A. I did.
19  Q. And about when did you first meet him?
20  A. I believe we met the first time on or about January 12th,
21  2018, and then again in September, mid-September of 2018, and
22  then another time we went to court together in April of this
23  year.
24  Q. Okay. So I'd like to direct your attention to the
25  encounter in September of 2018. Where did that meeting take

1   place?
2   A. In the lockup here in this courthouse.
3   Q. And did you guys speak?
4   A. Yes, we did.
5   Q. About what?
6   A. We discussed his pending -- his motion for dismissal based
7   on the outrageous government conduct theory that he had about
8   the torture he endured in Mexico surrounding his arrest.
9       We also discussed possible options if that, you know,
10  the results of everything with that, and we discussed just
11  basically keeping in touch and me to try to find him cases
12  that would help his legal position.
13  Q. So you already mentioned that you represented yourself at
14  trial?
15  A. Correct.
16  Q. And are you, among the other inmates, someone who's
17  perhaps more familiar with the law?
18  A. Yes, I am.
19          MR. BRINDLEY: Objection. Speculation.
20          THE COURT: Sustained.
21  BY MR. ERSKINE:
22  Q. Do you represent yourself to other inmates as someone who
23  has some familiarity with the law?
24  A. I do.
25  Q. And so when the defendant started talking to you about

```
 1   this topic, the concept of the outrageous government conduct,
 2   is that why you were speaking to him about it?
 3   A.  Correct.
 4   Q.  So once again, how did you leave that conversation?
 5   A.  We left it where we would just -- we were cordial and we
 6   would stay in touch, and I would send him any kind of case law
 7   that I ran into that would help him with his case that I
 8   thought was beneficial.
 9   Q.  Did you encounter -- let me ask you at this time, so
10   obviously you just testified to having -- well, was that
11   conversation in person?
12   A.  Yes.
13   Q.  So you were able to look at him?
14   A.  Yes.
15   Q.  If you saw him again today, do you think you'd recognize
16   him?
17   A.  I would.
18   Q.  So I'd ask you to look in the courtroom and tell us if you
19   see him here today?
20   A.  I do.
21   Q.  And please describe what he's wearing.
22   A.  He's wearing an orange jumpsuit.
23           MR. ERSKINE:  Your Honor, may the record reflect the
24   witness has identified the defendant?
25           THE COURT:  It will.
```

```
 1   BY MR. ERSKINE:
 2   Q.  So did you see him again?
 3   A.  I did.  I saw him on April 11th, 2019.
 4   Q.  And where did that encounter take place?
 5   A.  Here in this courthouse.
 6   Q.  Now, did it -- did the entire encounter take place in this
 7   courthouse?
 8   A.  No.  It began at the MCC Chicago when we were preparing to
 9   be transported over here for court together on the 5th floor,
10   and it carried on through our time over here in the lockup
11   waiting for court.
12   Q.  And for how much time were you interacting with the
13   defendant during that time in MCC plus the time here in this
14   courthouse?
15   A.  I would say approximately four hours.
16   Q.  And did you speak with him?
17   A.  Extensively.
18   Q.  For about how long were you speaking at the MCC?
19   A.  I would say about 15 to 30 minutes before we were
20   transported to this building.
21   Q.  And what, if anything, did the defendant say to you or ask
22   you while you guys were both at the MCC?
23   A.  We -- I asked him what his reason why he was going to
24   court for and obviously made small talk about his motion, and
25   he stated that he was going -- he was contemplating pleading
```

Case: 1:19-cr-00383 Document #: 778 Filed: 10/03/19 Page 151 of 165 PageID #:7202

Johnston - direct

151

Case: 21-2081    Document: 13    Filed: 07/21/2021    Pages: 181

guilty.

2   And I explained to him, I asked him, I said why were

3   you pleading guilty? I thought were you going to trial.

4   He stated that the government had brought in a

5   witness that he did not want to go to trial with.

6   Q.   And, again, I'll ask you to keep your voice up.

7   A.   Okay.  He said that he had -- the government was going to

8   bring a -- had brought in a witness that did not -- he did not

9   want to go to trial because the government had brought that

10   witness.

11   Q.   Now, did the defendant tell you the witness's name?

12   A.   He did.  Damaso Lopez.

13   Q.   What, if anything, did the defendant tell you about Damaso

14   Lopez or who he was?

15   A.   He stated that Damaso's father, I believe, had testified

16   against Chapo Guzman and that Damaso could testify about very

17   damaging things against the defendant.

18   Q.   Did the defendant ask you what floor you lived on?

19   A.   He did.

20   Q.   And what did you tell him?

21   A.   I told him the 25th floor.

22   Q.   And what, if anything, did the defendant say in response

23   to that?

24   A.   He said that that was the floor that Damaso lived on.

25   Q.   And what happened next in the conversation?

---

Case: 1:19-cr-00383 Document #: 778 Filed: 10/03/19 Page 152 of 165 PageID #:7203

Johnston - direct

152

A.   I asked him -- I told him that I thought -- I asked him

2   what he looked like, and then I told him that I -- when he

3   kind of described him to me, I told him that I knew who he was

4   and that I knew he was in the room with a friend of mine.

5   Q.   What happened next in this conversation between you and

6   the defendant?

7   A.   The defendant asked me how he was being treated,

8   specifically who he was in the room with, how the other

9   Mexicans on the unit were engaging with him, were they

10   ostracizing him, were they allowing him to use the phones,

11   were they allowing him to use the computer, eat with everybody

12   like normal, or were they treating him differently?

13   Q.   And what was your response?

14   A.   I told him that they were treating him like a king, like

15   he was somebody big and that they treated him regular compared

16   to everybody else.

17   Q.   And how did the defendant react with that information?

18   A.   He was disturbed by it.

19   Q.   Why do you say that?

20   A.   He -- he seemed -- he told me, he said why aren't they --

21   why are they letting him do that?  Why didn't they run him

22   off?  Why aren't they stopping him from using the phones?  Why

23   aren't they treating him like the piece of shit that he is and

24   things of that nature.

25   Q.   Did the defendant ask you any other questions about what

1    MR. BRINDLEY: Objection, Your Honor. The witness is
2 speculating as to the defendant's meaning. He can testify to
3 what he did, but not what he meant by it.
4    THE WITNESS: Okay.
5    THE COURT: Okay.
6    MR. ERSKINE: Hold on a second.
7    THE COURT: Sustained.
8 BY MR. ERSKINE:
9 Q. First of all, Mr. Johnston, I'd ask you to please show the
10 judge the gesture that the defendant was making?
11 A. This (indicating).
12 Q. And what did you understand that gesture to mean?
13 A. I understood him to mean that he was telling me that Lopez
14 could testify about violent acts, murder -- whatever it means
15 when you pull the trigger of a pistol.
16 Q. And so then what happened next in that encounter?
17 A. We spoke about the dual sovereign exception to the double
18 jeopardy clause, just different case law about, like, the
19 individualized drug quantity approach, a lot of different
20 stuff that I told him I would do legal research for on him if
21 it would benefit -- if I felt like I could find something that
22 would benefit him.
23 Q. And did you agree to do some legal research for him?
24 A. I did.
25 Q. Beyond agreeing to do some legal research for him, was

1 Lopez was up to?
2 A. He did. He asked me who he was in the room with, and I
3 explained to him that the person Lopez was in the room with
4 was a friend of mine and that that person was uncomfortable
5 being in the room with Lopez because of the things that Lopez
6 was saying to him about his cooperation.
7 Q. Okay. So -- and we'll get back to that, but at one
8 point -- so at some point, you've moved to the courthouse?
9 A. Yes. So that was the beginning of -- the conversation
10 began there, and as we got transported, we didn't pick it back
11 up until we got over here in this building.
12 Q. Did you ask the defendant any more questions about why it
13 was he was pleading guilty, given this one witness?
14 A. Yes. When we got here to the courthouse and we got our
15 shackles off -- I mean, our handcuffs off and everything,
16 everybody calmed down and me and him began talking kind of
17 privately off to one side in the lockup cell.
18    And at that point, he -- I asked him, like, why are
19 you going to trial? I mean, why aren't you going to trial if
20 it's just one person? Why are you so worried about one
21 person? You can cross-examine him, and I was trying to
22 encourage him to go to trial.
23    And he said he held up his finger, and he said that
24 he did like a finger pull notion that basically Lopez could
25 testify about: --

1 there anything else the defendant asked you to do?
2 A. He asked me to go back to the 25th floor and make sure
3 that the Mexicans began to ostracize Damaso Lopez.
4 Q. And was there anything he asked you to find out?
5 A. He asked me to find out who -- what his cooperation --
6 what information he had been sharing to his roommate on the
7 25th -- Lopez had been sharing to his roommate on the 25th
8 floor about his cooperation.
9 Q. What happened next with regard to the defendant from your
10 perspective?
11 A. The next thing that happened after that was on April 21st,
12 another individual had gone to church, Courtney Sims had gone
13 to church and had returned from church to the 25th floor.
14 Courtney Sims came back with a message from church
15 stating that there was a $5,000 reward placed by the defendant
16 on Damaso Lopez to have him severely beaten.
17 MR. BRINDLEY: Objection. Objection. Your Honor.
18 Can I get foundation as to who was involved in that
19 conversation?
20 THE COURT: Okay. Why don't you lay out the
21 foundation.
22 MR. ERSKINE: Definitely.
23 BY MR. ERSKINE:
24 Q. And so what, you said this was April 21st?
25 A. April 21st.

1 Q. Of this year?
2 A. Of this year.
3 Q. And where were you located?
4 A. I was on the 25th floor.
5 Q. And, again, who was it that came back?
6 A. Courtney Sims.
7 Q. And what is his nickname, if he has one?
8 A. Freeze. His nickname is Freeze and a Four Corner Hustler.
9 Q. Now, when he returned to the floor, walk us through, did
10 he speak to you directly? Did he speak to others? Who was he
11 speaking with?
12 A. He spoke to Damaso Lopez's roommate, which is a close
13 friend of mine that I was also doing legal research for,
14 Sergio Robles. And Robles came straight to me and told me
15 what Sims had said, what they were up to.
16 Q. And what did this friend of yours tell you?
17 A. He told me that they're going to -- they're going to F
18 that guy up. They're going to F my roommate up, that Chuy put
19 $5,000 on his head, and they're going to take care of him.
20 Q. And to clarify, is this what Robles is telling you the
21 other person just said?
22 A. Correct, within a matter of ten minutes.
23 Q. Did you see Freeze speaking with your friend?
24 A. Yes.
25 Q. And how long after those -- that group of people or that

1 Q. Now, have you reviewed a clip of the recording you made?
2 A. I have.
3 Q. And did you recognize the voices on it?
4 A. I do.
5 Q. Is the clip a true and accurate and fair clip from the
6 recording of a conversation you and the defendant had on that
7 day?
8 A. It is.
9 Q. So I'm going to play the clip at this time, and I'm going
10 to pause it at different times and ask you some questions.
11 A. Okay.
12 　　　MR. ERSKINE: So I'm beginning the clip at the
13 1 minute 19, and I will create a copy for the record. We'll
14 call this Government Exhibit Clip, and starting this exhibit
15 at 1 minute 19 seconds.
16 　　　(Government Exhibit Clip played in open court.)
17 BY MR. ERSKINE:
18 Q. So pausing it at 1 minute 33, you heard those voices?
19 A. Correct.
20 Q. And the first voice, that's yours?
21 A. It's my voice.
22 Q. The other voice is who?
23 A. The defendant.
24 Q. And did you hear the part where you were talking about
25 Tito and Freeze?

1 pair were done speaking did your friend come speak with you?
2 A. Within 10, 15 minutes.
3 Q. Okay. So what happened next?
4 A. I told Robles that he had a problem because if anything
5 happened to Lopez while he was in his room, he was going to be
6 involved or at least suspected to be involved because of the
7 nature of his charges and that something had to be done.
8 Q. And then what happened?
9 A. I called my girlfriend, and I told my girlfriend to -- she
10 was downtown driving Uber, and I told her to come to the lobby
11 at MCC and report it to staff.
12 Q. Report the threat?
13 A. Report the threat.
14 Q. Now, at that point in time, did you begin cooperating with
15 the government?
16 A. I did.
17 Q. As part of your cooperation, did you agree to wear a
18 recording device on Beltran Leon?
19 A. I did.
20 Q. And did you do so?
21 A. I did.
22 Q. When did you do that?
23 A. I did that on May 8th, 2019.
24 Q. And where did you encounter the defendant?
25 A. On the 15th floor of the MCC Chicago.

1  A.  I did.
2  Q.  Who were they?
3  A.  The two Four Corner Hustler brothers that resided on the
4  25th floor.  I previously told you who Freeze was.
5  Q.  And what did you mean when you said, "They're going to
6  take this guy back up there"?
7  A.  After I reported this threat, the staff at the MCC Chicago
8  placed Mr. Lopez in protective custody, and I was telling the
9  defendant that they are going to move Lopez from protective
10  custody back to the 25th floor.
11           MR. ERSKINE:  So I'm pressing play again at 1 minute
12  33.
13           (Government Exhibit Clip played.)
14  BY MR. ERSKINE:
15  Q.  So pausing at 2 minutes 9 seconds, what did you say in
16  Spanish to the defendant?
17  A.  I said that I heard -- I said (speaking Spanish.)  I said
18  I heard that they -- somebody wants to pay $5,000 to severely
19  beat Lopez.
20  Q.  And you obviously didn't use Lopez's name?
21  A.  Correct.
22  Q.  You're saying that now?
23  A.  Right.
24  Q.  Did you hear the defendant say in response, "I heard
25  25,000"?

1  A.  I did.
2  Q.  And what did you -- what did you understand him to mean by
3  that?
4  A.  I understood him to mean that he said 25,000, that he was
5  taking ownership of it.
6  Q.  But with regard to the number itself?
7  A.  I understood it to be a lot more than what was solicited
8  at the time.  I was kind of shocked.
9  Q.  So just to clarify, you had just told him that you heard
10  someone was offering $5,000 to harm him, meaning Lopez?
11  A.  Correct.
12  Q.  And then the defendant responded, "I heard it was
13  $25,000"?
14  A.  Yes.
15  Q.  So -- and this may be obvious, but he was telling you he
16  heard that was the price being offered for this hit?
17  A.  Yes.
18  Q.  Now, were you -- were you with the defendant face to face
19  when you were having this conversation at this moment?
20  A.  Yes.  We were in his room with the door closed.
21  Q.  And did you observe -- were you looking at him?
22  A.  I was looking at him face to face.
23  Q.  And what, if anything, did you observe about his face or
24  his demeanor when he responded, "I heard it was 25,000"?
25  A.  He -- he lit up.  He started smiling and he, you know,

1 showed enthusiasm or self-approval, however you want to put
2 it.
3 Q. And how did you understand that? What did you take that
4 to mean?
5 A. Ownership of the $25,000 hit.
6     MR. ERSKINE: I'm going to press play again at
7 2 minutes and 9 seconds.
8     (Government Exhibit Clip played.)
9 BY MR. ERSKINE:
10 Q. Pausing at 2 minutes 45 seconds, so what were you and the
11 defendant discussing right there?
12 A. We were talking about how Tito and Freeze had skimmed
13 $20,000 off the $25,000 that was initially offered.
14 Q. And then did you hear the part where you were discussing
15 about it not being worth risking your freedom?
16 A. I did.
17 Q. What did you understand that part of the conversation to
18 mean?
19 A. I understood it to mean that the defendant was, like,
20 disappointed that it had been watered down to $5,000.
21 Q. What was the significance of the 5 or the 25 and the
22 risking your freedom?
23 A. That it was a waste of time to have people running around
24 saying $5,000 to do this when nobody was going to do it for
25 that price.

1 Q. Do you know which church service Freeze and his brother
2 went to?
3 A. I believe it was the Protestant service in the afternoon.
4     MR. ERSKINE: All right. So pressing play again at
5 2 minutes 45 seconds.
6     (Government Exhibit Clip played in open court.)
7 BY MR. ERSKINE:
8 Q. So it was kind of hard to hear, but in that last clip
9 towards the end, did you hear the defendant say something?
10 A. I did.
11 Q. And what did you hear him say?
12 A. He wanted to know who Lopez was telling on.
13 Q. Did he use the word Lopez?
14 A. No.
15 Q. What did he say verbatim the best you can recall?
16 A. He said, "I just want to know who he's telling on."
17 Q. And what did you understand him to mean?
18 A. I understood him to mean that he wanted to know who Lopez
19 was telling on.
20 Q. Now, why was he saying -- not why was he, but had you had
21 prior conversation, perhaps that day or earlier, that you
22 understood to be the reason why he was saying to you that he
23 wanted to know who Lopez was telling on?
24 A. Yes. Robles, Lopez's roommate, his nickname is Checo. So
25 we were speaking of -- of -- of Robles at that time who was

1  Lopez's roommate at the time.
2  Q. And how might you be someone who could tell the defendant
3  who Lopez is telling on?
4  A. Through Robles, through me obtaining information from
5  Robles.
6  Q. Now, had Robles told you that Lopez was giving him
7  information?
8  A. He had, and he said that it had been making him feel
9  uncomfortable.
10     MR. ERSKINE: So pressing play at 3 minutes
11  23 seconds.
12     (Government Exhibit Clip played in open court.)
13  BY MR. ERSKINE:
14  Q. So pausing at 4 minutes 50 seconds, so that was a longer
15  segment, but did you hear the part where you were speaking in
16  Spanish?
17  A. I did.
18  Q. And what did you say to the defendant in Spanish?
19  A. I told him that the information that he wanted was written
20  down on pieces of paper that had been thrown away when Lopez
21  went to the hole, which is the Loya, when he went to
22  protective custody, and that the only person that had the
23  information that he had written down was Robles at that time.
24  Q. So what did Beltran say in response?
25  A. He said for me to obtain the information and I told him

1  how much should I tell Lopez -- how much should I tell Robles
2  that you're going to give him for it, and he told me a hundred
3  bucks.
4  Q. Now, did the defendant propose an intermediary between
5  himself and Robles for obtaining this information in exchange
6  for a hundred bucks?
7  A. He did. He proposed that I be the courier.
8     MR. ERSKINE: So pressing play again at 4 minutes
9  50 seconds.
10     (Government Exhibit Clip played.)
11  BY MR. ERSKINE:
12  Q. So pressing pause at 4 minutes 57 seconds, what did you
13  just say to the defendant?
14  A. I told the defendant that 25, speaking about the $25,000
15  hit, I said that was crazy.
16  Q. And what did the defendant say in response?
17  A. He said, "I know."
18  Q. And were you once again looking at him when he said that?
19  A. Face to face.
20  Q. And how would you describe his expression?
21  A. Bearing with pride, self-approval.
22     MR. ERSKINE: No further questions.
23     THE COURT: Okay. How long do you think the cross
24  will take?
25     MR. BRINDLEY: Judge, it will take at least a half an

Johnston - direct                                                    165

1        hour. I think it will take longer than that.

2                THE COURT: Okay. We'll start tomorrow with cross.

3                MR. BRINDLEY: Okay.

4                THE COURT: And I'm going to ask you to come at 9:50,

5        9-5-0. We'll resume this sentencing.

6                Thank you.

7                (Court adjourned, to reconvene at 9:50 a.m. on 8/6/19.)

8                                CERTIFICATE

9        I certify that the foregoing is a correct transcript from

10       the record of proceedings in the above-entitled matter.

11       /s/Kathleen M. Fennell                September 23, 2019

12       _____            _____

13       Kathleen M. Fennell                          Date
         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25



```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF ILLINOIS
                                EASTERN DIVISION

 1
 2
 3   UNITED STATES OF AMERICA,          )
 4                  Plaintiff,          )
 5                                      )
 6        -vs-                          )   Case No. 09 CR 383-16
 7   JESUS RAUL BELTRAN LEON,           )   Chicago, Illinois
 8                  Defendant.          )   August 6, 2019
                                        )   9:53 a.m.
 9
10               VOLUME 2
11   TRANSCRIPT OF PROCEEDINGS - SENTENCING
12   BEFORE THE HONORABLE RUBEN CASTILLO
13
14   APPEARANCES:
15
16   For the Government:      MS. ERIKA L. CSICSILA
17                            MR. ANDREW CONNOR ERSKINE
18                            Assistant U.S. Attorneys
19                            219 S. Dearborn Street
20                            Suite 500
21                            Chicago, IL  60604
22                            (312) 353-5300
23
24   For the Defendant:       MR. PATRICK W. BLEGEN
25                            Blegen & Garvey
                              53 West Jackson Boulevard
                              Suite 1437
                              Chicago, IL  60604
                              (312) 957-0100

                              MR. BEAU B. BRINDLEY
                              The Law Offices of Beau B. Brindley
                              53 West Jackson Boulevard
                              Suite 1410
                              Chicago, IL  60604

     Court Reporter:
                              KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                              Official Court Reporter
                              United States District Court
                              219 South Dearborn Street, Suite 2504
                              Chicago, Illinois  60604
                              Telephone:  (312) 435-5569
                              Kathleen_Fennell@ilnd.uscourts.gov
```

166

```
 1   APPEARANCES:  (Cont'inued)
 2
 3   For the Defendant:       MR. STEPHEN G. RALLS
 4                            Ralls & Reidy, P.C.
 5                            314 South 6th Avenue
 6                            Tucson, AZ  85701
 7                            (520) 884-1234
 8
 9                            MR. PAUL M. BRAYMAN
10                            Law Offices of Paul M. Brayman
11                            727 South Dearborn Street
12                            Suite 712
13                            Chicago, IL  60605
14                            (312) 427-9766
15
16                            MR. JONATHAN M. BRAYMAN
17                            Breen & Pugh
18                            53 West Jackson Boulevard
19                            Suite 1215
20                            Chicago, IL  60604
21                            (312) 360-1001
22
23
24
25
```

167

168

```
 1              (Proceedings heard in open court:)
 2              THE CLERK:  09 CR 383, United States versus Jesus
 3   Raul Beltran Leon.
 4              MS. CSICSILA:  Good morning.
 5              THE COURT:  Good morning.
 6              MS. CSICSILA:  Erika Csicsila and Andrew Erskine on
 7   behalf of the United States.
 8              MR. BRINDLEY:  Good morning, Your Honor.  Beau
 9   Brindley, Patrick Blegen, Steve Ralls, Jon Brayman and Paul
10   Brayman on behalf of Mr. Beltran Leon.
11              THE COURT:  Okay.  And we're going to proceed with
12   the cross of the witness on the stand?
13              MR. BRINDLEY:  Yes, Your Honor.
14              THE COURT:  Okay.  We'll bring out the witness.
15              (Pause.)
16              THE COURT:  Okay, Mr. Johnston, you recognize you're
17   still under oath?
18              THE WITNESS:  Yes, I do, Your Honor.
19              THE COURT:  Okay.  Then you can be seated.
20              You can proceed with the cross-examination,
21   Mr. Brindley.
22              MR. BRINDLEY:  Thank you, Your Honor.
23   ANDREW JOHNSTON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,
24                    CROSS-EXAMINATION
25   BY MR. BRINDLEY:
```

Johnston - cross

169

```
 1   Q.  Mr. Johnston, if I heard you correctly, you're presently
 2   serving a sentence of 168 months in custody for bank robbery
 3   or attempted bank robbery, correct?
 4   A.  Yes, sir.
 5   Q.  And it is your hope that by testifying against Mr. Beltran
 6   Leon in this proceeding, you might get out of jail sooner,
 7   correct?
 8   A.  Correct.
 9   Q.  You are hoping, in other words, that your assistance of
10   the government with respect to Mr. Beltran Leon will get you a
11   reduced sentence, right?
12   A.  Correct.
13   Q.  That is why you agreed to make the recording of
14   Mr. Beltran Leon that we listened to yesterday, correct?
15   A.  No.
16   Q.  Well, when you made the recording against Mr. Beltran
17   Leon, it was as part of cooperation with the government, was
18   it not?
19   A.  Yes, it was.
20   Q.  Okay.  And you are cooperating with the government with
21   the objective and the goal to reduce that 168-month sentence,
22   correct?
23   A.  Correct.
24   Q.  Okay.  And your testimony here against Mr. Beltran Leon in
25   this sentencing proceeding is part of that effort, the effort
```

1   to hopefully obtain a reduced sentence, correct?
2   A.  Correct.
3   Q.  All right. Now, it is your testimony that you're simply
4   telling the truth about everything that you've discussed; is
5   that right?
6   A.  Yes, sir.
7   Q.  And you would agree with me then, I take it, that in your
8   view, you would never lie in an effort to get a lesser
9   punishment; is that right?
10  A.  No, sir.
11  Q.  You have never -- well, let me ask you a different
12  question.
13      You would never exaggerate in an effort to try to get
14  a lesser sentence, would you?
15  A.  No, sir.
16  Q.  And you would never make false claims about anybody in an
17  effort to get a lesser sentence or to avoid a conviction. is
18  that true?
19  A.  No, sir.
20  Q.  It's not true, or you're agreeing with me?
21  A.  I'm agreeing with you.
22  Q.  Okay. And you've never done that. You've never made a
23  false claim about anybody in an effort to avoid a sentence or
24  a conviction; is that correct?
25  A.  Correct.

1   Q.  Okay. And whenever you've told government agents or
2   officers something when having a conversation with them, it's
3   always been the truth; is that right?
4   A.  To the best of my knowledge, yes.
5   Q.  Okay. Well, to begin with, Mr. Johnston, this attempted
6   bank robbery conviction for which you're serving 168 months,
7   that is not your first bank robbery conviction, is it?
8   A.  No.
9   Q.  You were first convicted of bank robbery in 2009, right?
10  A.  Yes.
11  Q.  You were sentenced to 63 months for that crime, right?
12  A.  Yes.
13  Q.  And you were placed on supervised release, right?
14  A.  Yes.
15  Q.  And when you were placed on supervised release by I
16  believe it was Judge Darrah, am I right?
17  A.  Yes, sir.
18  Q.  You agreed with Judge Darrah and with the Probation Office
19  that you weren't going to commit any more crimes, right?
20  A.  Correct.
21  Q.  But then you ended up involved in another bank robbery,
22  didn't you?
23  A.  I was -- I pled guilty to one, yes.
24  Q.  Okay. In 2013, you were arrested for bank robbery, right?
25  A.  Yep.

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 7 of 129 PageID #:7233
Johnston - cross

172

1　Q. And that was while you were on supervised release and not
2　supposed to be committing any crimes, right?
3　A. Correct.
4　Q. Okay. And you pled guilty to that second bank robbery
5　committed while you were on supervised release, right?
6　A. Yes, sir.
7　Q. And you were sentenced for that offense, too, correct?
8　A. I was.
9　Q. And that was in front of Judge Kennelly here in this
10　building as well, right?
11　A. Yes, sir.
12　Q. And Judge Kennelly, despite your prior bank robbery, gave
13　you a really fair sentence, a break, and he only sentenced you
14　to 48 months for the second one, right?
15　A. There's more to it than that, but yes.
16　Q. Is that the sentence you got?
17　A. That's the sentence I got.
18　Q. Okay. And that was for your second bank robbery?
19　A. Yep.
20　Q. Okay. And you were placed on supervised release again
21　after that, right?
22　A. Correct.
23　Q. And you agreed that you weren't going to commit any more
24　crimes, right?
25　A. Correct.

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 8 of 129 PageID #:7234
Johnston - cross

173

1　Q. Certainly weren't going to rob any more banks, right?
2　A. For sure.
3　Q. Okay. But you were on supervised release in 2017, right?
4　A. Yep.
5　Q. And while you were on supervised release, Mr. Johnston,
6　you were arrested for bank robbery a third time, right?
7　A. Yes, sir.
8　Q. Okay. And, of course, at the time you were arrested for
9　bank robbery in 2017, you knew that you weren't supposed to be
10　committing any crimes because you were still on supervised
11　release, right?
12　A. Yep.
13　Q. Okay. Now, from the very moment of your arrest for that
14　bank robbery in 2017, you wanted to avoid having to go to
15　prison. That's true, isn't it?
16　A. Yes.
17　Q. Okay. You were interviewed about that bank robbery after
18　your arrest by Special Agent Hoogland, right?
19　A. Correct.
20　Q. And when you were interviewed by Special Agent Hoogland
21　and talking to him after your arrest, you told him that you'd
22　be able to give him all kinds of information about a drug
23　trafficker, right?
24　A. That interview is -- that is part of an inspector general
25　investigation right now.

1 Q. Well, that's fine, but the question I'm asking you, sir,
2 is that you were interviewed by Agent Hoogland and during that
3 interview -- first of all, let me ask you this. The interview
4 we're talking about, it was recorded, wasn't it?
5 A. That's -- that's part of the investigation. That's what
6 I'm saying is that basically he put things inaccurately into
7 his report.
8 Q. Okay. Well, we're going to talk all about that later, but
9 right now I'm asking you, you were interviewed about him,
10 right?
11 A. Correct.
12 Q. And the interview was recorded, right?
13 A. Correct.
14 Q. And on that recording, you're telling Agent Hoogland, oh,
15 I don't want to go to jail -- I'm summarizing -- I don't want
16 to go to jail. I can tell you about some drug trafficker.
17 You told him that, right?
18 A. No, no.
19 Q. You didn't tell him that.
20 A. The recording was altered.
21 Q. So it's your testimony that Special Agent Hoogland -- he's
22 with the FBI?
23 A. Yes,
24 Q. He altered the recording of your interview with him,
25 right?

1 A. NightOwls Media confirmed it, an expert witness in the
2 case.
3 Q. Mr. Johnston --
4 A. Yes.
5 Q. -- okay, I didn't ask you about all that, okay? If the
6 government wants to ask you about that, they can.
7 Here's my question, sir: You're -- you're testifying
8 that an agent with the FBI altered a recording of your
9 interview with him. That's your testimony.
10 A. He did.
11 Q. So that's what you're saying?
12 A. Yes.
13 Q. Okay. So you didn't try to tell him about a drug
14 trafficker, or you did? Forget about whether the recording is
15 right or not. You say it's not. Fine.
16 A. I'm not going to testify about an inaccurate recording.
17 Q. Okay. Then just tell me this, forget the recording, did
18 you tell him -- did you say to him I can give you information
19 about a drug trafficker? Did you tell him that?
20 A. No.
21 Q. You didn't tell him that?
22 A. No.
23 Q. So he made that up.
24 A. He did.
25 Q. Okay. So an agent with the FBI who's investigating you

1 for bank robbery, it's your testimony that that agent made up
2 a fictitious claim by you that you could tell him information
3 about a drug trafficker to stay out of trouble.
4 A. Correct.
5 Q. Okay. Now, when you were interviewed by Agent Hoogland,
6 did you tell him that you went into the bank that was robbed?
7 A. No.
8 Q. Okay. So that's another part of the recording that you
9 say has been altered?
10 A. Yes.
11 Q. So he altered the recording to say that you told him you
12 went into the bank, right?
13 A. Correct.
14 Q. And he altered the recording to say that you talked to the
15 tellers about $3,500, right?
16 A. Correct.
17 Q. And he altered the recording to say that you told him that
18 you put on a mask before you went into the bank, right?
19 A. I never said I put on a mask.
20 Q. He asked you on the recording whether you put on a mask
21 and went into the bank, and you indicated that --
22 A. I'm not going to discuss the recording. The recording was
23 altered. It's been certified that it was altered by an expert
24 witness in the case --
25 Q. Right, right.

1 A. -- a government expert witness.
2 Q. So your testimony is, sir, your testimony is then that a
3 Special Agent has altered a recording to make it sound like
4 you said you put on a mask and you went into a bank and you
5 asked for $3,500 when you didn't say any of that; is that
6 right?
7 A. Correct.
8 Q. Okay. Now, you -- ultimately you represented yourself on
9 your bank robbery case, right?
10 A. I did.
11 Q. And you made filings with the court in your bank robbery
12 case, right?
13 A. I did.
14 Q. In your filings with the court, did you ever -- did you
15 ever make false accusations in those?
16 A. I did not.
17 Q. No? Okay. Well, in your motion to suppress
18 identification, you told the court that the bank tellers in
19 the bank, one of the things you indicated is they'd never had
20 actually seen you, right?
21 A. Correct.
22 Q. That's your position now is that they'd never seen you,
23 right?
24 A. At the time of the bank robbery?
25 Q. Yeah.

1   A. Correct.

2   Q. Okay. And so when the bank tellers testified at your

3   trial that they could identify you as being the person in the

4   bank, your testimony is that, like Agent Hoogland, they're

5   also being dishonest, right?

6   A. Yeah, they took me to a one-man lineup.

7   Q. So the bank tellers were being dishonest about you,

8   and the agent altered your interview recording. That's your

9   testimony.

10   A. Correct -- I would say the agents mistakenly identified

11   me.

12   Q. They mistakenly identified you.

13   A. To the tellers.

14   Q. Okay. But they testified to it under oath, and they were

15   wrong.

16   A. Right.

17   Q. Okay. Let's talk about some of the other things you've

18   said in your filings to the court talking about what other

19   people did.

20   Originally, you were represented by a Criminal

21   Justice Act-appointed attorney named Mr. Hill. Do you

22   remember Mr. Hill?

23   A. I do.

24   Q. Okay. And you didn't get released on bond, did you?

25   A. No.

---

1   Q. And after you didn't get released on bond, even though you

2   put together one of your pro se filings in which you claimed

3   that Mr. Hill lied to you about your preliminary hearing

4   rights, correct?

5   A. Correct.

6   Q. So Mr. Hill, he lied to you and took advantage of you,

7   right?

8   A. He waived -- told me to waive the preliminary hearing, and

9   I didn't want to do that.

10   Q. All right. So he lied about that to you.

11   A. Yes.

12   Q. Okay. So he lied.

13   And you also in your filings to try to dismiss your

14   case and quash your arrest, you accused Agent Hoogland, and

15   maybe that's what you're talking about now, of fabricating a

16   recording, right?

17   A. Correct.

18   Q. You accused the U.S. Attorneys prosecuting your case of

19   knowingly presenting fabricated recordings, right?

20   A. Correct.

21   Q. You claimed that the prosecutors knew that recordings were

22   fabricated by the FBI, but they went ahead and presented them

23   to the court anyway. That's what you said, right?

24   A. Yep.

25   Q. And you're maintaining that's true, that the U.S.

---

1  Attorney's Office was -- was involved with an FBI agent to --
2  to fabricate recordings and present them to the judge, and
3  they knew it?
4  A. Correct.
5  Q. Okay. And when you're making those filings, making the
6  accusations against Agent Hoogland with the FBI and against
7  the U.S. Attorneys handling your case, those allegations that
8  you're making was all part of efforts by you to get that case
9  dismissed, correct?
10 A. Correct.
11 Q. You specifically accused U.S. Attorney Aaron Bond of lying
12 to the court about whether the bank you were charged with
13 robbing was FDIC insured. Do you remember that?
14 A. I do.
15 Q. So you accused him about lying about that?
16 A. I did.
17 Q. So Aaron Bond lied to the court, according to you?
18 A. He did.
19 Q. Okay. You accused U.S. Attorney Tiffany Ardam of making
20 arguments just for the purpose of harassing you, right?
21 A. Uh-huh.
22 Q. Yes?
23 A. Yes.
24 Q. So Aaron Bond lied about you, right?
25 A. Yep.

(10:06:57) (10:07:03) (10:07:18) (10:07:31) (10:07:36)

---

1  Q. Your lawyer, Anthony Hill, lied to you, right?
2  A. And -- yeah.
3  Q. Okay. The FBI agent investigating you committed all kinds
4  of dishonesty, fabricated a whole recording, right?
5  A. Most of it, yeah.
6  Q. Okay. And then Tiffany Ardam, she was out trying to
7  harass you in front of the court.
8  A. Correct.
9  Q. Okay. You had claimed that an agent who gave testimony in
10 the grand jury, Agent Cartwright, committed perjury against
11 you, right?
12 A. She did.
13 Q. And that's a different FBI agent, right?
14 A. Uh-huh.
15 Q. Okay. You have accused Agent Hoogland of, in addition to
16 fabricating the recording, to also falsifying claims of
17 probable cause against you?
18 A. Correct.
19 Q. Okay. You accuse him of fabricating a 302 report in order
20 to deceive the judge, right?
21 A. Correct.
22 Q. And you've accused Agent Hoogland and others of the FBI of
23 planting evidence in your car to falsely incriminate you,
24 right?
25 A. Correct.

(10:07:49) (10:08:04) (10:08:12) (10:08:28) (15:08:39)

1 Q. And you've accused the U.S. Attorney's Office in this
2 building of going along with that and helping to cover it up
3 in order to prosecute you, right?
4 MR. ERSKINE: Objection, asked and answered.
5 MR. BRINDLEY: It's a separate matter, Judge. It's
6 related.
7 THE COURT: The objection's overruled. You can
8 answer that question.
9 BY MR. BRINDLEY:
10 Q. You've accused the U.S. Attorney's Office here of going
11 along with that and helping to try to cover it up in
12 prosecuting you, right?
13 A. Not the whole office, just the prosecutor assigned to the
14 case.
15 Q. Just the rogue prosecutors handling your case.
16 A. I didn't say rogue.
17 Q. Well, would you say they're rogue, or do you think they're
18 all in on it?
19 A. I just said that the one who was assigned to the case went
20 along with it.
21 Q. I see. Okay.
22 And all of these accusations, every one of them that
23 I've mentioned, they were all in your filings that you made
24 with the court in an effort to get your case dismissed, right,
25 and get out of jail?

1 A. Correct.
2 Q. Okay. After Chief Judge Pallmeyer, now Chief Judge
3 Pallmeyer, refused to release you on bond, you even filed a
4 motion to recuse Judge Pallmeyer, didn't you?
5 A. I did.
6 Q. Okay. And one of the things you claimed was you claimed
7 that on August 25th of 2017, Judge Pallmeyer told you that she
8 would not take into consideration when she was deciding your
9 detention, she would not take into consideration that you were
10 on supervised release for bank robbery at the time.
11 You indicated in your filing that she told you that,
12 right?
13 A. She did.
14 Q. On August 25th, 2017.
15 A. No, what we're talking about here is August 25th -- no,
16 25th was the arraignment. The 21st is the -- is what you're
17 talking about.
18 Q. Well, you presented a filing to the court -- does
19 May 29th, 2018 motion for recusal of judicial assignment and
20 subpoena of Aaron Bond AUSA, does that sound familiar to you?
21 A. Yes, sir.
22 Q. Okay. And in that filing that you -- this is your filing,
23 correct?
24 A. It is.
25 Q. In that filing that you prepared, didn't you write:

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 19 of 129 PageID #:7245
Johnston - cross
184

```
1   "Defendant impeached Pallmeyer on the record on August 25th,
2   2017. Specifically, Pallmeyer made statements that she would
3   not take into consideration defendant's supervised release
4   initially. Shortly after defendant's arguments with no
5   response or objection from the government, Pallmeyer reverted
6   back to defendant's supervised release."
7       You wrote that?
8   A. I did.
9   Q. Okay. So it was your claim that Judge Pallmeyer, while
10  considering your detention issue, told you she would not
11  consider whether you were on supervised release for bank
12  robbery at the time you were arrested for bank robbery. Is
13  that right?
14  A. Correct.
15  Q. Okay. Now, in fact, on August 25th, 2017, Judge Pallmeyer
16  said to you: "Sir, if you think that means that it" --
17  referring to the supervised release -- "if you think that
18  means that it doesn't count with respect to the detention
19  calculus, that's a serious misunderstanding of the rules, and
20  I think you really need counsel."
21      Did she say that to you?
22  A. Among other things, I believe, yes.
23  Q. Okay. But it's still your position that Judge Pallmeyer,
24  when she was considering your detention, was that she wasn't
25  going to consider the fact you were on supervised release?
```

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 20 of 129 PageID #:7246
Johnston - cross
185

```
1   A. You're not reading the whole context of it.
2   Q. I'm asking you a question.
3   A. Yeah.
4   Q. Don't worry about what I'm reading or not. Here's my
5   question, sir: You are still maintaining that Judge
6   Pallmeyer, sitting in judgment on whether you should be
7   detained, really told you, Mr. Johnston, I'm not going to
8   consider the fact you were on supervised release when you were
9   arrested. She told you that?
10  A. She did.
11  Q. Okay.
12  A. It was either the 21st or the 25th.
13  Q. Okay. You were never able to present a copy of a
14  transcript of that and highlight the portion where she said
15  that, were you?
16  A. No, I wasn't able to get any transcripts.
17  Q. I see. All right.
18      Now -- but that's not the only thing that you said
19  about Judge Pallmeyer in your filings, is it?
20  A. No.
21  Q. When you didn't get out on bond after you were not
22  released on bond, you filed motions in which you accused Judge
23  Pallmeyer of lying, specifically lying about your bond
24  forfeitures?
25  A. Correct.
```

186

```
 1   Q.   So Judge Pallmeyer lied about your bond forfeitures.
 2   A.   Never had a bond forfeiture.
 3   Q.   Okay.  So she lied about that.  That's your view.
 4   A.   Yep.
 5   Q.   That's your claim.
 6   A.   Yep.
 7   Q.   You accused Judge Pallmeyer of influencing and
 8   intimidating your standby counsel into serving subpoenas,
 9   correct?
10   A.   He never served the subpoenas.
11   Q.   Okay.  So you accused Judge Pallmeyer of intimidating him
12   into not doing so --
13   A.   Correct.
14   Q.   -- is that right?
15   A.   Yes.
16   Q.   Okay.  And you accused Judge Pallmeyer of preventing you
17   from subpoenaing witnesses and privately obstructing your
18   standby counsel from issuing your subpoenas.  You said she did
19   all that.
20   A.   Correct.
21   Q.   And these were all -- this was all done in motions you
22   used to either remove the judge who didn't give you bond or
23   dismiss your case, right?
24   A.   Yes, and there's exhibits from standby counsel, emails
25   confirming what he said.
```

187

```
 1   Q.   So you've accused Judge Pallmeyer of all these things, and
 2   it's still your view that you never made a false allegation
 3   against anybody to try to get out of trouble; is that right?
 4   A.   Correct.
 5   Q.   Now, even though you've accused Judge Pallmeyer of being
 6   involved in dishonesty, the FBI of fabricating evidence
 7   against you, and the U.S. Attorney's Office or the U.S.
 8   Attorneys assigned to your case of going along with it, you --
 9   the government still called you as a witness to testify
10   against Mr. Beltran Leon; is that correct?
11   A.   Yes, sir.
12   Q.   Okay.  And you haven't taken back any of those claims.
13   A.   No.
14   Q.   Okay.  Now, you claimed yesterday that there was a point
15   where you were in the marshal's lockup with Mr. Beltran Leon
16   around April 11, what was it, the 11th?
17   A.   Yeah.
18   Q.   Okay.  And -- in 2019, right?
19   A.   Correct.
20   Q.   April 11th, 2019 in the lockup here in the building here,
21   right?
22   A.   Yep.
23   Q.   And you said Mr. Beltran Leon had made some gesture with
24   his hand, right?
25   A.   Yes.
```

1    Q.   Do you remember that?  Okay.

2         And you said that you took that to mean that this

3    witness against him, Damaso, knew something about a violent

4    act, right?

5    A.   Yes.

6    Q.   Okay.  Now, of course, you know there's cameras in the

7    marshal's lockup, right?

8    A.   Uh-huh.

9    Q.   Yes?

10   A.   Yes.

11   Q.   Okay.  But the government did not ever show you any video

12   footage confirming what you claim, did they?

13   A.   No.

14   Q.   You say that you talked to Mr. Beltran Leon for hours

15   about his case, right?

16   A.   Yes.

17   Q.   You were able to gain his trust, right?

18   A.   Yes.

19   Q.   You were able to gain his trust to talk about his motions,

20   right?

21   A.   Yep.

22   Q.   About his strategy --

23   A.   Yes.

24   Q.   -- right?

25        But this confidante of yours, Mr. Beltran Leon, you

1    cannot tell us who this person, Mr. Damaso, what this violent

2    act was even supposed to be, can you?

3    A.   He indicated it was -- it was something along the lines --

4    Q.   He indicated with a gesture is all you said yesterday,

5    right?

6    A.   Yes.

7         MR. ERSKINE:  Objection, Your Honor.  There was a

8    question pending.  The witness was giving an answer.  Defense

9    counsel cut him off.

10        THE COURT:  Okay.  You can finish your answer.

11   BY THE WITNESS:

12   A.   He indicated that it was -- the way that I took it, you

13   deal with a lot of body language, and he -- he took it to mean

14   like a murder.

15   BY MR. BRINDLEY:

16   Q.   Okay.

17   A.   That's what I took from it.

18   Q.   That's how you interpreted it?

19   A.   Yes.

20   Q.   But in all of your hours of conversation with him, he

21   never talked to you about what this murder was that he was

22   supposed to be worried about, right?

23   A.   That wasn't the basis of our conversation.

24   Q.   The answer is no, correct?

25   A.   No.

1  Q. Okay. And he, in all the hours of conversation with him,
2  he never told you who it was that he was involved in murdering
3  supposedly, right?
4  A. Correct.
5  Q. In all these hours of conversation with you, he never ever
6  indicated that he actually murdered anyone, did he?
7  A. No.
8  Q. The only thing was this gesture that you say you
9  interpreted, right?
10  A. Correct.
11  Q. Okay.
12  Q. Okay. Now, in all of the hours of conversation you
13  said that you had with Mr. Beltran Leon, Mr. Johnston, he
14  never once at any time discussed any specific threat to
15  Mr. Lopez Serrano with you ever, did he? Threat by him.
16  A. No.
17  Q. Okay. He never told you that he wanted you to put the
18  word out that he'd pay somebody to beat up Mr. Lopez, did he?
19  A. No.
20  Q. You did not hear about this supposed payment of $5,000 for
21  someone to beat up Damaso from Mr. Beltran at all, did you?
22  A. No.
23  Q. Mr. Beltran did not tell you that he wanted Damaso beat up
24  and that there was money in it for the man who would do it,
25  did he?

1  A. No.
2  Q. And you were talking to him routinely, right?
3  A. To Mr. Beltran?
4  Q. Yeah. About his case and whatnot.
5  A. No, just at the courthouse that one time.
6  Q. Okay. You only talked to him one time.
7  A. Well, on the 11th and in September as well, September 2018
8  before that.
9  Q. Okay. So he never told you that he wanted the guy beat up
10  and that he'd pay somebody to do it?
11  A. No.
12  Q. There was -- the information that you had about the $5,000
13  came from an inmate named Robles, right?
14  A. Correct.
15  Q. And Robles told you that he heard about this $5,000 from
16  some other people, right?
17  A. Yes, standing in front of me.
18  Q. Okay. Mr. Robles did not tell you that he ever spoke to
19  Beltran himself about it, did he?
20  A. No.
21  Q. He told you that he heard this from some guy they call
22  Freeze, Courtney Sims, right?
23  A. Correct.
24  Q. That $5,000 would be paid for assaulting Mr. Lopez, right?
25  A. Correct.

1 Q. So Freeze is the person who got the information and
2 brought it to Robles who reported it to you as you understand
3 it, right?
4 A. Yep.
5 Q. Okay. So your knowledge about this was third hand,
6 correct?
7 A. Correct.
8 Q. And when you initially approached Mr. Beltran and were
9 wearing the recording device, remember one of the first things
10 you said to him is, "You know Tito and Freeze," right?
11 A. Yes.
12 Q. You asked him whether he knew these people, right?
13 A. Yes.
14 Q. These were the people who were supposed to have learned
15 about the bounty that Mr. Beltran was supposed to be paying
16 for, according to you, right?
17 A. Correct.
18 Q. Okay. And when you said, "You know Tito and Freeze,"
19 Mr. Beltran's answer was, "No, I don't know them." Right?
20 A. Correct.
21 Q. And then you had to try to explain who they were, right?
22 A. Yep.
23 Q. If Mr. Beltran was communicating to Freeze, hey, I'll give
24 you $5,000 if you get Damaso beat up, then Mr. Beltran would
25 have to have some familiarity with Freeze. Do you agree with

1 that much?
2 A. There's couriers involved. There's other people involved
3 as well.
4 Q. You assume.
5 A. Sure.
6 Q. Okay. So when you asked him whether he knew the guy that
7 supposedly was the one that learned about this $5,000, he said
8 he didn't even know that guy, right?
9 A. Correct.
10 Q. And then you tried to give him some explanation of who he
11 was or give him some information so he might figure out who
12 you're talking about.
13 A. Correct.
14 Q. Okay. And when you went to him to make this recording for
15 the government, you didn't say to Mr. Beltran, you know, is it
16 really going to be $5,000? You didn't ask him about what the
17 price was really going to be, did you?
18 A. No.
19 Q. Okay. You didn't say anything to him to indicate -- when
20 you spoke to him, you didn't say anything to him to indicate
21 that you thought he was the one promising to pay, did you?
22 A. Can you ask that a different way?
23 Q. Sure.
24 When you spoke to Mr. Beltran, you decided what you
25 were going to say, right?

1   beat up Damaso, Mr. Beltran didn't respond by saying what do

2   you mean, they're going to pay it? I'm going to pay it. He

3   didn't say that, did he?

4   A.  No.

5   Q.  He said I heard it was 25,000, right?

6   A.  Correct.

7   Q.  When you said 5,000, Mr. Beltran, what he didn't do was he

8   didn't turn around and say no, it's 25,000. That's not what

9   he said, is it? He said he heard it was 25,000.

10  A.  He didn't say it, no.

11  Q.  Okay. And it was just you and him talking, and you said

12  this yesterday, I wrote this down to make sure I got it right,

13  you said it was just you and him talking with the door shut,

14  right?

15  A.  Correct.

16  Q.  No one else in there, right?

17  A.  Correct.

18  Q.  Okay. And then yesterday the -- you started talking about

19  his facial expressions when he said that, the thing about the

20  $25,000, right?

21  A.  Yes.

22  Q.  And you said he -- you said he was beaming with pride or

23  something; is that what he said?

24  A.  He lit up.

25  Q.  Hmm. Well, you met with the government multiple times to

1   A.  Correct.

2   Q.  And you were making the recording for the government,

3   right?

4   A.  Correct.

5   Q.  To help them collect evidence, right?

6   A.  Correct.

7   Q.  Okay. And when you approached him, you did not say

8   anything to him to suggest that he was the one that you

9   thought put the bounty on him?

10  A.  Correct.

11  Q.  Okay. What you said to him, I think you said in Spanish,

12  is now they want to pay $5,000 to beat the guy up, right?

13  A.  Correct.

14  Q.  Okay. So you didn't say I heard you want to pay $5,000;

15  no?

16  A.  No.

17  Q.  You chose not to say that, correct?

18  A.  Correct.

19  Q.  And if Mr. Beltran was really the one that was offering

20  the bounty himself, it would seem odd for you to be telling

21  him about it. Don't you think?

22  A.  You're asking me if it would seem odd?

23  Q.  Yeah, I am.

24  A.  I don't think so, but -- not really. I don't think so.

25  Q.  Now, when you told him that they're going to pay 5,000 to

1  talk about this recording, right?
2  A. Correct.
3  Q. And in all of your discussions with the government about
4  this recording in the past, you never made much -- any
5  reference to his facial expressions, did you?
6  A. There was no need for it.
7  Q. So the idea about his facial expressions -- let me back up
8  a step.
9       But yesterday you basically said that your
10 information saying that he was the source of this $25,000 was
11 communicated by his facial expression.
12 A. By his body language, yes.
13 Q. Okay. And so the body language -- you agree with me --
14 you'd agree with me that it's an important -- it would be
15 important if you had information indicating that he was indeed
16 the one that put the bounty out, right?
17 A. Correct.
18 Q. If it's body language that was the real indicator of that,
19 that would be an important thing, right?
20 A. Correct.
21 Q. And in your discussions with the government about your
22 testimony and this recording, you never mentioned the body
23 language until you hit this witness stand, correct?
24 A. No, during my preparation for testimony and --
25 Q. You told them about the facial expressions then and you

1  think they kept that from the defense?
2  A. Well, they have to -- they have to play the recording.
3       MR. ERSKINE: Objection, Your Honor. Misstates the
4  discovery.
5       THE COURT: Sustained, sustained.
6  BY MR. BRINDLEY:
7  Q. Okay. Ultimately, though, you would agree with me now
8  that during the entirety of Mr. Beltran's conversation with
9  you, he never indicated that -- through anything he said, that
10 he was the one that was the source of this bounty, correct?
11 Not through his words.
12 A. The second time that he said 25, it's 25,000, he said,
13 that's when I knew it was him that said it.
14 Q. Uh-huh. And you said it was --
15 A. I knew that it was him that had issued it.
16 Q. And you said yesterday it was his facial expressions that
17 did that for you.
18 A. In his tone of voice, you can hear it in the recording as
19 well.
20 Q. Okay. During that same recording, he told you that he'd
21 like to deliver a message to Robles that he'd pay a
22 hundred dollars for some information, right?
23 A. Correct.
24 Q. So he was willing to ask you to deliver a message that
25 he'd pay a hundred dollars for information, correct?



199

1    Q.  And you're not alleging that the government has

2    fraudulently altered this recording?

3    A.  No.

4    Q.  Okay.  So basically the last thing he said on the subject

5    of Damaso and the bounty was "I do want to know who he's

6    talking about.  That's it," right?

7    A.  Correct.

8    Q.  Okay.

9            (Counsel conferring.)

10           MR. BRINDLEY:  No further questions, Your Honor.

11           THE COURT:  Okay.

12           MR. ERSKINE:  No questions from the government, Your

13   Honor.

14           THE COURT:  Okay.

15           Do you have another witness, or we're done?

16           MR. ERSKINE:  Your Honor, may we have a sidebar?

17           THE COURT:  Sure.

18           And the witness is excused.

19           (Sealed proceedings heard at sidebar:)

20

21

22

23

24

25

---

198

1    A.  Correct.

2    Q.  But he didn't tell you, hey, go tell those people it's

3    really 25,000.  He didn't tell you that?

4    A.  No, he didn't say that.

5    Q.  Okay.  In fact, when talking about the 25,000, Mr. Beltran

6    said at the end -- toward the end of the recording, you said

7    something about the 25,000 being crazy, and Mr. Beltran agreed

8    with that, right?

9    A.  Correct.

10   Q.  What Mr. Beltran said to you on the recording was:  "I do

11   want to know who he's telling on.  That's it."  Do you

12   remember him saying that?

13   A.  I remember him saying that.

14   Q.  Okay.  And then you said, "Exactly," right?

15   A.  Yes.

16   Q.  Okay.  So when he said, "I do want to know who he's

17   telling on.  That's it," you didn't say, "What do you mean

18   that's it?  I thought you wanted somebody to do something to

19   him," right?

20   A.  Correct.

21   Q.  When he said, "That's it," you said, "Exactly," right?

22   A.  Right.

23   Q.  And after he said, "That's it," he didn't give any other

24   indication he wanted anybody beat up, did he?

25   A.  No.  We were only talking about that part of it.



1  ten minutes.
2  (Recess from 10:30 to 10:40 a.m.)
3  THE CLERK: 09 CR 383, United States versus Beltran
4  Leon.
5  THE COURT: Okay, now that we've completed, you know,
6  the factual part of this sentencing, I think we should go back
7  to the presentence report and take up any objections.
8  So let me just start by asking Mr. Brindley, have you
9  had a full opportunity to review the presentence report with
10 Mr. Beltran Leon?
11 MR. BRINDLEY: Yes, Your Honor, we have.
12 THE COURT: And after doing that, first of all, are
13 there any factual changes you want me to consider making to
14 the report?
15 MR. BRINDLEY: Judge, we have filed objections to the
16 calculations that were detailed in our previous filing and
17 some of which the evidence here was to relate to, so --
18 THE COURT: Okay.
19 MR. BRINDLEY: -- we obviously stand by those. If
20 there are other factual objections, I don't think there are,
21 other than what was noted in that.
22 THE COURT: Okay. Well, let's take up then the legal
23 objections --
24 MR. BRINDLEY: Yes.
25 THE COURT: -- to the application of the advisory



24 (Proceedings heard in open court:)
25 THE COURT: We'll stand in recess for at least

1 Sentencing Guidelines first.

2   So they have filed their objections. Do you want to

3 respond based on the hearing?

4   MS. CSICSILA: Judge, yes, and we did respond with

5 respect to the government's sentencing memo.

6   THE COURT: Okay.

7   MS. CSICSILA: But we also -- we're happy to talk

8 through some of the guideline enhancements. With respect to

9 the base offense level, I think there's agreement that the

10 defendant qualifies as a Level 38 under 2D1.1(a)(5) and (c)1.

11   THE COURT: Okay. Let's just stop right there.

12   Do you agree with the base offense level as 38?

13   MR. BRINDLEY: We do, Judge. We agree that the

14 minimum --

15   THE COURT: That's based on drug quantity.

16   MR. BRINDLEY: Yeah, the quantity can be reached, the

17 minimum threshold. We don't necessarily agree with the amount

18 over that the government has claimed at different points. But

19 it doesn't matter. We agree that the threshold's met, and

20 it's a Level 38.

21   THE COURT: Okay. Well, let's -- we might get back

22 to the issue of drug quantity, but let's skip over that for

23 now.

24   Then you have a disagreement about the obstruction

25 enhancement.

1   MR. BRINDLEY: Yes, Judge, absolutely.

2   THE COURT: Okay. And does that come down to the

3 issue of the potential beating of the witness --

4   MR. ERSKINE: Yes, Your Honor.

5   THE COURT: -- or is there more than that?

6   MR. ERSKINE: The basis for the obstruction

7 enhancement would be the defendant's efforts to have Damaso

8 Lopez beaten at the MCC for money.

9   THE COURT: Okay. So based on the hearing that we

10 conducted over the last day, what is the government's position

11 as to the state of the evidence?

12   Do you believe that that is corroborated by the

13 recording, or is there more? I'll let you make your argument.

14   MR. ERSKINE: Thank you, Your Honor.

15   Yes, the government would turn Your Honor's attention

16 first and foremost to the recording itself and also to the

17 circumstances. The thing to keep in mind, Your Honor, is that

18 you heard testimony yesterday that this Freeze person, the

19 person who brought the hit up to 25, he goes to the Protestant

20 mass. The defendant goes to the Catholic mass which happens

21 before it.

22   As you heard in the recording, the defendant didn't

23 know who Freeze was. He was asking Mr. Johnston who is this

24 Freeze. That's because the defendant did not give the offer

25 directly to Freeze. It had made its way to the Protestant

204

1 service from someone else, and you have not received evidence
2 as to who would have done that, but it's clear that the
3 defendant did not give it directly to Freeze, and the
4 government doesn't suggest that he did.
5 But keep in mind the recording is very clear. On the
6 one hand, the defendant says, "Who's that?" But he's
7 correcting Mr. Johnston. It's not 5,000, it's 25,000.
8 THE COURT: Okay.
9 MR. ERSKINE: And Your Honor heard the defendant's
10 intonation. You can put aside, if you'd like, Johnston's
11 testimony as to, you know, the facial expressions of the
12 defendant. Your Honor could -- we're happy to play it again,
13 but Your Honor heard the intonation with which the defendant
14 sort of said that, I heard it was 25,000, in a very knowing
15 and telling fashion, in a way saying this is not just a
16 bystander saying he heard it was 25,000.
17 This is a guy who doesn't know the people or who are
18 the ones going around bringing the info to the 25th floor. He
19 doesn't know them, yet he knows it's for 25,000. And it's
20 critical to keep in mind exactly what Johnston testified to
21 the defendant saying is what happened in this case.
22 The government brought Damaso Lopez to Chicago to
23 testify against the defendant, and shortly thereafter, the
24 defendant indicated his intention to plead guilty. You know,
25 we have not offered any evidence through Damaso Lopez -- and

205

1 so I offer to the Court, not even so much asking the Court to
2 credit the testimony of Mr. Johnston on that point, but just
3 to think about the motivation and the fact that as soon as
4 Mr. Lopez came to Chicago, shortly thereafter is when the
5 defendant pled guilty.
6 THE COURT: Okay. Do you have a transcript of the
7 recording?
8 MR. ERSKINE: Not an entire transcript.
9 THE COURT: Okay.
10 MR. ERSKINE: We could finish the transcript and
11 submit it to Your Honor if you'd like. It's essentially for
12 the first part.
13 THE COURT: Okay. But do you agree that the
14 defendant saying I heard it was up -- it was 25,000 is not,
15 how would I put it, convincing in terms of -- convincing proof
16 of that he's behind the scheme?
17 MR. ERSKINE: Well, Your Honor, later on in the
18 recording, they continue the aspect of the conversation of --
19 which indicates his interest in Damaso Lopez and his focus on
20 Damaso Lopez.
21 Later on in the recording, you hear the further
22 conversation about how the defendant is trying to pay Robles
23 and pay Johnston to get this information that Lopez had
24 supposedly given to --
25 THE COURT: That's the hundred-dollar payment.

1 I heard it was $25,000 is not enough to prove by preponderance
2 he ordered it or offered it.
3 Moreover, the witness himself admits that at the end
4 what he says is "I would like to know who he's talking about.
5 That's it." And the witness says, "Exactly" and that was the
6 end of it.
7 This recording doesn't come anywhere close to
8 establishing that my client is, in fact, the one who went out
9 there and solicited people for $25,000. If that happened, we
10 would have to have some evidence of who actually talked to
11 him.
12 This witness doesn't even say that. They're saying
13 that he didn't even know the person that talked to a person
14 that talked to the witness, and that's the best they can do?
15 Judge, that's not enough for an obstruction enhancement in
16 this case. I don't think I need to say more than that.
17 MR. ERSKINE: If I could just respond briefly?
18 THE COURT: Go ahead.
19 MR. ERSKINE: Your Honor, again, I would be happy to
20 play the recording again, but it's not simply him asking or
21 saying I heard it was 25,000. There's a certain intonation in
22 his voice which is not consistent with an objective,
23 uninterested bystander. His voice tells the tale.
24 And, Your Honor, there's no one else in that building
25 who has the interest and the means and the motivation to harm

1 MR. ERSKINE: That's the hundred-dollar payment, for
2 just the information, Your Honor. It's just, as they say in
3 the recording, "Just for the information? Just for the
4 information."
5 THE COURT: Okay.
6 MR. ERSKINE: Like service, like pay. A hundred
7 dollars for information; $25,000 for beating.
8 THE COURT: What's the burden of proof here?
9 MR. ERSKINE: A preponderance.
10 THE COURT: Okay. Let me hear from Mr. Brindley for
11 a second.
12 MR. BRINDLEY: Judge, with respect to this whole
13 issue of the bounty, the recording just doesn't do the job of
14 proving this by preponderance. The witness that goes to him
15 and makes the recording doesn't approach him and talking to
16 him as if he's the one that put it out there. He talked about
17 he heard about it coming from somewhere else. All the
18 defendant says is I heard it was $25,000.
19 Now, if we have to get into the facial expression
20 thing, which they seem to be walking away from, then we'd have
21 to rely on the credibility of the witness, and I probably
22 spent too much time on it, Judge. This is a terribly
23 incredible witness based on what we know about him.
24 THE COURT: I agree with that.
25 MR. BRINDLEY: And so in light of all of that, saying

208

1   Damaso Lopez. You know, you heard countless testimony --
2       THE COURT: At that point in time, let me just ask
3   you this, at that point in time, Mr. Guzman had not gone to
4   trial in New York.
5       MR. ERSKINE: Yes, he had.
6       THE COURT: He had?
7       MR. ERSKINE: Yes. This took place, this recording
8   occurred in May 2019, so just a few months ago.
9       THE COURT: And Mr. Guzman's trial finished in New
10  York by when?
11      MS. CSICSILA: By March it was finished.
12      THE COURT: By March.
13      MR. ERSKINE: The defendant had pled guilty by the
14  time of this recording. This was all after the defendant's
15  guilty plea.
16      THE COURT: Right.
17  The defendant had already pled guilty.
18      MR. ERSKINE: Correct.
19      THE COURT: So you're saying that he's worried about
20  Mr. Lopez being called as he was.
21      MR. ERSKINE: I don't even know if it's worried.
22  It's vengeance. It's him not liking the guy. It's him --
23      THE COURT: Because Mr. Lopez had testified in
24  Mr. Guzman's trial?
25      MR. ERSKINE: No. because -- perhaps because he was

---

209

1   teed up to, but more primarily because there had been a huge
2   falling out between the Chapitos on the one hand and Damaso,
3   Sr. and Damaso, Jr. on the one hand.
4       MS. CSICSILA: Damaso, Sr. did testify against Chapo
5   in the trial in New York.
6       MR. ERSKINE: That's a large part --
7       THE COURT: But the witness before me had not, right?
8       MS. CSICSILA: Correct.
9       THE COURT: Testified in New York.
10      MS. CSICSILA: Correct.
11      MR. ERSKINE: Correct.
12      THE COURT: I've got to tell you, while I think it's
13  a close call, I will not use the obstruction enhancement. I
14  think it's a very close call by a preponderance, but I don't
15  think it's appropriate to do so. There's too many stretches.
16      It's certainly not proof beyond a reasonable doubt.
17  It's certainly not proof by clear and convincing, and then at
18  the end of the day when the U.S. Attorney's Office is up here
19  asking for an obstruction based on intonation with the
20  credibility of the witness that was on the stand,
21  Mr. Johnston -- and his credibility is just about nowhere in
22  this building. That's all I will tell you.
23      So I don't think, based on that record when I put the
24  evidence on a scale, it doesn't tip the way the government
25  wants it to tip.

210

1　So I will not use the obstruction.
2　Let's go on to the next enhancement. Is it the
3　firearm and bribery enhancements?
4　MS. CSICSILA: Yes, Judge. The dangerous weapon
5　enhancement, and the government believes that that two-point
6　enhancement should apply.
7　You heard testimony from, for example, Damaso Lopez
8　Serrano that he attended cartel meetings at which firearms
9　were held by various cartel members and associates, including
10　sicarios that were assigned to protect him and protect Chapo
11　and Chapo's sons.
12　You also heard testimony about the defendant having a
13　very -- well, first of all, familial relationship with Chapo
14　and Chapo's sons, and then also a social relationship. You
15　also heard testimony from Damaso Lopez Serrano that the
16　defendant -- he saw the defendant carrying a firearm on
17　multiple occasions, including at a cartel Christmas party that
18　was hosted, I believe, for Mayo's workers. At that party, the
19　defendant was carrying a gold-plated AK-47, and the witness
20　recalled that incident specifically.
21　There's more than ample evidence in the record to
22　show that the defendant knew his co-conspirators carried
23　firearms, that he carried firearms, that it was reasonably
24　foreseeable that co-conspirators were carrying firearms.
25　THE COURT: Okay.

211

1　MS. CSICSILA: So the government believes the
2　enhancement should apply.
3　THE COURT: Mr. Brindley?
4　MR. BRINDLEY: Judge, with respect to the gun
5　enhancement, what I would say is this: The examination of the
6　witness yesterday indicated a clear admission that people
7　carrying guns in the area where they were was commonplace. It
8　wasn't necessarily carrying a gun because we're protecting
9　drugs or drug proceeds. I think Mr. Damaso basically said a
10　lot of people or many, many people in Culiacán have guns.
11　It's a dangerous place.
12　And so the fact that Mr. Beltran Leon may have had --
13　one of them was sounded like he was on a dance floor, from
14　what I got -- and Mr. Beltran Leon had a firearm unrelated
15　necessarily to any drug trafficking that may have occurred,
16　then I don't think that would qualify for the enhancement, and
17　the evidence that we got yesterday didn't give any indication
18　of him being involved in a drug transaction in which he had
19　any firearm.
20　Now, the presentence report had identified an
21　incident where firearms were located in a car which had
22　been -- firearms sounded like that belonged to Alfredo and
23　Ivan Guzman, but there's no indication in the evidence that we
24　have that Mr. Beltran Leon knew those firearms in that
25　incident were in the car ahead of time.

212

```
 1          Moreover, for -- if there had been more detailed
 2   evidence on this, Judge, I think I would take a position of a
 3   different nature; but what we had is basically, well, a lot of
 4   people carried guns so he should get the gun enhancement.
 5   which would mean basically everybody charged in a conspiracy
 6   of this sort -- this one would all get the gun enhancement
 7   because it's reasonably foreseeable to everybody --
 8          THE COURT:  Mr. Brindley, your position, just at
 9   sentencing, I'm sentencing the defendant for participating in
10   a drug conspiracy.
11          MR. BRINDLEY:  Yes.
12          THE COURT:  So you admit he's involved in a drug
13   conspiracy --
14          MR. BRINDLEY:  Absolutely.
15          THE COURT:  -- right?  Is it your position ultimately
16   that he was involved in one drug transaction?
17          MR. BRINDLEY:  Absolutely not, Judge.  We don't take
18   that view.
19          THE COURT:  Okay.
20          MR. BRINDLEY:  That's why we agreed to the quantity.
21          THE COURT:  Okay.  So you agree to quantity, but you
22   sort of disagree to quantity.
23          MR. BRINDLEY:  Only at some -- depending on the level
24   of excess that we get to; but we don't -- we're not taking --
25   I think it's an absurd view that Mr. Beltran Leon only engaged
```

213

```
 1   in one single drug transaction here or there.
 2          THE COURT:  Right.
 3          MR. BRINDLEY:  He was --
 4          THE COURT:  So what's the bottom line quantity you're
 5   agreeing to, just so I know?
 6          MR. BRINDLEY:  Judge, let me talk to Mr. Blegen for a
 7   second.
 8          THE COURT:  Sure.
 9          (Counsel conferring.)
10          MR. BRINDLEY:  Judge, in light of the evidence that
11   the government has presented at our hearing here, we do not
12   have an exact number we can give you, I'll tell you that we
13   disagree with thousands of kilos.
14          THE COURT:  Okay.
15          MR. BRINDLEY:  It's not that, and the evidence that
16   was presented here suggests it really definitely wasn't that.
17   What we heard from Damaso Lopez, indicating he was a drunk and
18   they didn't really want to deal with him very much.
19          But we acknowledge he was associated with Alfredo and
20   Ivan, which were moving large quantities, and was engaged in
21   we don't know how many but certain number of transactions with
22   them.  We acknowledge that.
23          THE COURT:  We're talking hundreds of kilograms of
24   cocaine.
25          MR. BRINDLEY:  Yes, Judge.
```

1 western-type setting like in a movie. There's a reason for
2 that, and so I will use the firearm enhancement because in my
3 view, Mr. Beltran Leon is participating in a significant drug
4 conspiracy where there are -- one of the prices is safety.
5 MR. BRINDLEY: And --
6 THE COURT: And so that will be the ruling with
7 regard to that.
8 Are we now to the bribery enhancement?
9 MR. ERSKINE: Yes, Your Honor.
10 THE COURT: Okay.
11 MR. ERSKINE: Your Honor, the bribery enhancement is
12 premised on this event: where you heard some testimony on it.
13 It was also detailed through citation to the intercepts in the
14 government's version.
15 So that's in February 2014 when the defendant is at
16 this restaurant, El Firon, with Alfredo Guzman and Ivan
17 Guzman. And then the military arrives, and they all flee
18 dressing up as the waiters.
19 And the intercepts as cited and quoted in the
20 government's version made clear that they left their vehicles
21 there and that there was incriminating evidence in the
22 vehicles that they wanted to get back because it would tie --
23 with regard to the defendant, it would show the location of
24 his residence --
25 THE COURT: Okay.

1 THE COURT: Okay.
2 MR. BRINDLEY: I would say that's fair.
3 THE COURT: Okay. And how many kilograms of heroin?
4 MR. BRINDLEY: Once again, Judge, I don't think the
5 government has proven a specific amount such that I can give
6 it to you. We're only disputing this notion that he was in
7 the thousands and thousands of kilos, which, like what we
8 heard from Mr. Fernandez was doing. Mr. Beltran Leon wasn't
9 even close to that.
10 THE COURT: What you're saying is a significant
11 amount of cocaine and heroin --
12 MR. BRINDLEY: Yes, sure.
13 THE COURT: -- but not into this mega --
14 MR. BRINDLEY: Yes.
15 THE COURT: -- stratosphere.
16 MR. BRINDLEY: Yes.
17 THE COURT: I get that. And the reason I'm asking
18 you this is because then once he's involved in a drug
19 conspiracy like that, and I do credit the testimony of
20 Mr. Lopez, our first witness, in terms of people having guns
21 on different occasions, and I think the whole purpose of
22 having guns is an issue of safety and protection, and I think
23 the reason you're doing that is because you're in a drug
24 conspiracy.
25 It isn't just to show off or because you're in a

1   MR. ERSKINE: -- and it would let the military come
2  to his residence.
3       So, essentially, if I read the defense's objection
4  correctly, their objection is one of really more of a legal
5  argument because they argue that under the law -- well,
6  actually, their argument is no longer moot -- sorry, it is
7  moot now because they said if obstruction applies, then this
8  can't apply because there is a note that says to the extent
9  the bribery is obstructive, you know, deal with that under the
10  obstruction enhancement under Section 3, not this. Well,
11  that's no longer at play, so their argument is moot.
12       So based on the testimony Your Honor heard and the
13  intercepts detailed in this section of the government's
14  version, it's clear the defendant made many attempts to and
15  eventually did pay government officials for the retrieval of
16  these items from the vehicles belonging to himself and the two
17  Guzman brothers.
18       THE COURT: Okay. Mr. Brindley.
19       MR. BRINDLEY: Judge, I would say that the evidence
20  that we heard at the hearing, the hearing evidence where I
21  thought we would get more on this, was very sparse. There was
22  almost no significant evidence -- there was evidence about
23  them fleeing that incident from Guadalupe, but there was not
24  much of any evidence and detail about how these payments were
25  made, who they were made to, anything of that sort that was

1   presented in the evidence.
2       We objected that there wasn't reliable evidence to
3  establish that this was, in fact, a bribe that was paid for
4  some improper purpose or some illicit reaction. I maintain we
5  didn't get that evidence, Judge. If we had gotten it, then we
6  could address it.
7       The problem is the witnesses they had didn't address
8  it in any way, and we're left with a record that doesn't tell
9  us what was actually done and what the intent was to the
10  recipients of this work. He wanted to get property back that
11  was his. A lot of people do after they've been involved in an
12  incident with the law enforcement.
13       I don't think that's enough to rise to the level of
14  bribery unless we have more information about the recipient
15  and how it's given than we did and that we got in the case
16  from the evidence and these witnesses who really didn't have
17  any information about that.
18       MR. ERSKINE: Your Honor, if I may respond?
19       THE COURT: Go ahead.
20       MR. ERSKINE: The government has no way limited in
21  the evidence, asked Your Honor to consider, to the witnesses
22  who took the stand. These intercepts constitute the primary
23  evidence in this case. They are the defendant's own words,
24  messages he sent and received while committing the crime
25  itself. The government --

1  then?

2      THE COURT: Okay. What words are you relying on

3      MR. ERSKINE: Your Honor, I would direct Your Honor

4  to the government's version of the offense, Page 26, 27.

5      THE COURT: Okay. Where the defendant says what?

6      MR. ERSKINE: Actually Page 28, Your Honor.

7      THE COURT: Okay.

8      MR. ERSKINE: So the block quote at the top of 28,

9  the defendant explained to a person by screen name of Abogado:

10  "What I want to let you know is the car is less of a problem

11  now with what they took out from it otherwise more 'paba'

12  would indeed go there straight over there to your house ...

13  and it's that there was nothing else they could do honestly

14  man I insisted but they already told me it's not possible

15  anymore because the problem is these assholes," meaning the

16  military "stay there and keep watch over the vehicles that

17  have it."

18      And then further on -- and then further on, the

19  defendant in the middle of the page, the defendant further

20  stated, "Supposedly I gave the keys to an MP," which is law

21  enforcement official, "who did me the favor of taking out the

22  two cortas, guns, but they want to charge me 100,000 pesos,

23  and they didn't take out the most important thing," which he's

24  referring to the earlier thing he said, "proof the address,

25  keys and the house remote."

1      The defendant then says later at the top, going on to

2  Page 29 of the government's version, ultimately the defendant

3  says, he reports to Felix Beltran: "I spoke to them and they

4  gave me the things without charging me. I had $1,600 and I

5  gave that to them. Tomorrow when they introduce me to the MP"

6  law enforcement official, "I will give them more. They gave

7  me what Pepe" meaning Alfredo "had in the car."

8      THE COURT: I think that's enough right there, the

9  language you just quoted, to prove bribery by a preponderance

10  of the evidence, so I will use the bribery enhancement.

11  What's next?

12      MS. CSICSILA: Judge, there is the --

13      THE COURT: The use of violence?

14      MS. CSICSILA: The use of violence enhancement that

15  the government is seeking to have applied, and, again, there

16  are explicit BlackBerry interceptions that reference the

17  defendant having previously kidnapped an individual Juan

18  Carlos, and then talking about seeking approval from the

19  Chapitos to again kidnap the individual Juan Carlos.

20      And the defense in their sentencing memo says, well,

21  we don't know if this kidnapping ever happened, or, you know,

22  if it really ever took place.

23      The defendant's own words say that he did this on a

24  prior occasion for the same purpose he's trying to do it

25  again, which is because there is a financial debt owed to the

1  he had paid to have him released.
2  Now, there was no indication that Mr. --
3  (Counsel conferring.)
4  MS. CSICSILA: No, I'm sorry, did I say the
5  defendant?
6  MR. BRINDLEY: No, talking about Mr. Fernandez.
7  MS. CSICSILA: Yes, Mr. Fernandez Valencia paid to
8  have the witness released.
9  MR. BRINDLEY: But, Your Honor, Mr. Fernandez
10 Valencia, as I understand it, didn't say that Mr. Beltran
11 Leon --
12 MS. CSICSILA: I'm sorry, he didn't pay, he called to
13 have him released.
14 THE COURT: So what I'd like to know is -- the
15 government has looked at this video.
16 MS. CSICSILA: Yes.
17 THE COURT: And you've looked at this translator's
18 affidavit.
19 MS. CSICSILA: Yes.
20 THE COURT: Is this the victim of the kidnapping who
21 is now withdrawing or attempting to withdraw, he has never
22 made a complaint, but you picked it up on a BlackBerry
23 intercept --
24 MS. CSICSILA: Right.
25 THE COURT: -- and picked up evidence of the

1  defendant.
2  THE COURT: Okay.
3  MS. CSICSILA: And so the government's position is
4  that this does apply.
5  THE COURT: Okay. Defense?
6  MR. BRINDLEY: Judge, with respect to this issue of
7  Juan Carlos Lou, Your Honor, we have from Juan Carlos Lou, we
8  have a video which we want to provide to Your Honor. We also
9  have a translation of the video recording in which Juan Carlos
10 Lou indicates that he was not and has never been kidnapped.
11 The government, I think, well, they told us and I
12 know they'll agree, that Manuel Fernandez identified, and I
13 think Damaso Lopez, too, identified the man on this video as
14 Juan Carlos Lou who they knew.
15 So, Your Honor, we would ask you to consider this
16 evidence. The transcript's right here.
17 THE COURT: Okay. Have you turned this over to the
18 government?
19 MR. BRINDLEY: Oh, yes.
20 THE COURT: Okay. What's the government's reaction
21 to this?
22 MS. CSICSILA: Well, first of all, we did ask
23 Mr. Manuel Fernandez Valencia about the individual in the
24 video. He said he did recognize him. And he, in fact, had
25 been kidnapped in the past, and the witness knew that because

222

1   kidnapping, and now the alleged victim is saying he was never

2   kidnapped.

3       MS. CSICSILA: Right.

4       THE COURT: Is that the case?

5       MS. CSICSILA: So, Judge, what we can say is that

6   appears to be an individual named Juan Carlos who has been

7   previously picked up and kidnapped --

8       THE COURT: So is the government's position --

9       MS. CSICSILA: I'm sorry.

10      THE COURT: -- that this is the same person or not?

11      MS. CSICSILA: It's not -- I don't think we have

12  evidence to show that it's the same position, but I'll let my

13  colleague --

14      THE COURT: Yeah.

15      MR. CSICSILA: -- because I'm clearly twisting a few

16  things up here, so I'm going to let him address this.

17      THE COURT: Okay.

18      MR. ERSKINE: So, Your Honor, we would like to show

19  you just the intercept itself. It's the defendant's own words

20  in which he admits that he --

21      THE COURT: Well, I don't think there's an issue that

22  the intercept says that the defendant is asking for

23  authorization from the Chapitos to once again "pick up the

24  dude."

25      MR. ERSKINE: Right. And so, Your Honor --

223

1   is as close as you get to talking to the dude.

2       THE COURT: But instead what they're saying is this

3       MR. ERSKINE: Right.

4       THE COURT: And he says he was never kidnapped.

5       MS. CSICSILA: Well --

6       MR. ERSKINE: Sorry. Your Honor, so, yes, we agree

7   that the person in that video is Juan Carlos Lou because both

8   Manuel Fernandez and Damaso Lopez recognize him to be Juan

9   Carlos Lou.

10      THE COURT: Okay.

11      MR. ERSKINE: And Juan Carlos Lou is referred in that

12  fashion in the defendant's intercept in which the defendant is

13  explicit that's the Juan Carlos Lou who he'd previously picked

14  up and was receiving authorization to pick up again because

15  that worked the first time to get the money out of the guy.

16      So, yes, they recently obtained a video in which, as

17  the government argues, a prior kidnapping victim is agreeing

18  on video in Culiacán that he had never been kidnapped by the

19  defendant. The government's position is that's not

20  persuasive. The defendant's own words at the time are the

21  most persuasive evidence.

22      MS. CSICSILA: The interception is referred to in the

23  government's version at Page 24, where the defendant says: "I

24  picked him up once for the same thing." Meaning I kidnapped

25  him for owing -- for him owing money.

225

1　MS. CSICSILA: But, correct, Judge.
2　THE COURT: I got it.
3　MS. CSICSILA: I -- the --
4　THE COURT: Bottom line, bottom line, I think, given
5　the state of the evidence, I don't think the government has
6　proven by a preponderance of the evidence that I should use
7　the use of violence. So that's going to be the ruling by this
8　Court.
9　I'm going to hand this back to you.
10　The stash house enhancement, is that still at issue?
11　MS. CSICSILA: Yes, Judge, it is.
12　MR. BRINDLEY: The government -- the Probation Office
13　didn't apply it, I believe.
14　THE COURT: Right. I understand that.
15　MS. CSICSILA: Correct.
16　THE COURT: And in this sense, the government is
17　objecting to the Probation Department's, you know, failure to
18　apply the enhancement.
19　MS. CSICSILA: Yes.
20　THE COURT: So you're relying on a stash house in Los
21　Angeles, is that it?
22　MS. CSICSILA: Yes, Judge. Manuel Fernandez Valencia
23　testified that he had conversations with the defendant in
24　which the defendant was discussing his worker having a large
25　quantity of methamphetamine in an apartment in Los Angeles.

---

224

1　MR. BRINDLEY: And, Your Honor, if I might respond,
2　Judge.
3　I mean, the problem with the government's argument
4　here is we have evidence that the person himself is saying
5　that it didn't happen. They don't have any -- there is no
6　evidence that anything that this recording was improperly
7　obtained or there was anything wrong in getting it or that
8　he's lying in some way.
9　THE COURT: Okay.
10　MR. BRINDLEY: That doesn't rise to the level of
11　preponderance. He's saying he was never kidnapped by
12　Mr. Beltran Leon, and Manuel Fernandez is saying, well, I made
13　a call in order to get him freed when he was kidnapped by
14　someone. He would know if it was Mr. Beltran Leon who did it,
15　and he didn't say that either.
16　MR. ERSKINE: To clarify that, Your Honor, that was
17　years earlier.
18　THE COURT: I understand that.
19　And this is the best the government can do in terms
20　of showing any type of use of violence other than the sort of
21　hearsay testimony we had about someone being shot at some
22　point by this defendant, right?
23　MS. CSICSILA: Right, and our position on that is not
24　that that was tied to drug trafficking.
25　THE COURT: Right.

226

```
 1              So it was the defendant's own words that this was his
 2    worker.  He was -- and the reference to drugs there, and the
 3    witness testified that his understanding based on the
 4    conversation is that this was --
 5              THE COURT:  And you believe it's corroborated by the
 6    BlackBerry intercept.  That's at the government's version of
 7    the offense at 14.
 8              MR. ERSKINE:  Not that particular stash house, Your
 9    Honor --
10              THE COURT:  Right.
11              MR. ERSKINE:  But the general use of stash houses by
12    both the defendant and the cartel.
13              THE COURT:  Okay.  Let me hear what the defense is.
14              MR. BRINDLEY:  Judge, first of all, with respect to
15    this stash house contingent, even if we credit Mr. Fernandez,
16    and I'm going to come back to that in a second because this
17    was part of the area where Mr. Fernandez hadn't been great on
18    this subject, but what he's saying is that there was a worker
19    that was at a place.
20              In order to be responsible for the stash house
21    enhancement, which I think is the Probation Office's problem,
22    is the government would have to prove that Mr. Beltran was
23    maintaining it.  It can't just be that it exists to get it or
24    that you had been there, you have to be the person maintaining
25    it.  And Mr. Fernandez didn't --
```

227

```
 1              THE COURT:  So you're saying if his worker is
 2    maintaining it, that's not enough?
 3              MR. BRINDLEY:  No, and I don't even think there's
 4    evidence the worker is the one -- Alfredo could have been,
 5    Ivan could have been maintaining it, which it may be more
 6    likely, but I don't know.  We don't have that.  I'm guessing.
 7    We shouldn't have to do that.  The evidence is what it is, and
 8    it's not enough.  We don't have evidence that Mr. Beltran Leon
 9    maintained this at all.
10              MS. CSICSILA:  But the guideline --
11              MR. BRINDLEY:  -- and this entire --
12              MS. CSICSILA:  I apologize.
13              MR. BRINDLEY:  Not quite finished.
14              The entire incident about this discussion with
15    Mr. Beltran Leon, all of it surrounds this 90 kilos thing, in
16    cross-examining Mr. Fernandez Valencia about yesterday, and
17    that's the subject where he talked to the government about the
18    subject in detail, he went before the grand jury, testified
19    about the subject and didn't say anything about Mr. Beltran
20    Leon; at one point testified yesterday that he lied to the
21    grand jury about having failed to correct something that was
22    wrong in his grand jury statement on this subject.
23              So there's a credibility issue with respect to the
24    particular subject matter in which this statement is
25    supposedly made, which I also think calls it into doubt.  And
```

228

1    without more evidence that it's actually Mr. Beltran Leon

2    that's maintaining this thing, I think the Probation Office is

3    correct.

4        THE COURT: Okay.

5        MS. CSICSILA: Judge --

6        THE COURT: Go ahead.

7        MS. CSICSILA: I believe the standard is that whether

8    he maintained the premises for purposes of distributing the

9    controlled substance or controlled the activities at the

10   location.

11       THE COURT: We don't even know where the stash house

12   was, right? There's just reference --

13       MS. CSICSILA: Correct.

14       THE COURT: -- to a potential.

15   I think in this instance, it's another situation

16   where there's good -- just like the obstruction, a good

17   likelihood, but I don't find that it passes the threshold of a

18   preponderance of the evidence as I'm applying it, and so I

19   will not use the stash house enhancement.

20       MR. ERSKINE: Your Honor, I'm sorry.

21       THE COURT: Yes.

22       MR. ERSKINE: At government's version 14.

23       THE COURT: Right.

24       MR. ERSKINE: Government's version 14, this is a

25   conversation between Victor Felix Beltran, the defendant's

229

1    admitted co-conspirator, and they're discussing the purchase

2    and sale of kilograms of cocaine under different brands, under

3    the LV brand, under the Jaguar brand --

4        THE COURT: Right.

5        MR. ERSKINE: -- and on the bottom the defendant is

6    quoted from the intercepts stating, "The guy just pays" --

7    this is because Victor Felix asked when are they going to pay.

8    The defendant responds: "This guy just pays." He doesn't ask

9    for days. "Here is the issue: We need you to send me two or

10   four of each brand," meaning kilos of cocaine. "He didn't

11   want the whole bunch all together because we have several in

12   the office," office being stash house, "brother-in-law. Don't

13   think it's because of being an asshole. In fact, I have a few

14   from two people."

15   So he's referring to a specific stash house

16   where he's keeping the cocaine.

17       THE COURT: Where do you get the office means stash

18   house?

19       MR. ERSKINE: The --

20       THE COURT: That's just vernacular.

21       MR. ERSKINE: It's vernacular. It's common use by --

22   and I believe there's a footnote dropped in here in the

23   government's version that is something that any of the

24   witnesses can testify to, whether Manuel Fernandez, Damaso

25   Lopez.

230

1    THE COURT: I just think there's a failure of proof
2  on that. That's my finding, that there is not one witness
3  who's testified anywhere or anywhere where it's been
4  established to my satisfaction that "office" means "stash
5  house." That's all I will tell you.
6    Now, it's likely, just like it's likely that this
7  defendant may have wanted the witness hurt. It's likely, but
8  this is a court of law, and there's a standard of proof, and
9  I'm applying the standard of proof and the government has
10  failed to meet it. That's my conclusion.
11    Let's go to criminal likelihood enhancement.
12    MR. BRINDLEY: Judge, on this one, we -- we were
13  objecting definitely to the witness intimidation that we
14  believe is connected to the obstruction, and we didn't want to
15  concede that.
16    THE COURT: We're already past that, so --
17    MR. BRINDLEY: I understand, so that part's not an
18  issue now.
19    THE COURT: Right.
20    MR. BRINDLEY: The portion that relates to
21  importation of a controlled substance, I think deals with --
22  the government's evidence on importation transaction with
23  Mr. Beltran Leon came from --
24    THE COURT: Okay, but that's not what we're on. I'm
25  talking about criminal likelihood enhancement.

---

231

1    MR. BRINDLEY: One of the bases for livelihood, C, is
2  the importation.
3    THE COURT: Okay.
4    MR. BRINDLEY: And the importation issue came from
5  Manuel Fernandez was the 90 kilos was the only importation
6  that we got testimony --
7    THE COURT: Okay, so all the other drug dealing that
8  you admit this defendant is doing, hundreds of kilograms,
9  they're not being imported?
10    MR. BRINDLEY: Judge, I'm not -- I don't want to take
11  that position particularly because --
12    THE COURT: I don't think you should take that
13  position.
14    MR. BRINDLEY: No -- well, the government didn't
15  provide evidence on it is my problem. They didn't provide
16  evidence. If they had evidence of more, I would talk about
17  what their evidence was.
18    But I want to limit -- I'm limiting my arguments to
19  what the evidence is. I am not going to stand here and say,
20  oh, Judge, we're going to affirmatively say and Mr. Beltran
21  Leon, none of what he did ever got into the United States or
22  some other country. I'm not taking that position.
23    But I do take the position that they have to prove it
24  with their evidence, and if you're going to infer it simply
25  from the quantity, I can accept that, but I think they should

233

1   THE COURT: Okay,
2   MR. BRINDLEY: And what Damaso Lopez testified to was
3   not that Mr. Beltran Leon was the kind of person that had a
4   bunch of workers and a lot of authority.
5   What Mr. Damaso Lopez said was that Mr. Beltran Leon
6   was both a drunk and an addict and a long-time friend and
7   compatriot of Alfredo and Ivan, and with Alfredo and Ivan he
8   was engaged in drug trafficking work. Work isn't the word he
9   used, but that's what he's talking about.
10   And while that may be the case, that doesn't
11   translate into that he had workers who were being rewarded in
12   the way that the Weaver case talks about.
13   THE COURT: What about the government intercepts that
14   they reference and specifically government's version at
15   Page 23 has the defendant saying, "I need a team to receive
16   work in L.A., another team to pick up a check and get it out
17   to T.J.," meaning Tijuana, or Mexicali."
18   MR. BRINDLEY: And what I would say about that,
19   Judge, is that what that amounts to, given what we heard about
20   it from Damaso Lopez, what that amounts to is Mr. Beltran Leon
21   asking for perhaps some assistance from people that are
22   associated with or perhaps working for Alfredo and Ivan.
23   THE COURT: Okay.
24   MR. BRINDLEY: I think that's just as consistent.
25   THE COURT: But backing up to where we started when I

232

1   have to provide more particular evidence than that in order to
2   get --
3   THE COURT: So you don't think this his plea where he
4   admits to very basic 45 kilograms into the United States, you
5   don't think that's enough?
6   MR. BRINDLEY: Just a second, Judge.
7   (Counsel conferring.)
8   MR. BRINDLEY: After consultation, Judge, we are not
9   going to contest this enhancement.
10   THE COURT: Okay. And I will apply it,
11   So that then brings us, I think this is the last
12   issue --
13   MR. BRINDLEY: No, Judge.
14   THE COURT: -- leader and organizer. Yeah, that's
15   what I said.
16   MR. BRINDLEY: I'm sorry.
17   THE COURT: This is now bringing us to the last
18   issue.
19   MR. BRINDLEY: Okay.
20   THE COURT: What's your argument as to this one?
21   MR. BRINDLEY: With respect to being an organizer or
22   leader, Judge, the evidence that's been presented, and I want
23   to start with the Damaso Lopez evidence because Damaso Lopez
24   is the one witness who seemed to have the most familiarity
25   with Mr. Beltran Leon himself.

234

1  said, okay, give me an idea of what you're admitting to --
2  MR. BRINDLEY: Yes.
3  THE COURT: -- in terms of drug quantity, and we
4  agreed, theoretically at least, to --
5  MR. BRINDLEY: It's in the hundreds.
6  THE COURT: -- hundreds of kilograms, you're saying
7  that was all done with no assistance and no leadership on the
8  part of this defendant.
9  MR. BRINDLEY: Judge, what I'm saying is the
10  leadership enhancement requires the government to prove that
11  there were -- now, what I'm not saying that this was all done
12  without the assistance of multiple persons. Of course, it
13  was. But did those persons work for Mr. Beltran Leon, or did
14  they work for Alfredo and Ivan Guzman? I don't think the
15  evidence has delineated that.
16  THE COURT: Okay. So if the defendant is under, and
17  I'll submit the evidence shows that, under Mr. Guzman's
18  sons --
19  MR. BRINDLEY: Yes.
20  THE COURT: -- there's still a lot of other people
21  involved --
22  MR. BRINDLEY: There may be.
23  THE COURT: -- in a drug organization to successfully
24  get drugs moved around and then, by the same token, get the
25  money back to where the drugs originated from.

235

1  MR. BRINDLEY: That's absolutely true, Judge. And
2  my -- I agree with that. And my view is there's obviously a
3  lot of people involved, but the government proving that
4  Mr. Beltran Leon had the relationship of those people of
5  leadership rather than Alfredo and Ivan, I think that was
6  undercut when Mr. Damaso said nobody really wanted to deal
7  with him, Alfredo and Ivan cut him off for a while. Their
8  evidence just didn't establish who they were. Now, there was
9  a statement from Fernandez that there was a worker --
10  THE COURT: So you're saying that the failure of the
11  government's proof is to actually sit down and identify who
12  these persons were.
13  MR. BRINDLEY: I don't know that they have to
14  identify them, but they have to give us more than they did. I
15  certainly don't think it reaches to the level of four points
16  for leadership; when we know that he was some kind of an
17  underling to Alfredo and Ivan, is basically the best -- and
18  was involved with them in some transactions, although we don't
19  know how many, and was cut off for a period of time, the best
20  they could get is three, Judge, but I don't even think they
21  should get that without giving us more detail on who was under
22  or who Mr. Beltran is ordering around if he is. That's my
23  view of their evidence.
24  THE COURT: Okay. Let me hear from the government,
25  MR. ERSKINE: Yes, Your Honor. And four points I

1 line 10 -- sorry, line 9, Beltran says: "I just heard him
2 out, and I'm going to pay him as soon as possible."
3 And line 10 Victor Felix says: "But the work falling
4 through has nothing to do with the money."
5 So what's going on, Your Honor, is this guy Jorgito
6 Caro is upset with Beltran Leon and Victor Felix because drugs
7 were seized, work fell through. And so they're saying --
8 Beltran Leon is saying we have different teams, meaning we
9 have teams that handle the drugs, we have teams that handle
10 the money. And because drugs fell through that's a different
11 team, so he has no justifiable reason to complain or worry
12 about money falling through because our team handles that.
13 THE COURT: Okay.
14 MR. BRINDLEY: And, Judge, what I would say about
15 that is that establishes the thing that I was just agreeing
16 with Your Honor, that there are groups, but it doesn't have --
17 establish the specific leadership relationship for Mr. Beltran
18 Leon himself. At best, I think the government can get three
19 points on this. We think they shouldn't, but I don't think
20 they could possibly be four with the evidence he's some sort
21 of underling of unknown import that seems to be less involved
22 than many other people here.
23 MR. ERSKINE: And there's additional evidence, Your
24 Honor. Obviously, we heard the testimony of Manuel Fernandez
25 talking about the worker in Los Angeles and how there was the

1 want to read here. First I would direct your Honor's
2 attention to Page 22 of the government's version --
3 THE COURT: Okay.
4 MR. ERSKINE: -- which details the intercepts in which
5 the defendant is explicitly recruiting a person by the name of
6 J.L. and then over the course of several days or weeks
7 proceeds to direct him around town, picking up money and
8 dropping money off at different places.
9 THE COURT: Okay.
10 MR. ERSKINE: That's a particular person.
11 Your Honor, in addition, I tender to Your Honor an
12 intercept which had already been tendered to the defense.
13 This is an intercept conversation between October 2nd and
14 18th, 2013. And essentially -- it's essentially here -- I'm
15 just going to hold -- it's essentially a conversation that
16 starts with the defendant complaining about Jorgito Caro and
17 about how Jorgito Caro is basically talking negatively about
18 Beltran Leon and Victor Felix.
19 And in line 6, you know, he's saying that they have
20 to -- they have to deal with it because this guy has more, you
21 know, weight than than than they do at the same time, and
22 line 8 is the critical line, Your Honor. It's Beltran Leon
23 says: "But what the dude doesn't know is that we have
24 different teams."
25 And if you keep reading, you'll see that the

```
 1   meeting because the two workers in Los Angeles were supposed
 2   to meet and there was a seizure. And so there was a meeting
 3   between Fernandez and the defendant and Alfredo to discuss
 4   that fact.
 5            Beyond that, the government's version talks about
 6   other instances in which the defendant was directing people,
 7   and this is often in context of money, which is obviously part
 8   of, the flip side of the drug conspiracy.
 9            THE COURT: Well, on this one I think the government
10   wins because this is a sophisticated drug network, as
11   sophisticated as it gets, and the defendant, while he's not on
12   top, he's significantly at a level where he's controlling five
13   or more participants.
14            It's very clear to me when I couple the testimony
15   that was given by the two witnesses, the first two witnesses,
16   with the intercepts. Here we go way beyond proof of a clear
17   and convincing nature. We're now where the Court is satisfied
18   it's beyond a reasonable doubt that he's a leader or organizer
19   of criminal activity that involved five or more participants.
20   So I will use that enhancement.
21            Now, having made all these determinations, what
22   guideline range, advisory in nature, are we at?
23            MR. BRINDLEY: Judge, before we do that --
24            THE COURT: Yeah.
25            MR. BRINDLEY: -- the government had indicated they
```

```
 1   were challenging acceptance. Because we didn't get the
 2   obstruction, I think he does get the acceptance, but I want to
 3   make sure that's clear on the record.
 4            THE COURT: Okay. Sure.
 5            MR. BRINDLEY: Before we calculate this out.
 6            THE COURT: Okay. Does the government agree on
 7   acceptance?
 8            MS. CSICSILA: Judge, yes, we do believe he would --
 9            THE COURT: Okay.
10            MS. CSICSILA: -- then qualify for acceptance.
11            THE COURT: Okay. So the defendant gets the
12   acceptance.
13            What range is he at?
14            MS. CSICSILA: I believe his total offense level is
15   46, minus the three for acceptance is a level --
16            THE COURT: 43.
17            MS. CSICSILA: -- 43, which still results, I believe,
18   in --
19            THE COURT: Still results in a life sentence.
20            MS. CSICSILA: Correct.
21            THE COURT: Okay. And that doesn't really change the
22   government's position that, in your written submission, that
23   he deserves a 35-year sentence, right?
24            MS. CSICSILA: Correct.
25            THE COURT: Has that changed based on the hearing?
```

---

240

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 75 of 129 PageID #:7301

```
 1        I'm going to let the government present its oral
 2   allocution. I'll let the defense present their allocution,
 3   and then I'll hear anything Mr. Beltran Leon wants to say to
 4   the Court before I sentence him.
 5        MR. BRINDLEY: Judge, just so we can be clear about
 6   how we're wanting to proceed, once the government is finished,
 7   I'll address --
 8        THE COURT: Okay.
 9        MR. BRINDLEY: -- some 3553 factors. I think
10   Mr. Blegen is going to talk about a particular incident --
11        THE COURT: Okay.
12        MR. BRINDLEY: And Mr. Ralls --
13        THE COURT: That's fine.
14        MR. BRINDLEY: -- will give some specific information
15   about the torture that he's more familiar with.
16        THE COURT: As long as you're covering different
17   topics, that's fine with the Court.
18        MR. BRINDLEY: All right.
19        THE COURT: So the government can go first.
20        MR. ERSKINE: Thank you, Your Honor. The
21   government --
22        THE COURT: And if you want, Mr. Brindley, you can be
23   seated.
24        MR. BRINDLEY: Thank you, Your Honor.
25        MR. ERSKINE: Thank you. Your Honor.
```

---

241

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 76 of 129 PageID #:7302

```
 1        The government will begin by responding to the --
 2   what's clearly the principal argument in mitigation of the
 3   alleged mistreatment of the defendant during his arrest, and
 4   we just want to clarify that the government's recommendation
 5   of 35 years does not factor for that -- those allegations --
 6        THE COURT: Okay.
 7        MR. ERSKINE: -- in.
 8        THE COURT: Do you believe the defendant has proven
 9   those? I mean, the last pleading that the defense filed,
10   which was a notice of supplemental evidence corroborating
11   account of torture, which refers to a case involving a
12   Mr. Madrid, do you think that that shows anything?
13        What weight should I give to this document that was
14   entered by the federal judiciary in Mexico?
15        MR. ERSKINE: Your Honor, the government believes you
16   should not give any weight to that, and I'm happy to speak to
17   that.
18        THE COURT: Okay.
19        MR. ERSKINE: But just one moment before that Your
20   Honor.
21        THE COURT: Sure, go ahead.
22        MR. ERSKINE: As we stated in our briefing
23   surrounding the earlier motions, you know, the government made
24   inquiries on the question of any participation by any U.S. law
25   enforcement.
```

242

1 And, you know, the government, through its inquiries
2 and those of the subject agencies, learned no information
3 corroborating the allegation that there was any involvement by
4 any U.S. law enforcement officials.
5 So we stick by that.
6 As far as -- and we'll also note, since we noted
7 before, on the question of any U.S. involvement, you know, the
8 defendant had inconsistent statements along those lines. On
9 the one hand, when he was first interviewed by the State
10 Department on November 18th, 2014, he said he believed U.S.
11 law enforcement officials were present when he was questioned
12 post-arrest due to the way these officials spoke Spanish.
13 But then in his affidavit of mistreatment on
14 January 16th, 2015, he swore that he'd been treated by Mexican
15 Marines, and he also wrote that he cannot identify those who
16 mistreated me and added they are Marines/Mexican.
17 So, again, this goes to the question of any possible
18 U.S. involvement, and it's clear to the government that
19 there's no evidence, corroborated evidence, that Your Honor
20 should give credit of any involvement by any U.S. law enforcement
21 officials.
22 With regard to the recently submitted materials, and
23 those were the essentially Mexican court documents pertaining
24 to an Alvaro Rios Madrid. And, Your Honor, what you'll see if
25 you read those materials is that they contain the statements

243

1 of several individuals.
2 Now, it's only the -- all of those individuals talk
3 about, yes, they were together. They were stopped by men.
4 They were arrested. They had bags put on their head, and they
5 were taken places. Only the deponent, the first person,
6 Alvaro Rios Madrid, makes the additional allegations that he
7 was sort of tortured in particular and specific ways.
8 But, Your Honor, I would draw your attention to the
9 first page of that document, where Rios Madrid swears -- this
10 is the court summarizing his sworn statement, that -- and this
11 is going to be the paragraph beginning that he, meaning Rios
12 Madrid, did not agree with that which has been stated by his
13 captors and that he now knows that they are from the Mexican
14 Marines, since everything that they say in the report is
15 completely false, since the deponent has never had in his
16 possession any type of drugs nor firearms, but instead is an
17 honorable person who engages in legal work and agriculture.
18 Well, Your Honor, that same individual, Alvaro Rios
19 Madrid on April 4th, 2017, Rios Madrid pled guilty in the
20 United States to narcotics conspiracy, and he admitted to
21 conspiring to distribute over 450 kilograms of cocaine, which
22 he admitted sending to the United States in loads of between
23 30 to 70 kilograms at a time.
24 He also agreed to forfeit $1 million in connection
25 with that guilty plea. And I would just also note that in the

1  Mexican court documents, and again we don't know anything
2  about those proceedings, who that judge was, about that court
3  in particular, but at no part in any of those allegations did
4  Rios Madrid claim that any U.S. officials were involved.
5  MS. CSICSILA:  Judge, with respect to the remainder
6  of the -- to the 3553(a) factors, there's a couple that the
7  government wants to highlight.
8  THE COURT:  Okay.
9  MS. CSICSILA:  One is just the seriousness of the
10 offense and the offense conduct itself, and as my colleague
11 mentioned earlier, the significant portion of the government's
12 evidence comes from the defendant's own words, which is his
13 BlackBerry interceptions.  Those reflect, and the witnesses
14 also testified, as to the defendant's role in the offense.
15 Obviously, there are the leaders of the cartel, Chapo
16 and Mayo, there are their children, and then the defendant
17 falls right into that next category.  He is a massive drug
18 dealer.  There are thousands of interceptions over a
19 relatively limited time period that reflect that conduct.
20 The government's version is hundreds of pages long in
21 part because the government attached hundreds of interceptions
22 reflecting the defendant's drug trafficking and money
23 laundering activities, but there are many, many more.  This is
24 just the tip of the iceberg.
25 And if I could, Judge, I would like to just discuss a

1  little bit about the defendant's drug trafficking
2  interceptions, and this is highlighted in part in the
3  government's version.  There's interceptions reflecting that
4  in April of 2014, the defendant conspired with Alfredo Guzman
5  and Victor Felix Beltran to bring -- to purchase 300 kilos of
6  cocaine from Honduras.
7  In January of 2013, he offered to sell cocaine to
8  many different people at the same time, and he did that over
9  multiple occasions.
10 June of 2013, he acknowledged distributing in an
11 interception 700 -- over 700 kilos of cocaine and 10 kilos to
12 an individual identified in the interceptions as Foxy.
13 In June --
14 THE COURT:  10 kilos of what?
15 MS. CSICSILA:  I believe it was 10 kilos of heroin,
16 but I'm happy to look that up, Judge.
17 THE COURT:  Okay.  Keep going.
18 MS. CSICSILA:  So 710 kilos of cocaine, Judge.
19 THE COURT:  Okay.
20 MS. CSICSILA:  June of 2013, the defendant and Victor
21 Felix Beltran conspired to distribute 46 kilos of cocaine in
22 Los Angeles.  That was part of his admissions when he pled
23 guilty.
24 In November 2013, the defendant coordinated the
25 receipt in the United States of 23 kilos of cocaine belonging

```
 1    to Alfredo Guzman.
 2          April 2014, the defendant and Alfredo conspired to
 3    distribute 10 kilos of heroin in Canada.
 4          June of 2014, the defendant, the interceptions
 5    reflect that the defendant agreed to sell 112 kilos of
 6    cocaine.
 7          In May of 2014, the defendant attempted to purchase
 8    30 kilos of cocaine from a West Covina cooperating source, and
 9    also in addition to the interceptions in the government's
10    version, there are reports reflecting that attempt.
11          In April of 2014, the defendant and an individual
12    identified as Ted conspired to purchase 200 kilos of cocaine
13    from a source in Guatemala.
14          In June of 2014, the defendant and Mayito Gordo,
15    who's Mayo's son, discussed operating under the protection --
16    drug trafficking under the protection of both Chapo and Mayo.
17          Those are the highlights that are found in the
18    government's version, and that's just the drug activity.
19    There are interceptions also reflected in the government's
20    version that show the defendant was a significant money
21    launderer, and then and there are interceptions showing he was an
22    intermediary and a lieutenant for the Chapitos, Chapo's sons.
23          The government acknowledges that it appears that the
24    defendant had a drug and alcohol problem but disputes the
25    presentation that's been made by the defense that he is
```

```
 1    someone who was essentially shunned and put off to the corner
 2    and only dealt with when necessary.
 3          He was a willing participant in this cartel. He was
 4    an active member. He distributed hundreds -- thousands of
 5    kilos, thousands of kilos of cocaine alone, let alone other
 6    drugs.
 7          And I would point out to the Court that the
 8    interceptions that the government has in its possession, and
 9    the defense has as well obviously, those interceptions took
10    place over a two-year time period, from 2012 to 2014. Over
11    that time period, the government had -- was intercepting only
12    approximately 20 percent of the time, and in that 20 percent
13    alone, there are -- when you total up the drug transactions
14    that I just rattled off that are reflected in the government's
15    version, that's 1,388 kilograms of cocaine and ten kilograms
16    of heroin. Again, approximately 20 percent of the time period
17    over that two-year period that we were actually intercepting.
18          The defendant's conduct is significant. He is a
19    massive drug trafficker. And, frankly, the government's
20    recommendation of 35 years is fair and reasonable in light of
21    all of that conduct.
22          Another aspect the government wants to highlight is
23    the history and characteristics of this defendant. He is,
24    unlike many individuals who come before the courts in this
25    building, he is educated. He had resources available to him.
```

1    He had the means to walk away from this conduct.

2         There are children of the various cartel leaders who

3    chose not to engage in drug trafficking, so this is a choice

4    he could have made to walk away, and instead he not only

5    engaged in the conduct but he it's clear from the

6    interceptions reveled in his role in the cartel.  He boasted,

7    he bragged, he took pride in what he was doing.  That's

8    reflected in the defendant's own words in his interceptions.

9         And this is highlighted in the government's

10   sentencing memo when he is talking with Victor Felix Beltran

11   and they're talking about what they're doing, what the plans

12   are, the defendant says "to buy drugs, to export them."  That

13   is the defendant's -- and there's a smiley face, which is

14   difficult to see because the interceptions don't come through,

15   but it's very clear that he's happy doing what he's doing.

16        The defendant's history and characteristics also

17   reflect someone who appears to have little care for other

18   individuals, including those involved in drug trafficking and

19   just other individuals in general.

20        Now, the government in its presentation to the Court

21   acknowledges that certain aspects of its presentation are --

22   could have been corroborated more.  For example, the conduct

23   that was -- the government put forth that took place at the

24   MCC, but we felt it was important for the Court to have a full

25   picture of who this defendant is, and it reflects someone who

1    has little respect for others and really for life.

2         You heard testimony, some of it hearsay, reflecting

3    that the defendant was possibly involved in the murder of an

4    individual in Culiacán, Mexico; that there were multiple

5    conversations about how he had been banished from the city as

6    a result of those activities.  And you heard witness testimony

7    from Danaso Lopez Serrano that he, in fact, knew that he had

8    been banished from the city.

9         You also heard from Manuel Fernandez Valencia that he

10   was in a meeting with the defendant in which the defendant

11   essentially said that he was going back to Guadalajara, and

12   the witness's takeaway was that it was because he had, in

13   fact, been banished.

14        He also -- and I understand the Court declined to

15   apply the enhancement for the use of violence, but the

16   defendant's own words do reflect that he, on prior occasions,

17   had kidnapped an individual because he owed a drug debt, and

18   there are interceptions reflecting his training of new teams

19   of sicarios, people he knows, not only just carry weapons but

20   actually use then, use violence to further the cartel 's

21   activities.

22        He also talks with another sicario and praises that

23   sicario for using violence in furtherance of drug-trafficking

24   activities that he's involved in.

25        So those are just some of the pieces that reflect the

1 guideline range, again, was lower, it was 188 months to
2 235 months, and like Mr. Renteria, the Court declined to apply
3 the firearm enhancement, and he only received three levels for
4 a manager/supervisor. So again a different role in the
5 cartel, not the same quantity of drugs by any means.
6 And then, finally, an individual who you heard from,
7 Mr. Manuel Fernandez Valencia, who was not sentenced by this
8 Court but by Judge Guzman. He received 27 years' imprisonment,
9 and that was taking into account 16 months that he had spent
10 in a Mexican prison, so essentially he was serving -- he is
11 serving over 28 years' imprisonment. That was, as he
12 testified, he was sentenced at a time where he had attempted
13 to cooperate with the government, and that's now clear, but
14 did not receive a recommendation.
15 However, that information was brought to the Court's
16 attention, and his guideline range was not life. It was Tower
17 than that. And he received, in fact, a Tow-end sentence of
18 324 months.
19 THE COURT: How would you compare the amount of drugs
20 he trafficked to this defendant?
21 MS. CSICSILA: I think based on his testimony
22 yesterday and the amount of time that he was involved in
23 cartel operations, it's likely that Mr. Fernandez Valencia
24 trafficked in more, but I think both are in a -- are in that
25 upper echelon, a huge leap from many of the individuals who

1 defendant's characteristics that the Court should be aware of
2 in factoring in what should be taken into account for the
3 defendant's sentence.
4 Another piece that the government wants to highlight
5 is the need to avoid sentencing disparities, and this Court
6 has had an opportunity to sentence multiple high-level cartel
7 members, many of whom have cooperated with the government, and
8 I know you're familiar with some of those sentences, and, in
9 fact, some of them have taken place before you recently.
10 There are a few that the government highlighted,
11 sentences that the government highlighted in its sentencing
12 memo that are worth talking a little bit about.
13 Tomas Renteria received 19-and-a-half years. His
14 guidelines were not life, they were 360 to life, and that was
15 in part because he had a felony conviction. The drug quantity
16 at issue in that case was 150 kilograms of cocaine and
17 30 kilograms of heroin, and the Court declined to apply a
18 firearm enhancement there.
19 So there are very different circumstances with that
20 particular defendant. He was in a different role than the
21 defendant who was at a very high level in the cartel dealing
22 in massive, much more massive amounts of drugs.
23 Mr. Vasquez-Hernandez, I know the Court is familiar
24 as well, received 22 years from this Court. That was with
25 respect to one transaction involving 276 kilos of drugs. His

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 87 of 129 PageID #:7313

252

```
 1   have been brought before the Court.
 2              THE COURT:  Okay.  Thank you.
 3              MS. CSICSILA:  Judge, the last thing I would just
 4   say, which is what I started with, is that the government's
 5   making a below guidelines recommendation here.  35 years is
 6   more than reasonable, given this defendant's conduct and who
 7   this defendant is, his role in the cartel, and all the damage
 8   that has occurred as a result of his conduct, so we would ask
 9   you to impose a sentence of no less than that.
10              THE COURT:  Thank you.
11              MR. BRINDLEY:  Judge, I think Mr. Ralls is going to
12   start.
13              THE COURT:  Sure.  Mr. Ralls.
14              MR. RALLS:  Thank you, Judge.
15              We've filed extensive briefings on the torture.
16              THE COURT:  And I have taken a look at all of them.
17              MR. RALLS:  Yeah.  I just want to touch on a couple
18   of things.  I want to touch on Ms. Csicsila's comment that
19   they have no information that DEA agents were present, you
20   know, trained to torture.
21              Well, in the pleadings that we filed, we also noted
22   that this U.S. Attorney's Office had been walled off from the
23   investigation.  You know, in 36 years of practice, I've never
24   seen a U.S. Attorney's Office being walled off from an
25   investigation like this, which really, really --
```

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 88 of 129 PageID #:7314

253

```
 1              THE COURT:  What conclusion do you draw from that?
 2              MR. RALLS:  I draw from that that they were walled
 3   off so they would not learn that DEA was involved in and knew
 4   about the torture.
 5              The question becomes who is SEMAR?  SEMAR is a
 6   special group of basically Navy SEALS that work for the
 7   Mexican military.  They're trained by the DEA.  They're funded
 8   by the DEA.  They work with the DEA.
 9              And if you look at the -- and I know you read it
10   because we talked about it -- The Hunt For El Chapo.  Some of
11   the pictures there show DEA agents in the barracks, you know,
12   with -- with the Mexican Marines.  It's one law enforcement
13   branch working with another law enforcement branch.  They talk
14   to each other.  They know what's going on.  They rely on each
15   other's information.  They go in with a particular goal, like
16   they did in November of 2014.
17              You've got three cases November 2014.  You've got on
18   the 11th, Alvaro Rios Madrid.  He was the one they just
19   mentioned that was picked up.  He had his two nephews with
20   him.  They applied the plastic bags over his head.  They
21   asphyxiated him, they beat him, and then they let him go.
22              The judge in Mexico found that the Marines lied, that
23   they lied about all the facts that they had employed.
24              Granted, they did not see, you know, American agents there,
25   but American agents are not going to show their face on an
```

1  operation like this. They never do.
2      THE COURT: Okay.
3      MR. RALLS: Then you've got Jose Miguel Arano on
4  November 14th, still within the seven-day operation.
5      Now, Jose Miguel is picked up the same time early
6  morning as Mr. Beltran Leon. He's given electrical shocks.
7  He's asphyxiated with plastic bags, and then they took an
8  acetylene torch to the bottom of his feet.
9      And the Marines lied about that. They said that they
10 just happened to see him hobbling down the street and they
11 stopped him, and he tried to resist and that's why he had all
12 the bruising that he had.
13     Mexican court again found that the U.S. Marines
14 lied -- excuse me -- the Mexican Marines, okay?
15     Then you've got November 16th within this same
16 seven-day operation that DEA's in Culiacán. You've got
17 Mr. Beltran's case.
18     Mr. Beltran is picked up out of his house. He's
19 beaten. He had plastic bags over his head. He's put in a
20 barrel of water, sexually assaulted, and it's then during that
21 time period that Mr. Beltran says I saw Americans there. They
22 were there at my house. One of them interviewed me, told me
23 about the fact that I had been stopped in Los Angeles, and the
24 person that interviewed me was from San Diego, the DE --
25 actually, it was an ICE agent, and all that was correct.

1      Now, the situation here is what was the goal of SEMAR
2  and DEA? Who were they looking for? They were looking for
3  people that were wanted out of this courthouse, people in this
4  indictment, people in the indictment out of the San Diego case
5  because it was one investigation involving the same people,
6  torturing people so they could get to, say, for instance,
7  Chapo's kids, Ivan and Alfredo. They wanted that information.
8      DEA says, well, you know, Beltran Leon lied about it.
9  Why would he lie about two days after he's turned over to the
10 embassy in Mexico City, he says there were Americans there.
11 And later he again says there were Americans there. They
12 spoke English, I saw them present.
13     We continued with that scenario of Americans being
14 there almost a year and a half into after Mr. Beltran Leon was
15 here. Finally, the government says, yes, we admit that
16 Americans were present during this SEMAR operation.
17     We had already placed the Americans there. We had
18 the information as to when they had arrived at the Culiacán
19 airport. We had information as to how many Americans had
20 arrived at the Culiacán airport. They had that information.
21 We provided it to them. And they said, well, we've been --
22 you know, we can't talk about it because we've been walled
23 off.
24     Finally, they say, yes, there were Americans there,
25 but where were they? They were parked four blocks away.

256

1 Interesting how Mr. Beltran would know that there were
2 Americans at that point and the government finally says, well
3 they were four blocks away.
4 Mr. Beltran did not see them four blocks away. He
5 saw them right there in his house when he was being tortured.
6 He saw them right there at the barracks at the same time that,
7 you know, he was being tortured and then interviewed by a
8 Hispanic DEA agent wanting information about El Chapo's kids.
9 This stuff was not made up by Mr. Beltran. If
10 there's any issue of credibility, it has to be on that table
11 right there. They're the ones that have been hiding this
12 information for a long time.
13 You know, you have five situations where there has
14 been torture. We talked about another one, another two
15 yesterday. We talked about the torture of Fernandez Valencia,
16 Manuel. You saw the pictures of how he got beat up.
17 Who did he get beat up? He got beat up by the SI
18 Unit that's funded by the DEA, that's trained by the DEA,
19 that's salaried by the DEA. And in our pleadings, you also
20 had the fifth case, which is the case of Marco Paredes
21 Machado. It's in our pleadings because that case is still
22 pending in Detroit.
23 In that case the SIU, headed by the same person,
24 Eduardo Pequeño as the comandante picked up Mr. Paredes and
25 his wife. They beat him. They water boarded him until he

257

1 confessed. You have DEA right in the middle of all these
2 tortures, and they're saying we don't know anything about it.
3 That's incredible.
4 You have Leonardo Silva.
5 THE COURT: You say they're right in the middle. The
6 only thing I would tell you is to be cautious about, and I
7 think we had this discussion before, about expending your
8 credibility with this Court.
9 First of all, you pointed to the government's table,
10 and you said they're the ones hiding the information. I have
11 seen no evidence that they're hiding information. They have
12 turned over what I've required them to turn over.
13 But when you say the DEA is right in the middle of
14 this, this Court has not been presented with any evidence that
15 the DEA is right in the middle of torture in Mexico, and I
16 want to say that for the record.
17 So you are needlessly, needlessly expending your
18 credibility with this Court. That's what I would tell you.
19 It's one thing to say someone funds it. How is that any
20 different than the government trying to say, well, your client
21 was trying to have somebody beaten up at the MCC but they
22 can't prove it. And you're in the same situation. You
23 suspect the DEA is right in the middle of it, but you don't
24 have proof of it, sir, do you?
25 MR. RALLS: You're right, okay.

259

1 you know what? In the United States of America, and I don't
2 have to lecture you on this, suspicion doesn't win. That's
3 not the country that I belong to, where suspicion is enough to
4 win. You need proof.
5 And then the question is what is the standard of
6 proof? Is it preponderance? Clear and convincing? Or beyond
7 a reasonable doubt? But you can't just be saying things like
8 the DEA is right in the middle of this when you don't have
9 proof of that.
10 MR. RALLS: You know, you're right. I don't have
11 proof, but indirectly, I can make the argument that they were
12 there. You know. They were there --
13 THE COURT: They were there, you know, there's a
14 difference, sir, if they're four blocks away versus they were
15 there right in the middle of it. Your four blocks away, you
16 have argued in courts of law that your client is four blocks
17 away, they're not guilty, right?
18 MR. RALLS: How would --
19 THE COURT: No, no, I'm asking you a question. If
20 somebody is four blocks away, are they guilty of a criminal
21 offense that's occurring four blocks away? How would they
22 know what's going on?
23 MR. RALLS: Do they know that a criminal offense is
24 happening?
25 THE COURT: They can suspect what's going on -- you

258

1 THE COURT: Okay.
2 MR. RALLS: You're absolutely correct.
3 THE COURT: You don't have one witness other than
4 your client, who doesn't take the witness stand and he's free
5 to take the witness stand. Let him take the witness stand
6 right now and see how that goes for him.
7 MR. RALLS: He filed the affidavit with this Court.
8 THE COURT: Right, but he won't take the witness
9 stand and repeat that declaration in front of me, will he,
10 sir?
11 MR. RALLS: He filed the affidavit.
12 THE COURT: Will he take the witness stand?
13 MR. RALLS: He will not take the witness stand.
14 THE COURT: Will he take the witness stand and repeat
15 that declaration and see how that goes for him?
16 MR. RALLS: He will not --
17 THE COURT: I'm asking you, will he, yes or no?
18 MR. RALLS: No.
19 THE COURT: Okay. And there's a reason for that, and
20 any lawyer in this business knows the reason behind that.
21 So please don't do this. You're needlessly expending
22 your credibility with this Court, and you're tarnishing
23 reputations of prosecutors in this courtroom. For what? For
24 what? You don't have proof.
25 You suspect, just like the government suspects, but

1   Has any Mexican marine ever died? Do you want to
2   answer that question?
3        MR. RALLS: I suspect they have.
4        THE COURT: You suspect. Hundreds have died.
5   Hundreds. That's the answer, sir.
6        MR. RALLS: Well --
7        THE COURT: I'm not saying the end justifies the
8   means, but let's get real about this. What do you think is
9   driving that? Violence begets violence. They lose people.
10  They lose people.
11       MR. RALLS: It's the same thing you just said --
12       THE COURT: Do you understand that?
13       MR. RALLS: -- the ends justify the means. Can you
14  justify torture --
15       THE COURT: I'm not saying the end justifies the
16  means, but when I ask you what do you think is driving that,
17  you're losing your points with me because the reason they are
18  tough is because they have lost people. They have had people
19  tortured.
20       MR. RALLS: Is that okay? Is that okay?
21       THE COURT: No, no one is saying that's okay.
22       MR. RALLS: You know --
23       THE COURT: But you don't have a right, sir, to start
24  asking me questions, but I have a right to ask you questions.
25       MR. RALLS: Well, then I'm not asking --

1   don't want to answer my questions. And I will tell you, sir,
2   you've got about three minutes and then sit down. That's what
3   I would tell you.
4        MR. RALLS: Fair enough.
5        THE COURT: Because you are not serving your client
6   well right now.
7        MR. RALLS: Fair enough.
8        So the question becomes, you know, the government
9   does not dispute that Mr. Beltran, you know, was tortured, and
10  you have the letters --
11       THE COURT: What do you think is driving that? Let's
12  just pause on that.
13       What do you think is driving that?
14       MR. RALLS: What?
15       THE COURT: The torturing of narcotic defendants in
16  Mexico? What do you think is driving that? That's what I'd
17  like to know.
18       MR. RALLS: I think what's driving it is a seeking
19  information of other people.
20       THE COURT: Is that all? Do you think that's all?
21  Do you think that's all, sir?
22       MR. RALLS: I think --
23       THE COURT: How about this? Let me just show you
24  this: "Mexico war on drugs leaves 750 military personnel
25  dead." okay?

262

1 THE COURT: So if you want to ask me questions, I
2 would tell you why don't you just sit down, sir.
3 MR. RALLS: Well, then let me make a comment.
4 THE COURT: Make a comment.
5 MR. RALLS: The comment is that Mr. Beltran was
6 tortured, and he was tortured with the intent that he reveal
7 information, and he was brutally tortured. Those things --
8 and he was brutally tortured --
9 THE COURT: And I'm not saying that is right, but you
10 have to acknowledge the reason that that is happening is
11 because military personnel have been lost in Mexico.
12 MR. RALLS: I agree with you. I agree with you --
13 THE COURT: Okay.
14 MR. RALLS: -- on that, and I --
15 THE COURT: Is it one or two, or is it hundreds?
16 MR. RALLS: You know, I would say there's hundreds,
17 and I would say --
18 THE COURT: Does it matter?
19 MR. RALLS: Well, when you --
20 THE COURT: No, no, I'm asking you, sir, does it
21 matter? Is there a difference between one or two or 750? Is
22 there a difference in your mind? I
23 MR. RALLS: You know, there is no difference. I
24 think the loss of life --
25 THE COURT: You don't think there's a difference.

263

1 MR. RALLS: I think the loss of life is --
2 THE COURT: You don't think there's a difference
3 between losing two people and losing 750.
4 MR. RALLS: Oh, absolutely, and I'm saying that the
5 loss of life is a horrible thing. Any time that a person --
6 THE COURT: If you can't acknowledge a difference
7 between losing two and losing 750, then I would tell you
8 something is wrong with you. That's what I would tell you.
9 MR. RALLS: Well, what I'm saying is a loss of
10 life --
11 THE COURT: Okay.
12 MR. RALLS: -- any life is bad.
13 THE COURT: Sir, wind up. Three minutes, you're
14 sitting down.
15 MR. RALLS: All right.
16 THE COURT: That's what I would tell you.
17 MR. RALLS: All right.
18 THE COURT: Mr. Brindley, you want to say something?
19 MR. BRINDLEY: No, Judge. I'm prepared to take over
20 when he's finished to address other issues.
21 THE COURT: You'd better be prepared to take over
22 because this is going nowhere fast.
23 MR. RALLS: Well, you know, all I can tell you is
24 that Mr. Beltran was tortured. Nobody is disputing the fact
25 that he was tortured.

264

```
 1            THE COURT:  Uh-huh.
 2            MR. RALLS:  And the fact that he was tortured is
 3   because they were seeking information on him.
 4            THE COURT:  Okay.  I agree that could have happened.
 5            MR. RALLS:  And it shouldn't have happened.
 6            THE COURT:  I agree with that, too.
 7            MR. RALLS:  And the torture itself was heinous,
 8   cruel, brutal and degrading.
 9            THE COURT:  I'm not saying I agree with that.
10            MR. RALLS:  You don't think it was cruel?
11            THE COURT:  No.  I'm not saying that I agree with all
12   the allegations Mr. Beltran has made.  I agree he was
13   mishandled and treated inappropriately.
14            MR. RALLS:  You have the letters by two doctors that
15   did a forensic examination on him, and it's the type of
16   situation in which they themselves say there's indicators here
17   of the torture.  They've got indications there that this is
18   going to be a long-term situation for him.
19            The suffering that he is going to face will be
20   suffering for the rest of his life.  If you take a situation
21   in which a person goes through a near drowning, you remember
22   that, and you remember that for the rest of your life,
23            When you have a situation in which you are restrained
24   and plastic bags are placed over your head, you're suffocated,
25   and what you're trying to do is bite through the plastic bags,
```

265

```
 1   you know, that's a different type of drowning.  That's a
 2   drowning that you're going to remember even further.
 3            The --
 4            THE COURT:  If that happened, that was inappropriate,
 5   definitely inappropriate, sir.  That's what I would tell you.
 6   But there's no conclusive evidence that that happened.  You
 7   understand that.
 8            MR. RALLS:  Well, right, we don't have photographs of
 9   that happening.
10            THE COURT:  No, I'm saying you have no conclusive
11   evidence that that happened.  That's what I'm saying.
12            I'm not saying there's no photographs.  I know how to
13   frame a sentence, and I know how to ask a question, sir, and I
14   also know how to tell time.  So you have one minute to wind up
15   now.
16            MR. RALLS:  I think that this Court should consider
17   the information that you have before you concerning the
18   torture.
19            THE COURT:  And you believe that that should entitle
20   you to a sentence of ten years.
21            MR. RALLS:  I believe that should entitle --
22            THE COURT:  Your client to a sentence of ten years,
23            MR. RALLS:  Yes.  I think ten years is --
24            THE COURT:  Okay.  You're done.  Thank you.
25            MR. RALLS:  All right.
```

```
1            THE COURT: Next.
2       And please do not get repetitive.
3            MR. BRINDLEY: Judge, I will not -- I'm not going to
4    repeat the same things that Mr. Ralls discussed.
5            What I'll say is I want to start, Judge, by talking a
6    little bit about the defendant's personal history and
7    characteristics, which ultimately boils down to a situation in
8    which the defendant is born the son of a massively important
9    drug trafficker. Your Honor knows this.
10           And what that does is, while not justifiable, it puts
11   him in a situation where he's surrounded by that from an early
12   age. That's what he knows. He sees all that goes with it,
13   all of the wealth and things.
14           THE COURT: Okay. If that is the case, then he is
15   exactly like Mr. Zambada who I sentenced, right?
16           MR. BRINDLEY: I believe there are similarities.
17           THE COURT: Okay. So what sentence did I sentence
18   him to?
19           MR. BRINDLEY: Mr. Zambada's sentence? Was it 15,
20   Judge?
21   I don't remember the sentence.
22           THE COURT: Okay. So you don't know.
23           MR. BRINDLEY: The sentence of Mr. Zambada as I stand
24   here, I can't tell you.
25           THE COURT: Okay. But you do know the one crucial,
     crucial distinction.
```

```
1            MR. BRINDLEY: I know that he cooperated, Judge.
2            THE COURT: That's the crucial distinction, right,
3    Mr. Brindley?
4            MR. BRINDLEY: I agree with you.
5            THE COURT: Right.
6            MR. BRINDLEY: All right. That's true. And so I
7    only frame that in the beginning insofar as to say from
8    Mr. Beltran's perspective as he's getting involved in this,
9    he's surrounded by it, and it's easy. It's easy to get
10   involved. The wealth is there. It looks promising.
11           THE COURT: Right.
12           MR. BRINDLEY: And what we heard about him, Judge,
13   from Mr. Damaso Lopez, we heard that he was someone that
14   wanted to be around Alfredo and Ivan, that liked to
15   exaggerate, that he was drinking, he was doing drugs. He
16   wanted to be that way, and the drinking and the drugs and that
17   lifestyle, certainly it impacts what he chose to do.
18           Now, obviously it was a mistake, Judge. Obviously,
19   he was wrong. But we can at least to some extent understand
20   how it happened. And I think it's important to acknowledge we
21   can understand how it happened, and what the -- how that --
22   those occurrences and that experience can cause somebody to
23   get involved in a situation like this, and when we understand
24   that, then I think that can mitigate somewhat.
25           Here is the other thing that I would say, and this
```

1 mitigator that justifies some adjustment of the sentence
2 downward below what the government's asking.
3 THE COURT: Okay.
4 MR. BRINDLEY: Because the government's not
5 considering that. They said they were not.
6 THE COURT: Okay.
7 MR. BRINDLEY: And so we should have a downward
8 adjustment for that in the same way that we get it for
9 cooperating witnesses who had to get confined in Mexico. You
10 understand where I'm going.
11 THE COURT: So then -- I follow you completely.
12 MR. BRINDLEY: Okay.
13 THE COURT: And I tend to agree with that. Then the
14 question becomes what is the nature of the downward
15 adjustment, and what is the actual proof of the torture?
16 Now, as I told Mr. Ralls, there's no question that
17 the Mexican Marines go in there with full force, and they're
18 going to handle people tough because they've lost personnel.
19 That's the problem.
20 When they're arresting people who have AK-47s,
21 they're not going to go in and gently say, put up your hands,
22 put your hands behind your back, handcuff somebody, and read
23 then their Miranda rights.
24 MR. BRINDLEY: I agree.
25 THE COURT: Let's be realistic about what is going on

1 relates to the torture, but it's not the same as what
2 Mr. Ralls was saying.
3 The government continually recognizes, Your Honor,
4 that conditions of confinement, and sometimes for cooperating
5 witnesses in this case, conditions of confinement can be a
6 justification for a mitigated sentence, and we cited all the
7 cases, and I did -- we did that work for Your Honor already.
8 THE COURT: Okay.
9 MR. BRINDLEY: And I would say that when the
10 government doesn't contest Mr. Beltran's allegations that he
11 was tortured, and quite frankly, we are not -- I am not going
12 to take the position, and I want to be clear about that, that
13 the U.S. Attorney's office here has anything to do with that.
14 No. What I'm saying --
15 THE COURT: They also are not stipulating that the
16 torture that Mr. Beltran alleges occurred in the manner in
17 which he says it did.
18 MR. BRINDLEY: No. They're just not contesting that
19 it happened. I agree.
20 But that being said, given what he has indicated and
21 they have not contested as part of this record, that's an
22 experience that he had that is different than many of the
23 other defendants.
24 THE COURT: Okay.
25 MR. BRINDLEY: And that experience should be a

270

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 105 of 129 PageID #:7331

```
 1   in Mexico.  People are dying day in, day out, and that
 2   includes a significant number of Mexican military personnel.
 3           MR. BRINDLEY:  Yes, Judge, and I agree with you, and
 4   that justifies the degree of force with which they enter.
 5           But what I am concerned more about, and I think we
 6   can say -- we know why they have to do that.  They don't want
 7   to get killed, right?  You're right, but --
 8           THE COURT:  Sure, all of that, but it goes beyond
 9   that because then you have to acknowledge, or else we both
10   live closeted, that atrocities are occurring on both sides.
11   That is, Mexican military personnel have had family members
12   who have been killed --
13           MR. BRINDLEY:  Yes.
14           THE COURT:  -- just conveniently, their wives killed
15   at home, their children killed at home.
16           MR. BRINDLEY:  That's true, that's true.
17           THE COURT:  And there are going to be hard feelings
18   about that.
19           MR. BRINDLEY:  Absolutely.
20           THE COURT:  Just like there would be hard feelings if
21   something happened to any one of our family members.
22           MR. BRINDLEY:  Absolutely, Judge, that's true.  And
23   our -- the point that I think we should be making here is that
24   while there's a justification of the force, and maybe there's
25   a justification of the mindset.  That's what you're getting
```

271

Case: 1:09-cr-00383 Document #: 780 Filed: 10/03/19 Page 106 of 129 PageID #:7332

```
 1   at.  And I see that, I agree with you.
 2           But once they have someone in custody if these things
 3   are happening, that's something that shouldn't happen.
 4           THE COURT:  I agree with that.
 5           MR. BRINDLEY:  And you and I agree on that.
 6           THE COURT:  It shouldn't happen.
 7           MR. BRINDLEY:  And when it does, when someone has
 8   made the allegation that's happened and it's uncontested, then
 9   we should mitigate the sentence.
10           THE COURT:  Okay.
11           MR. BRINDLEY:  And I believe that's what should
12   happen here.
13           The -- the things that he has alleged are terrible.
14   They involve threats about what they're claiming has been done
15   to his family.  Mr. Ralls didn't talk about that, but I think
16   that's a terrorizing factor.
17           He says that happened.  Threats about what they say
18   they've done to his wife and child, all of these kinds of
19   things, and he's made those claims throughout, his experience.
20   That experience puts a -- and what that does, Judge, is it
21   puts a penalty and a harsh condition upon Mr. Beltran Leon
22   that's unusual in the criminal context.
23           That wouldn't happen if he got arrested downtown
24   here, and so he should have a sentence less than that, than
25   the 35 years the government asks for.
```

1        The other thing that I would note is that it's a
2  differentiating factor between Mr. Beltran Leon and some of
3  the other defendants that the government was talking about
4  here, one of those being Mr. Renteria who didn't have any
5  torture issue. He had a 360-to-life guideline, ended up
6  getting a downward deviation to 19 years and was a logistical
7  coordinator is how I think he's described.
8        THE COURT: And less drugs.
9        MR. BRINDLEY: Lower quantity of drugs were in that
10 case, yes, and he got 19-and-a-half years without this kind of
11 allegation made by him at any time.
12       THE COURT: Okay.
13       MR. BRINDLEY: The Manuel Fernandez Valencia --
14       THE COURT: Sentenced by Judge Guzman.
15       MR. BRINDLEY: -- sentenced by Judge Guzman, but
16 Judge -- Manuel Fernandez Valencia by his own admission here
17 was a far more substantial drug trafficker than Mr. Beltran.
18       Combine the testimony of Manuel Fernandez Valencia
19 with the testimony of Damaso Lopez, and what you have is
20 someone who was -- became a figure in drug trafficking at
21 these high levels because of his relationship to Chapo's sons.
22 It wasn't for any other reason that's been established. It
23 seems that's what it was. He was with them, and they were
24 with Chapo.
25       But what Fernandez Valencia illuminated was that he

1  was involved in thousands and thousands and thousands of
2  kilos. And from what Damaso Lopez said, that wasn't the kind
3  of person that Beltran Leon was, and Fernandez Valencia only
4  having heard of one deal with Beltran Leon, he's dealing with
5  all these guys, Chapo and Mochomo all the time, says he's much
6  bigger.
7        Not only that, but he, Manuel Fernandez Valencia at
8  the time of sentencing, he had gone to the government and said
9  he was going to cooperate but then gave millions of dollars to
10 people to do drug trafficking crimes at the same time while he
11 was cooperating and lied about it, got caught on that, didn't
12 get any cooperation credit until he went back later and had to
13 re-establish his whole relationship and comes here on a
14 Rule 35.
15       So not only is he involved much bigger, he's giving
16 loans to El Chapo by his own admission, but he is also,
17 Mr. Fernandez Valencia, someone who's manipulated the
18 cooperation process for his own benefit to benefit his family
19 and lied. And he got 27.
20       Mr. Beltran Leon needs to get a lower sentence than
21 Manuel Fernandez Valencia because there's no way -- I don't
22 know whether Manuel Fernandez Valencia, as I think back on it,
23 specifically got the firearms enhancement, but he testified
24 that he'd been shot. He went to the -- El Chapo because he
25 wanted protection. He knew there were guns.

274

```
 1            Every enhancement for Mr. Beltran Leon has been held
 2   responsible is an enhancement that would also apply factually
 3   to Mr. Fernandez Valencia, and so Mr. Beltran Leon should get
 4   a sentence less than Fernandez Valencia, and given the degree
 5   of Fernandez Valencia's involvement, it should be
 6   significantly less than the 27 that he got.
 7            THE COURT: Well, the problem, Mr. Brindley, is you
 8   and I both don't know enough about Mr. Valencia who appears to
 9   have been mistreated by Mexican authorities when he was
10   arrested --
11            MR. BRINDLEY: Yes.
12            THE COURT: -- also got credit for some type of time
13   or conditions of confinement from Judge Guzman, and ultimately
14   he was sentenced by Judge Guzman. So I can't mind-read my way
15   through what Judge Guzman was talking or thinking about when
16   he sentenced him to 27 years.
17            MR. BRINDLEY: I understand, but sentencing disparity
18   means we have to --
19            THE COURT: No, I understand.
20            MR. BRINDLEY: -- avoid no matter who sentences.
21            THE COURT: I totally understand that.
22            MR. BRINDLEY: Okay.
23            THE COURT: But ultimately I don't know all that went
24   on. All I know is what the record lets me know.
25            MR. BRINDLEY: Right. And I actually represented
```

275

```
 1   Mr. Fernandez Valencia at sentencing in that case, Judge.
 2            THE COURT: But even then, you can't mind-read your
 3   way into Judge Guzman's mind.
 4            MR. BRINDLEY: Not into Judge Guzman's mind. I wish
 5   I could, but I've never been able to.
 6            I'll say this, when issuing his sentence, Judge
 7   Guzman did not address the torture at all. That would have
 8   been the nature of Mr. Fernandez --
 9            THE COURT: I accept your word on that.
10            MR. BRINDLEY: That would have been the nature of his
11   appeal which we filed, until he decided -- Mr. Oliva took
12   over, and they did the cooperation.
13            But ultimately I think that's a good distinguishing
14   factor of where we are to break this down and say, well, it
15   needs to be less than Fernandez, and I think that's a good
16   starting point.
17            Now, the other thing that I would say, Judge, is
18   Mr. Beltran Leon, this is the only experience he has like that
19   in his life. His entire experience -- he hasn't been arrested
20   before. He hasn't been put through this before, and the
21   problem is it's kind of a weird situation where you have a
22   person who the first offense that they ever get grabbed for is
23   massive and they've been involved in this life. And so all of
24   a sudden, we're facing these terrible penalties.
25            But I don't think we have to say it's going to take,
```

276

```
1              you know, 20 years for him to learn his lesson.  I don't think
2              we have to say that.  I don't think there's any evidence to
3              say that because he hasn't had this experience before.
4  12:17:44    And I do think that the torture that Mr. Ralls was
5              discussing, factually set aside, that is going to impact
6              recidivism from him certainly knowing that that's an
7              experience that he's been part of.  He's not going to want to
8              have anything else to do with that again.  He's not.  He
9              doesn't want to put his family through all of this again.  He
10 12:18:02    doesn't.  He has to learn a terrible lesson the first time
11             out.
12                  THE COURT:  He certainly -- I will just tell you
13             this:  I didn't use the obstruction enhancement, but he
14             certainly doesn't come across like that in the recordings that
15 12:18:13    we heard yesterday.  That's all I will tell you.  It doesn't
16             sound like the person you're describing right now.
17             Mr. Brindley, so I just have to call you on that.
18             But keep going.
19                  MR. BRINDLEY:  All right, Judge, in terms of the -- I
20 12:18:28    already argued that issue.
21                  THE COURT:  Okay.
22                  MR. BRINDLEY:  And I think that in terms of the way
23             that he interacts with the guy on the recording, I don't
24             think -- it's very short, and I don't think it tells us a
25 12:18:39    whole lot.
```

277

```
1                  THE COURT:  Okay.
2                  MR. BRINDLEY:  I think it's unilluminative.  That's
3              not a word, I don't think.
4                  THE COURT:  I'll accept that.
5  12:18:46         MR. BRINDLEY:  Okay.  There is an issue.  Your Honor
6              mentioned Zambada and the significant difference being the
7              cooperation.  I'm going to come to that.  I wanted to mention
8              cooperation here.
9                  Mr. Beltran Leon makes a decision not to cooperate,
10 12:18:59    and I don't think it's -- I don't think there's any problem
11             with us telling you that in the process of going back and
12             forth with him about this, the problem always for Mr. Beltran
13             Leon will boil down to this issue of trust of the authorities.
14                 And every time, every time you want to talk to the
15 12:19:17    man and say, Jesus, we need to think about what to do, he will
16             always start talking about what happened to him before, and
17             that would give you the expert reports.  You got all the
18             stuff.  But that impacts his mindset and his willingness to
19             say, okay, I'm going to trust them and get involved in.
20 12:19:37    cooperation, and it impacted him in a way that I think would
21             have been very different if he didn't have that experience,
22             based on long and many conversations that we have had with him
23             about this very issue.
24                 And I think that ultimately that experience in the
25 12:19:53    end impacts the sentence and his whole experience totally, his
```

1 going to be involved in this type of drug dealing at this
2 level and you decide not to cooperate, then you will serve a
3 significant sentence in the United States if you're
4 successfully prosecuted, and that is the message that I think
5 my fellow judges have been sending out. It is a different
6 situation if you cooperate, and there is a premium on
7 cooperating because you do put your life at risk in
8 cooperating, and I don't minimize for one second that
9 Mr. Perez is at risk, our first witness in this sentencing
10 proceeding, by giving the testimony he has given. That's just
11 a fact of life. And I think any judge worth his or her salt
12 will take into consideration cooperation each and every time.
13 So after the sentence is served by Mr. Beltran Leon,
14 he will be placed on five years of supervised release.
15 I'm not imposing any type of fine in view of the
16 preliminary forfeiture order which I'm entering in this case.
17 There is a special assessment of $100 on Count I, and
18 then we're going to go over the conditions of supervised
19 release, and if there's any objection, you can let me know.
20 The preliminary forfeiture order is for the amount of
21 $4,109,400. So once that is entered, I see no need to impose
22 a fine that goes beyond that.
23 The conditions of supervised release will be, first
24 of all, the mandatory conditions pursuant to 3583(d):
25 1, that Mr. Beltran Leon not commit any other

1 federal, state or local crime.
2 No. 2, that he not unlawfully possess a controlled
3 substance.
4 No. 5, that he cooperate in the collection of a DNA
5 sample.
6 No. 6, that he refrain, which I think is a
7 significant issue before for him, from any unlawful use of a
8 controlled substance and submit to one drug test within
9 15 days of release on supervised release and at least two
10 periodic tests thereafter up to a total of 104 periodic tests
11 per year.
12 Now we're going to go to the discretionary conditions
13 of supervised release pursuant to 18 U.S.C. 3563(b) and 18
14 U.S.C. 3583(d):
15 I'll impose No. 1, which is to provide financial
16 support to any dependents if financially able to.
17 No. 4, to seek and to work conscientiously at lawful
18 employment and, if not gainfully employed, to pursue a course
19 of study or vocational study.
20 I'll impose No. 7, which is to refrain from any
21 excessive use of alcohol, which we've heard testimony about.
22 No. 8, that you refrain from possessing a firearm,
23 destructive device, or other dangerous weapon.
24 No. 9, that you participate at the direction of the
25 probation officer in any substance abuse treatment program,

286

```
 1    the United States based on suspicion.
 2         If that were the case, I'd be sentencing you a lot
 3    higher because there's a strong suspicion that you were trying
 4    to do something to one of the witnesses in this case, but we
 5    cannot rely on suspicion.  We are a country of laws.  And I
 6    said before in the stash house cases that we cannot have a
 7    situation where the end justifies the means in the
 8    administration of criminal law.
 9         So ultimately the United States does not sanction
10    torture of any kind in any country, and that is the United
11    States that I'm proud to serve as a United States District
12    Court Judge.
13         Did the Mexican Marines torture Mr. Beltran Leon?  It
14    will take a power greater than me to come to the bottom line
15    of that, but I do submit that he has put forth some evidence
16    indicating severe mistreatment, and I do think that part of
17    the reason for that is what I waved around before is that
18    they, meaning the Mexican military personnel, because at the
19    end of the day, the Assistant United States Attorneys and I
20    are not the ones busting through doors in Mexico arresting
21    people who are heavily armed.  They, Mexican military
22    personnel, have to undertake that service.
23         They've lost considerable personnel in Mexico.  It's
24    not one or two, and there is a difference between one or two
25    or 750.  750 military personnel dead.  I'd like to know the
```

287

```
 1    number of family members of military personnel who have been
 2    killed, because that would be a sad story, let alone if we go
 3    to media who have been killed in Mexico.  That's a whole
 4    'nother story.
 5         So nothing good has come out of the cartels that have
 6    existed in Mexico, and that's sad to me because for all of my
 7    almost 65 years, Mexican blood has run through my veins, and
 8    so this is a personal hurt that I feel every day.  So I
 9    repeat, Mexico is tired of this violence, and so is the United
10    States.
11         So at the end of the day, I do agree with
12    Mr. Brindley that Mr. Beltran Leon's sentence should be
13    somewhat modified downward because of what may have occurred
14    because the end doesn't justify the means.  So at the end of
15    the day, I believe the sentence that is appropriate for
16    Mr. Beltran Leon, because of his involvement in this
17    significant drug conspiracy that breeds nothing but harm to
18    this country because I will tell you every day I see that, in
19    my work with former federal prisoners who are addicted to
20    cocaine and heroin, mostly minority men and women, it is a sad
21    day, I'm going to sentence Mr. Beltran Leon to 28 years in the
22    custody of the Attorney General.  That is what I believe is a
23    sufficient-but-no-greater-than-necessary sentence, a sentence
24    of 336 months in custody.
25         And I believe a message should go out that if you're
```

284

```
1    penalties.
2         Now, having said that, unfortunately for Mr. Beltran
3    Leon, I think you are a very, very significant drug dealer and
4    probably one of the most significant drug dealers I have
5    sentenced, and we -- there's a price to be paid for being
6    involved in a drug conspiracy as large as this was ultimately
7    headed by Mr. Guzman who was tried in New York. And there
8    really is no winners in all of this.
9         Mr. Guzman received a life sentence, but more
10   importantly, he has lost at least one son in Mexico, so I
11   don't see where he's a winner.
12        His other sons are always going to be subject to some
13   type of violence, and the fact that you, Mr. Beltran Leon,
14   decided to, because of circumstances, get involved with them
15   in dealing drugs in a significant quantity, is sad that you
16   would throw your life away, your family's life away, I think
17   unfortunately, movies and media have glamorized this life way
18   too much.
19        But at the end of the day, the United States is
20   tired, but more importantly, Mexico is tired, and I want to
21   focus just on Mexico for a minute because last year, they lost
22   30,000 individuals. When I think about that number, 30,000
23   individuals were lost to drug violence last year.
24        And I said that previously if there is a crisis along
25   the U.S.-Mexican border, it really is in Mexico because no
```

285

```
1    one's looking at that, the number of people that are being
2    lost to drug violence, and all of this shipment of drugs and
3    battles over turf and vengeance for one atrocity versus the
4    other, it just leads to a total chaotic, sad situation. And
5    it's sad for the United States, too, because all we do is
6    consume drugs and send weapons to Mexico because not one
7    weapon is manufactured in Mexico. They're all coming from the
8    United States.
9         So what goes back to Mexico are weapons and money,
10   and what comes through Mexico, not necessarily even starts in
11   Mexico other than marijuana and some methamphetamine, is what
12   comes through Mexico is cocaine and heroin, and it gets
13   delivered to the United States.
14        So you decided to involve yourself in it, and, yes,
15   today you do make a statement which I want to rely on in terms
16   of how you have reformed, but I am unsure as to how much you
17   really, really have reformed. I cannot calculate that. What
18   I do know is that you were a serious drug conspirator at a
19   high level, and I need to sentence you accordingly.
20        The elephant in the room is this allegation of
21   torture by Mexican Marines, and it is hard for me to get a
22   handle on that because there's no clear proof. There
23   certainly is no proof of any kind that the DEA was involved or
24   anybody from the United States. There is a suspicion, but as I
25   said before, our -- we don't operate our legal system here in
```

282

1  incarcerated for selling them, I would be devastated, and that

2  makes me understand my mistakes.

3      It does not matter if I did not sell drugs to addicts

4  or that I didn't force nobody to take drugs. The problem is

5  that I helped to make it available. I apologize for this

6  respect. I apologize for my actions that have caused many

7  problems. I am so sorry, and I speak how great this country

8  is because losing my citizenship is like a life sentence for

9  me. Not being able to enjoy America is far worse than being

10  in prison.

11      So today, I feel as if I'm losing my freedom twice,

12  first due to incarceration, and second due to my citizenship.

13      No matter what happens here today, I am done with

14  that life. This life has caused nothing but sadness,

15  devastation, and I built it on lies and false hope. This life

16  has put me and my family through horrible moments, moments

17  that have changed us for the rest of our lives. I will never

18  put us in this situation again if you gave me the opportunity.

19      Thank you, Your Honor.

20      MR. BLEGEN: Judge, can I just clarify one thing

21  about the citizenship issue?

22      THE COURT: Yes.

23      MR. BLEGEN: Mr. Beltran received, the government

24  actually sent to it to us, I forget, maybe a month or so ago,

25  an indication that, I forget who it was, Customs, I guess,

283

1  somebody did an investigation and indicated that he was not

2  born in the United States, as he has believed since he was a

3  child as his family has -- he has always believed, and I think

4  one of the witnesses yesterday even said he was born in the

5  United States.

6      THE COURT: Right.

7      MR. BLEGEN: So they've revoked his passport because

8  they say they have evidence that he was not born in the United

9  States, and we believe what's coming is perhaps a stripping

10  him of his U.S. citizenship, but we haven't heard anything

11  about that. I know you hadn't heard anything about it, so I

12  just wanted to make it clear.

13      THE COURT: Thank you for clarifying that.

14      THE DEFENDANT: Thank you.

15      THE COURT: Well, I wish I knew how many people in my

16  25 years on the bench I have sentenced for drug offenses is

17  too numerous to count, and I am tired of it, and I'm tired of

18  being involved in the so-called war on drugs. I have said

19  numerous times that if there was a war on drugs, we've lost

20  it.

21      And I played different roles with regard to the war

22  on drugs. As a prosecutor, I put my life on the line for the

23  so-called war on drugs. As the district court, I've tried to

24  sentence every defendant as fairly as I can. As a Sentencing

25  Commissioner, I called for reform to some of these drug

1 decision to cooperate, his feelings about the entire case,
2 everything. And because of that, I think that it becomes a
3 substantial mitigating factor. In our memorandum, it was the
4 most substantial factor we've argued when we drafted it, and
5 it's because I think it permeates the totality.
6 Now, I'm not here to place blame about him, I don't
7 think that's helpful. Based on what we've just seen, I think
8 it's unhelpful. But what I do think is helpful is to
9 recognize that this is a thing that he's continued to maintain
10 happened to him as part of his -- basically part of the
11 punishment he suffers for being arrested, and that is worth
12 something. How much, Judge, it's up to you to decide.
13 But I believe those kinds of experience, that kind of
14 fear, the threat to the family, the degradation, I think it's
15 worth a fair amount, and we would like you to mitigate his
16 sentence. Because of it, I believe it should be less than the
17 27 that Fernandez got and well less than the 35 years the
18 government has requested.
19 And the other issue that we haven't discussed is
20 they've made an allegation of a shooting. I'm going to let
21 Mr. Blegen talk about that specific thing, and then we'll be
22 done.
23 Thank you, Your Honor.
24 THE COURT: Thank you.
25 MR. BLEGEN: Judge, I'll be brief, and then you'll

1 hear from Mr. Beltran.
2 THE COURT: Okay.
3 MR. BLEGEN: I don't know that I got your -- maybe I
4 didn't catch it -- your thoughts on the evidence related to
5 this alleged shooting in Mexico.
6 THE COURT: I will make this simple for you,
7 Mr. Blegen, not that I don't want to hear from you. I'm not
8 going to rely on that shooting at all.
9 MR. BLEGEN: Fair enough. You may remember me coming
10 in and complaining a month ago or so about it --
11 THE COURT: I remember. You didn't know where it
12 occurred, what date it occurred, and that was all true.
13 MR. BLEGEN: Or the victim.
14 THE COURT: Or the victim.
15 MR. BLEGEN: Fair enough.
16 MR. BLEGEN: Judge, the only thing I want to say very briefly is I
17 think the government in part, at least as I read their
18 sentencing memorandum, is asking for a significantly higher
19 sentence than the three people they listed --
20 THE COURT: Yes.
21 MR. BLEGEN: -- because of that shooting, which
22 you've just said you're not relying on, and the obstruction,
23 which you've indicated that you're not relying on. So the
24 government says he's a massive distributor of drugs. Okay.
25 Well, if you use the word massive for him, what word

280

1  do you use for Manuel? What word do you use for Damaso? But
2  I think he admitted to 14, between 13 and 15 or something
3  murders, ordering murders yesterday in court? What level do
4  you use for him? I mean -- and one of the things, when
5  Mr. Brindley was arguing the four points for the offense,
6  which I understand your ruling and I'm not rearguing, but
7  under 3553, when you're dealing with something like this, how
8  do you take into account the fact that somebody like Damaso,
9  somebody like Manuel, somebody like Chapo gets the same
10  four-level enhancement as Beltran Leon? There's no -- you
11  know there's no 20-level enhancement for -- that maybe Chapo
12  deserved.
13      In that case, his sentence should be adjusted down
14  under 3553 to take that into account. You found he's a
15  leader/organizer, but not to the extent of people running this
16  organization.
17      You're going to hear from Mr. Beltran in a moment.
18  He's got some remarks that he would like to make.
19      THE COURT: Okay.
20      MR. BLEGEN: And that's where we'll end. Thank you.
21      THE COURT: Let's go there.
22      MR. BLEGEN: Want me to have him come up here, Judge?
23      THE COURT: What?
24      MR. BLEGEN: Should I have him come up here?
25      THE COURT: Yes.

---

281

1      MR. BLEGEN: Okay.
2      THE COURT: And he doesn't need an interpreter,
3  right?
4      MR. BLEGEN: He does not.
5      THE COURT: Okay.
6      THE DEFENDANT: Your Honor.
7      THE COURT: Yes.
8      THE DEFENDANT: I apologize to this Court, I
9  apologize to the United States. I am sorry. I do regret my
10  mistakes, hanging with the wrong crowd, having the wrong
11  mentality, and I wrote this, the honest truth is that I never
12  considered how important my freedom was until I lost it. I
13  did not realize how beautiful America is until I received a
14  letter from Washington saying my citizenship is retrieved from
15  me. My citizenship -- my U.S. citizenship really means the
16  world to me.
17      I did not stop to think about my actions affected so
18  many. When caught in this drug life, all I thought about was
19  making money. Sadly in my case, the American dream I lived
20  was an illegal one. My culture made it seem so easy. I
21  couldn't resist. I didn't resist.
22      My ignorance affected America, which caused me to
23  ignore, realize any problems I caused here. I was wrong, and
24  losing my freedom has made me sit down and realize my
25  mistakes. If my children ended up using drugs, were

290

1    including urine testing up to a maximum of 104 tests per year.
2        Also that you participate at the direction of
3    probation officer in a mental health treatment program.
4        No. 14, that you refrain from knowingly leaving the
5    federal judicial district where you are being supervised
6    unless granted permission to leave by that court or probation
7    officer that you're assigned to.
8        No. 15, that you report to the probation officer as
9    directed by the court or probation officer.
10       No. 16, that you permit a probation officer to visit
11   you at any reasonable time at home, and we're just going to
12   leave it at home.
13       That you permit confiscation of any contraband
14   observed in plain view by the probation officer.
15       No. 17, that you notify a probation officer within
16   72 hours after becoming aware of any change in residence,
17   employer or workplace.
18       No. 18, that you notify a probation officer within
19   72 hours if you've been arrested, charged, or even just
20   questioned by a law enforcement officer.
21       And that you satisfy, No. 22, the following special
22   conditions under 3563(b), 22, and 3583(d), that is:
23       No. 22, participate in any approved job skill training
24   program at the direction of a probation officer within the
25   first 60 days of placement on supervision.

291

1        No. 3, that if you're unemployed that you -- well,
2    I'm going to skip No. 3. I'm not going to impose No. 3. I'm
3    not going to impose any others.
4        Do you have -- does the defense have any objection to
5    any of the conditions that I've imposed?
6        MR. BLEGEN: No.
7        THE COURT: Does the government want me to consider
8    some other conditions that I've failed to impose?
9        MS. CSICSILA: No, Your Honor.
10       THE COURT: Then what I need to notify you,
11   Mr. Beltran Leon, is that you have a right to appeal this
12   sentence. It is my judgment, as I said before and considering
13   the 3553 factors, that this is sufficient but no greater than
14   necessary.
15       I have not considered any violence on your part at
16   all in imposing this sentence, but you have a right to appeal
17   this sentence by filing a notice of appeal within 14 days, and
18   if you need court-appointed counsel, you can request one from
19   the Court of Appeals.
20       Do you want me to recommend any particular
21   institution?
22       MR. BLEGEN: Yes, Judge.
23       THE COURT: Yes.
24       MR. BLEGEN: Mr. Beltran has some family in
25   California, so we would like you to recommend -- he

1 understands it's a recommendation -- Terminal Island in Los
2 Angeles.
3 THE COURT: Okay.
4 MR. BLEGEN: And then a couple other things. I don't
5 think he can get, based on some of your rulings and the fact
6 that his citizenship may get taken, I don't think he can get
7 credit for the RDAP program, but I think he's someone who
8 clearly needs it based on testimony that we heard.
9 THE COURT: Okay. I'll recommend the RDAP program.
10 MR. BLEGEN: And then the last thing is, Judge,
11 it's -- and the government can correct me if I'm wrong --
12 THE COURT: As well as the location that you've asked
13 for,
14 MR. BLEGEN: Thank you.
15 It's my understanding that Mr. Beltran should get
16 credit for the time he served from the time of his arrest in
17 Mexico, since it was on this case, and I've had trouble
18 sometimes in the past with the Bureau of Prisons not giving
19 that credit because the PSR wasn't perfectly clear.
20 So what I would ask is that the PSR state, either on
21 the second page where it talks about release status, that the
22 defendant has been detained on this case since his arrest in
23 Mexico on November 16th, 2014. In that circumstance, I've
24 always -- the Bureau of Prisons has always made -- you know,
25 started the date at the right time.

1 THE COURT: Okay.
2 MR. BLEGEN: So I would ask for that modification
3 just to make sure he gets the credit that I think everybody
4 agrees he should get.
5 THE COURT: Does the government object to that?
6 MS. CSICSILA: No. No, Your Honor, as long as that
7 time was factored into the Court's sentence.
8 THE COURT: We will word it exactly like that, that
9 he should get credit from when he was detained in Mexico and
10 indicate the date.
11 MR. BLEGEN: Thank you, Judge.
12 MS. CSICSILA: And, Your Honor, earlier you mentioned
13 that the defendant had not testified regarding the allegations
14 of torture.
15 THE COURT: Right.
16 MS. CSICSILA: And I would just ask you to revisit
17 that point briefly --
18 THE COURT: Sure.
19 MS. CSICSILA: -- and to clarify.
20 THE COURT: I have not held that against the
21 defendant, but I just wanted to clarify that he put forth an
22 affidavit, and there were some holes in that affidavit the way
23 I saw it in terms of who did what, and there was just no
24 opportunity to buttress that in any sense, but I understand he
25 has a right not to testify.

294

1        MS. CSICSILA: Thank you, Your Honor. Thank you for

2   clarifying that.

3        THE COURT: And I take it, the last matter, the

4   defendant has no objection to the preliminary order of

5   forfeiture; is that correct?

6        MR. BLEGEN: Judge, I -- we didn't really have a lot

7   of time to consider it, frankly.

8        THE COURT: Okay. If you have any objection, I'll

9   let you file any objection within five days.

10        MR. BLEGEN: Very good.

11        THE COURT: How about that?

12        MR. BLEGEN: Thank you, Judge.

13        THE COURT: Thank you.

14        MS. CSICSILA: Thank you, Your Honor.

15        THE COURT: Thank you. We'll stand in recess.

16        (Which were all the proceedings heard.)

17                        CERTIFICATE

18        I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20   /s/Kathleen M. Fennell                September 23, 2019

21   _____              _____
     Kathleen M. Fennell                              Date
22   Official Court Reporter

23

24

25

# APPENDIX

## B

- April 7, 2021
  Motion To Compel;

- April 12, 2021
  Motion To Reduce;

- May 28, 2021
  Memorandum Order.

(11) Pages

SM

**FILED**

APR 07 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

United States District Court
Northern District of Illinois

United States of America,
             Plaintiff,

v.                                        Case No. 17 CR 517

Andrew Johnston,
             Defendant.

## DEFENDANT'S MOTION TO COMPEL

The Defendant, respectfully moves this Honorable Court for an order compelling the United States to file a motion requesting at least a fifty percent reduction in sentence pursuant to Judge Seeger's March 8, 2021 order, Exhibit A, at the earliest opportunity available.

Respectfully Submitted,

Date: 03/29/21    Andrew Johnston

Mr. Andrew James Johnston

EXHIBIT

A

March 8, 2021
Order
(6) Pages

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW JAMES JOHNSTON,        )
                                        )
       Plaintiff,           )     Case No. 21-cv-1057
                                          )
   v.                      )     Hon. Steven C. Seeger
                                          )
UNITED STATES ATTORNEY'S OFFICE   )
FOR THE NORTHERN DISTRICT OF      )
ILLINOIS,                           )
                                          )
       Defendant.        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Andrew James Johnston, an inmate, filed this pro se action under the

Administrative Procedure Act (APA) against the United States Attorney's Office for the

Northern District of Illinois. Johnston has not paid the filing fee and has not applied to proceed

in forma pauperis, but given the nature of the complaint, the Court will perform an early

prescreening.

Under 28 U.S.C. § 1915A, the Court must screen prisoners' complaints and dismiss the

complaint, or any claims therein, if the Court determines that the complaint or claim is frivolous

or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief

against an immune defendant. *See Jones v. Bock,* 549 U.S. 199, 214 (2007); *Turley v. Rednour,*

729 F.3d 645, 649 (7th Cir. 2013). Courts screen prisoners' complaints in the same manner that

they review motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Maddox v.*

*Love,* 655 F.3d 709, 718 (7th Cir. 2011). The Court "accept[s] the well-pleaded facts in the

complaint as true," but ignores "legal conclusions and conclusory allegations merely reciting the

elements of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009)). Those well-pleaded factual allegations, taken

together, must allow the Court "to draw the reasonable inference that the defendant is liable for

the misconduct alleged." *Iqbal*, 556 U.S. at 678. That is, they must constitute a "facially

plausible" claim for relief. *Id.* When screening a *pro se* plaintiff's complaint, courts construe

the plaintiff's allegations liberally. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam).

Johnston is currently incarcerated for attempted bank robbery. He was convicted after a

trial before Chief Judge Pallmeyer. *See United States v. Johnston*, 17-cr-00517-1. The Seventh

Circuit affirmed his conviction on May 11, 2020. *See United States v. Johnston*, 814 Fed. Appx.

142 (7th Cir. 2020).

According to the complaint, Plaintiff notified the government of a threat to a "high-

profile government witness" when he was incarcerated at the Metropolitan Correctional Center

in 2019. *See* Cplt., at ¶ 1. Plaintiff later met with someone from the U.S. Attorney's Office, and

he agreed to covertly record the other inmate who made the threat. *Id.* He did so under a

"confidential human source agreement" with the Drug Enforcement Administration. *Id.* at ¶ 2.

In exchange, the government agreed to seek a "reward reduction of sentence in

17-cr-517" "if the operation was successful." *Id.* Presumably that agreement contemplated a

motion by the government under Federal Rule of Criminal Procedure 35(b)(2)(C) to reduce his

sentence. That Rule provides that "[u]pon the government's motion made more than one year

after sentencing, the court may reduce a sentence if the defendant's substantial assistance

involved . . . information the usefulness of which could not reasonably have been anticipated by

the defendant until more than one year after sentencing and which was promptly provided to the

government after its usefulness was reasonably apparent to the defendant." *See* Fed. R. Crim. P.

35(b)(2)(C).

2

After entering into the agreement, Plaintiff allegedly lived up to his end of the deal. He "covertly recorded the source" of the threat, an inmate named Jesus Beltran. *See* Cplt., at ¶ 2. Plaintiff later testified at Beltran's criminal trial about the threat to the witness. He laid the foundation for the admissibility of the recording, and he "stood firm" during cross examination. *Id.* at ¶ 4. The trial apparently led to a conviction. *Id.* at ¶ 5 (characterizing the trial as a "tremendous success").

About a year later, Plaintiff reached out to the government about obtaining a reduction of his sentence. *Id.* He asked the government to request a "sixty six percent reduction" in his sentence in light of his cooperation. *Id.*

But according to Plaintiff, the government balked at the length of the proposed reduction. On February 10, 2021, the United States Attorney's Office sent Plaintiff a letter, revealing that it would seek a 25% reduction – not a 66% reduction – in his sentence. *Id.* at ¶ 6.

The parties had a telephone call two days later. Plaintiff told the prosecutors that the proposed 25% reduction was "lacking," and he asked the government to seek a greater reduction. *Id.* The government refused, explaining that "Judge Castillo [*i.e.,* the judge who presided over Beltran's trial] supposedly didn't credit plaintiff's testimony beyond the context of the recording." *Id.* at ¶ 7.

A few days later, Plaintiff sent the prosecutors a draft of his complaint. He heard no response, so he decided to seek relief at the federal courthouse. But instead of seeking relief in the *criminal* case, Plaintiff filed the case at hand – a brand new *civil* case. *Id.*

Plaintiff brings claims against the United States Attorney's Office for the Northern District of Illinois under the APA. He alleges that the government's position about a 25% reduction is arbitrary, capricious, and an abuse of discretion. And he asks this Court to force the

government's hand. Specifically, he requests a preliminary injunction compelling the U.S.

Attorney's Office to request a "fifty percent" reduction in his sentence. *Id.* at ¶¶ 11–12.

Based on the Court's review of the docket in the criminal case, the government has not

yet filed a motion for *any* reduction in his sentence, let alone a 25% reduction. *See United States*

*v. Johnston*, 17-cr-00517-1. Perhaps a motion is still forthcoming.

A civil claim under the APA is not the right vehicle to seek a reduction of a criminal

sentence. Under 5 U.S.C. § 704, an agency action is reviewable under the APA only if "there is

no other adequate remedy in a court," and the action is a "final agency action." 5 U.S.C. § 704.

Here, there is another adequate remedy, so there is no need to address whether the government's

letter is a final agency action.

The APA is the wrong route because there is another path for a judicial remedy. *See* 5

U.S.C. § 794. The Seventh Circuit shined lights on that path in *Kirk v. Department of Justice*,

842 F.3d 1063 (7th Cir. 2016). There, an inmate invoked the APA and challenged the

government's refusal to file a motion for a reduced sentence under Rule 35(b).

The Seventh Circuit held that "the APA is not the right way to seek an order compelling

the prosecutor to file a Rule 35(b)." *Id.* at 1067. Under the APA, judicial review of an agency

action is only available if "there is no other adequate remedy in a court." *See* 5 U.S.C. § 704.

The Court of Appeals explained that the inmate had an adequate remedy because he could file a

motion to compel in the criminal case:

> Kirk could have filed an ordinary motion in the criminal case asking the judge to
> compel the prosecutor to file a Rule 35(b) motion. *See United States v. Wilson*,
> 390 F.3d 1003 (7th Cir. 2004) (using this procedure to contest the prosecutor's
> decision not to file a motion). Given Rule 35(a) the judge lacks authority to
> reduce Kirk's sentence *unless* the prosecutor files a motion, but *Wade* shows that
> the court has the power to compel the filing of such a motion if the criteria for
> review of prosecutorial discretion have been satisfied. Thus there cannot be any
> doubt about the district court's power to entertain a motion asking the judge for

4

that relief. And because this kind of motion is a complete remedy for someone in Kirk's position, 5 U.S.C. § 704 forecloses resort to the APA, just as the district court held.

*Id.* at 1066.

A different approach would vest other courts with power over the criminal case. "[G]iven the venue provisions in 28 U.S.C. § 1391(e)(1)," a defendant could request review "in multiple districts, including the district where the prisoner is confined and the District of Columbia." *Id.* "[I]t would be an unhappy development to split a criminal case into fragments and have issues such as Rule 35(b) motions litigated in districts that did not host the criminal prosecution." *Id.*

The same logic applies here. If Johnston believes that the government has not lived up to its end of the bargain, then he can seek relief in his criminal case under the Federal Rules. If he's worried that the government isn't going to file a Rule 35(b) motion at all, then he can file an "ordinary motion in the *criminal* case asking the judge to compel the prosecutor to file a Rule 35(b) motion." *Id.* (emphasis added). If he's concerned that the prosecutors will file a Rule 35(b) motion, but will request a reduction that is too small, then he can file a response and lay out his position after the government files its motion. The Federal Rules of Criminal Procedure provide a path for a remedy, so any route through the APA is foreclosed.

There is a related problem. Plaintiff can seek relief from the Court, but not *this* Court. The criminal case is not on *this* Court's docket. Instead, the criminal case was before Chief Judge Pallmeyer. This Court cannot reduce a sentence in a case before another district court judge. And it cannot compel the prosecutors in another case to do anything, because they are not on this Court's docket. This Court lacks power over another Court's docket.

Instead of filing satellite civil litigation about a criminal case, Plaintiff needs to seek relief in the criminal case. If Plaintiff wants relief in his criminal case, then he needs to file something in his criminal case. Filing a new civil lawsuit is not the way to go.

An argument under the APA in a new civil case is the wrong argument before the wrong court. A new civil lawsuit "is not the right forum for a decision on the merits," and "the APA is not the right way to seek an order compelling the prosecutor to file a Rule 35(b) motion." *Id.* at 1067.

This suit is the wrong claim in the wrong place. So there is no need for this Court to address whether the United States Attorney's Office for the Northern District of Illinois – as opposed to the United States, or the Department of Justice – is the wrong defendant. *See Taylor v. United States*, 2014 WL 4987984, at *2 (S.D. Ind. 2014) (holding that the "U.S. Attorney's Office" is not a "suable entit[y]"); *see also Smith v. City of Chicago Police Dept.*, 937 F.2d 610 (7th Cir. 1991) (explaining that a claim could not proceed against the Chicago Police Department because it is merely "an organizational division of the City and therefore not a separate suable entity").

The case is closed. Civil case terminated.

Date: March 8, 2021

Steven C. Seeger
United States District Judge

6

EXHIBIT

B

February 3, 2021

Notice of Case Opening

(2) Pages

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF CASE OPENING

February 3, 2021

| | |
|---|---|
| No. 21-1221 | ANDREW J. JOHNSTON,<br>Plaintiff - Appellant<br><br>v.<br><br>FRANCES WARD and REBECCA R. PALLMEYER,<br>Defendants - Appellees |

**Originating Case Information:**

District Court No. 1:20-cv-07247
Northern District of Illinois, Eastern Division
Clerk/Agency Rep Thomas G. Bruton
District Judge Andrea R. Wood

Case filed: 02/03/2021
Case type: pr/fed
Fee status: PLRA ifp pnd D.C.
Date of Judgment: 01/11/2021
Date NOA filed: 01/29/2021

The above-captioned appeal has been docketed in the United States Court of Appeals for the
Seventh Circuit.

**Deadlines:**

| Appeal No. | Filer | Document | Due Date |
|---|---|---|---|
| 21-1221 | Andrew J. Johnston | Docketing statement due | 02/05/2021 |
| | | | |
| 21-1221 | Andrew J. Johnston | Transcript information | 02/17/2021 |

sheet

**NOTE:** This notice is issued to counsel of record, in furtherance of the revised *Circuit Rule 3(d)*, to provide necessary information regarding this appeal. Please verify this notice for accuracy. Counsel are encouraged to provide a fax and/or e-mail address to the court. If any corrections are necessary, please indicate those corrections on this notice and return it to the Clerk's Office within ten (10) days.

**THIS NOTICE SHALL NOT ACT AS A SUBSTITUTE FOR MOTIONS FOR NON-INVOLVEMENT / SUBSTITUTION OF COUNSEL. COUNSEL ARE STILL REQUIRED TO FILE THE APPROPRIATE MOTIONS.**

Important Scheduling Notice!

> Hearing notices are mailed shortly before the date of oral argument. Criminal appeals are scheduled shortly after the filing of the appellant's main brief; civil appeals are scheduled after the filing of the appellee's brief. If you foresee that you will be unavailable during a period in which your appeal might be scheduled, please write the clerk advising him of the time period and the reason for your unavailability. The court's calendar is located at http://www.ca7.uscourts.gov/cal/argcalendar.pdf. Once an appeal has been scheduled for oral argument, it is very difficult to have the date changed. See Cir.R. 34(e).

form name: **c7_Docket_Notice(form ID: 108)**

Mr. Andrew James Johnston
Prisoner ID No. 22712424
United States Penitentiary Tucson
P.O. Box 24550
Tucson, Arizona 85734

2021 APR -7 AM 9:07

Time Sensitive Correspondence

04/07/2021-38

To: U.S. Clerk
U.S District Court
219 South Dearborn Street
Chicago, Illinois 60604

AFSM G N Mail
WED 31 MAR 2021 PM

FOREVER / USA

1 USA DOLLAR

FOREVER / USA

Time Sensitive Correspondence

Papers & Effects

Protected

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

        v.

ANDREW JOHNSTON

No. 17 CR 517

Chief Judge Rebecca R. Pallmeyer

## GOVERNMENT'S MOTION FOR REDUCTION OF SENTENCE

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United

States Attorney for the Northern District of Illinois, respectfully moves the Court to

reduce the prison sentence of defendant Andrew Johnston from 168 months to 126

months (a 25% reduction), pursuant to Federal Rule of Criminal Procedure 35(b), and

in support thereof states the following:

### PROCEDURAL BACKGROUND

1.     On or about August 23, 2017, defendant was charged by indictment with

one count of bank robbery, in violation of 18 U.S.C. § 2113(a), Dkt. 31, and was

detained at the MCC-Chicago pretrial. He was convicted by a jury on January 10,

2019, Dkt. 297, and sentenced to 168 months' imprisonment, Dkt. 342. The sentence

became final on or about April 4, 2019. *Id.* His conviction was affirmed on appeal.

Dkt. 92. Defendant filed a petition for a writ of certiorari with the Supreme Court of

the United States,[1] which was denied on or about January 19, 2021. *Id.*

---

[1]    https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-6487.html (last accessed April 8, 2021)

## DEFENDANT'S SUBSTANTIAL ASSISTANCE

2.      Jesus Raul Beltran Leon, a high-level Sinaloa Cartel member, was charged in the 9th Superseding Indictment in *United States v. Guzman Loera* et al. (09 CR 383-16, Judge Castillo) with drug-trafficking conspiracy, drug-importation conspiracy, and money-laundering conspiracy. The government's evidence showed that Beltran was a principal member of a close-knit Sinaloa Cartel cell headed by Ivan Guzman and Alfredo Guzman, sons of Sinaloa Cartel leader Joaquin Guzman Loera ("El Chapo"). Beltran had three primary roles within Ivan and Alfredo's cell. First, Beltran coordinated, brokered, and otherwise facilitated the movement of thousands of kilograms of cocaine on behalf of his coconspirators and himself. Second, he coordinated, oversaw, and otherwise facilitated the collection and laundering of millions of dollars of drug proceeds for the benefit of his coconspirators and himself. Third, Beltran acted as Alfredo and Ivan Guzman's intermediary and lieutenant— insulating them from customers, fellow drug-traffickers, and the government. Beltran was extradited to this district from Mexico, and he was housed in the MCC while in Chicago. In April 2019, Beltran pled guilty to Count One without a plea agreement. An evidentiary sentencing hearing was set for August 2019.

3.      Damaso Lopez-Serrano a/k/a Mini Lic was moved in custody from San Diego (where he faced federal drug-trafficking charges of his own) to Chicago in order to testify as a cooperating witness for the government at Beltran's sentencing

hearing. Lopez was also a high-ranking member of the Sinaloa Cartel, who fled Mexico after Alfredo and Ivan Guzman sought to kill him.

4.      When Lopez first arrived in Chicago, he was housed in the MCC. In late April 2019, defendant Andrew Johnston informed the government that Beltran was trying to put a hit out against Lopez in the MCC. At the request of the government, defendant wore a wire in the MCC in an attempt to record Beltran discussing the planned hit. The operation was moderately successful, with defendant making a recording in May 2019 in which Beltran appeared to acknowledge offering $25,000 to anyone who would assault Lopez. Defendant also captured Beltran talking about being willing to pay Lopez's cellmate for information on Lopez's cooperation. However, due to factors outside of defendant's control, the window of time defendant had to record on Beltran was cut short.

5.      At Beltran's August 6, 2019, sentencing, the government sought an obstruction enhancement under Guideline § 3C1.1 based on Beltran's plot to harm a witness (Lopez). Defendant testified in open court about his conversations with Beltran and laid the foundation for admission of the recording, which was played in court. Defendant was vigorously crossed by defense counsel.

6.      Characterizing it as a "very close call," Judge Castillo declined to credit defendant's testimony and ultimately found the government had not proved the obstruction enhancement. The Court nonetheless relied on the recording defendant had made in the course of its § 3553(a) analysis, and held the recording against

3

Beltran. Specifically, when defense counsel argued that Beltran was a low risk of recidivism who'd learned a "terrible lesson" and didn't want to put his family through that again, Judge Castillo responded:

> THE COURT: He certainly -- I will just tell you this: I didn't use the obstruction enhancement, but he certainly doesn't come across like that in the recordings that we heard yesterday. That's all I will tell you. It doesn't sound like the person you're describing right now, Mr. Brindley, so I just have to call you on that.[2]

09 CR 383, Dkt. 780.

7.    Judge Castillo ultimately sentenced Beltran to 28 years' imprisonment.

8.    Beltran's sentencing was closely covered in the news. As such, information about defendant's cooperation against a member of the Sinaloa Cartel is now widely available on the Internet.

### GOVERNMENT'S REQUEST

9.    Rule 35(b) permits the government to move the Court to reduce a defendant's sentence if, after sentencing, the defendant provides substantial assistance in investigating or prosecuting another person.[3]

---

[2] Defense counsel countered that the recording was short and didn't tell very much. Judge Castillo responded, "Okay. I'll accept that."

[3] Rule 35(b) sets forth various time restrictions, including distinguishing between motions made by the government inside and outside of a year of the defendant's sentencing. In this case, defendant's sentencing occurred in April 2019, which means the one-year period referenced by Rule 35(b) expired in April 2020. However, the government's position is that the one-year rule in Rule 35(b) is a waivable claims-processing rule. *Cf. Eberhart v. United States,* 546 U.S. 12, 19 (2005) (holding that Rule 33's time limits can be forfeited); *United States v. Taylor,* 778 F.3d 667, 671 (7th Cir. 2015) (§ 3582(c)(2)'s limits are not jurisdictional). Although the Seventh Circuit has previously characterized Rule 35(b)'s one-year restriction as "jurisdictional," *see, e.g., United States v. McDowell,* 117 F.3d 974, 978–80 (7th Cir. 1997); *United States v. Whitehead,* 217 F. App'x 537, 538–39 (7th Cir. 2007), "jurisdiction" tends to

4

10.    As described above, defendant provided substantial assistance to the United States in connection with the prosecution of Beltran, including the government's investigation of Beltran's attempts to harm a witness. Accordingly, the government respectfully requests that this Court reduce defendant's sentence by 25% from 168 months' imprisonment to 126 months' imprisonment.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ *Andrew C. Erskine*
ANDREW C. ERSKINE
ERIKA L. CSICSILA
Assistant United States Attorney
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-1875

---

be a word of "too many meanings," *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1848 (2019), often used in a "less than meticulous" manner, *Eberhart*, 546 U.S. at 16. To be truly jurisdictional, courts generally require a clear statement from Congress, attaching a jurisdictional label to the prescription. *Fort Bend County*, 139 S. Ct. at 1849-50.

Like other claims-processing rules, Rule 35(b) does not contain a clear statement that it is jurisdictional. And it functions not to "limit a court's jurisdiction, but rather [to] regulate the timing of motions or claims brought before the court." *Dolan v. United States*, 560 U.S. 605, 610 (2010). Accordingly, it is a mandatory claims-processing rule that can be waived by the government. The government here waives the one-year rule and requests defendant's resentencing despite the fact that more than one year has elapsed since his initial sentencing.

5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA          )
                                  )
                                  )   No. 17 CR 517-1
        v.                        )
                                  )   Judge Rebecca R. Pallmeyer
                                  )
ANDREW JOHNSTON                   )

## ORDER

Andrew Johnston's motion to compel the government to file a sentence reduction motion [399] is denied as moot. The government's Rule 35(b) motion [401] is granted in part and denied in part. Johnston's motion is reduced by 10%, to 151 months in custody.

## STATEMENT

Andrew Johnston was convicted by a jury of attempted bank robbery in violation of 18 U.S.C. § 2113(a) and sentenced to 168 months in custody. The government has moved pursuant to Rule 35(b) [401] for a 25% reduction in Defendant Johnston's sentence, based on his substantial assistance in the prosecution of Jesus Raul Beltran Leon, a member of the Sinaloa cartel. Johnston wore a wire and testified about conversations he had with Beltran Leon while both men were in custody. Specifically, Johnston testified about those conversations and laid foundation for introduction of a recording in which Beltran Leon appeared to acknowledge that he had offered to pay someone to assault an individual he believed to be cooperating against him. Judge Castillo called the credibility of Johnston's testimony a "close call," but ultimately rejected that testimony. Mr. Johnston's conduct was nevertheless useful in the prosecution of Beltran Leon because of the recorded conversation the government was able to introduce at trial.

Before ruling on the merits of this motion, the court comments, first, on Mr. Johnston's "affidavit" (it is not notarized) [398] in which Johnston has moved for reassignment of this case to another judge on the ground that "Chief Judge Pallmeyer . . . is a party to an appeal, No. 21-1221, in the Seventh Circuit." The court takes notice that the appeal at issue was from Judge Andrea Wood's order dismissing Mr. Johnston's complaint against the court reporter and the undersigned, who presided over his criminal case. See No. 20 C 7247. But a litigant may not use a lawsuit against a judge as a basis for disqualification. See Te-Ta-Ma Truth Found.—Fam. of URI, Inc. v. World Church of the Creator, 246 F. Supp. 2d 980, 987 (N.D. Ill. 2003) ("a judge is not subject to disqualification merely because a litigant sues the judge"); see also In re Martin-Trigona, 573 F. Supp. 1237, 1243 (D. Conn. 1983) ("it is clear that a judge is not disqualified under 28 U.S.C. § 455... merely because a litigant sues or threatens to sue him.").

Second, Mr. Johnston has moved to compel the government to file a motion "requesting at least a fifty percent reduction" in his sentence. The court has the power to review the government's refusal to file a substantial-assistance motion only if the refusal was based on an unconstitutional motive—for example, the defendant's race or religion. Wade v. United States, 504 U.S. 181, 185-86 (1992). Mr. Johnston has not suggested such a motivation in this case. In any case, the government has now filed a Rule 35(b)(6) motion. Mr. Johnston's motion [399] is stricken as moot.

That leaves the merits of the motion itself. The government has asked for a 25% reduction

of Mr. Johnston's sentence. Although Mr. Johnston's testimony may not have been compelling, his cooperation was unquestionably useful to the government, and such cooperation is to be encouraged. The motion makes no other argument in support of a reduction. Cooperation with authorities in a prosecution is often a sign of acceptance of one's own responsibility for wrongdoing. Sadly, the court is unable to draw such a conclusion in this case. Mr. Johnston has yet to acknowledge any wrongdoing of his own in this case. He has filed multiple appeals and some five civil actions that challenge his conviction in one form or another, naming as defendants the judge, the court reporter, prosecutors, a telephone service provider, and law enforcement officials. *See* No. 17 C 6183 (*Johnston v. DeVries*), 18 C 5651 (*Johnston v. Pallmeyer*), 18 C 6060 (*Johnston v. AT & T Corporation*); 20 C 7247 (*Johnston v. Ward*), 20 C 7814 (*Johnston v. Hoogland*). In *United States v. Johnson*, 580 F.3d 666 (7th Cir 2009), the Seventh Circuit reviewed relevant case law and explained that in assessing a Rule 35(b) motion, the court is expected first to calculate the value of the defendant's assistance to the government. After doing so, the court is directed to "ask whether [the] § 3553(a) factors weigh in favor of or against granting a reduction equivalent to that level of assistance." 580 F.3d at 674, citing *United States v. Chapman*, 532 F.3d 625 (7th Cir. 2008); *United States v. Poole*, 550 F.3d 676, 680 (7th Cir.2008).

The court has discretion in deciding whether a Rule 35(b) reduction is appropriate, and is free to consider § 3553 factors in doing so. As explained in *Chapman*, "[C]ooperation cannot be assessed in a vacuum. Whether such cooperation represents an opportunistic attempt to obtain a sentence reduction or a genuine alteration in the defendant's life perspective can best be determined by assessing that cooperation in light of earlier criminal history and the nature of the crime for which the defendant is presently being sentenced." *See also United States v. Manella*, 86 F.3d 201, 204–05 (11th Cir.1996) (holding, in the context of Rule 35(b), that "a reading of the rule that requires the district court to consider substantial assistance in isolation from any other factor leaves too little discretion for the court to exercise.").

The court believes a 25% reduction in Mr. Johnston's sentence is a greater reduction than appropriate, in light of the § 3553 factors that resulted in a substantial sentence just two years ago and Mr. Johnston's continue lack of remorse. The court exercises its discretion to reduce Mr. Johnston's sentence by 10%, to 151 months in custody.

ENTER:

Dated: May 28, 2021

REBECCA R. PALLMEYER
United States District Judge

2